1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                ---oOo---          CERTIFIED COPY

4   JUSTIN CODY HARPER,          )     Case No.
                                 )     5:23-cv-00695-
5                Plaintiff,      )     SSS-DTBx
                                 )
6   vs.                          )
                                 )
7   CITY OF REDLANDS, REDLANDS )
    POLICE DEPARTMENT, POLICE     )
8   OFFICER KOAHOU, and DOES     )
    1-10,                        )
9                                )
                Defendants.      )
10  _____)

11

12

13

14

15

16          DEPOSITION OF JOSEPH GARCIA

17             Remote Deposition

18          Tuesday, August 13, 2024

19

20

21

22

23

24  Reported by:
    Glinda F. Banks
25  CSR No. 11984
    JOB No. 24-140090A

```
 1    Department officers?

 2         A.   No, sir.

 3         Q.   Now, is Corey Guerra your brother, sir?

 4         A.   He is my stepbrother.

 5         Q.   Now, it's my understanding that he was in

 6    a vehicle with you when you initially encountered

 7    Mr. Harper on September 9, 2021.  Is that correct?

 8         A.   That is correct.

 9         Q.   Who was driving that vehicle?

10         A.   I was.

11         Q.   And Mr. Guerra was a passenger?

12         A.   Yes, sir.

13         Q.   Was there anyone else in the vehicle with

14    the two of you?

15         A.   No, sir.

16         Q.   And the vehicle that you were driving can

17    you describe it for me if you recall?

18         A.   It is a 2001 Chevy HD2500 work truck with

19    construction boxes on the back.

20         Q.   What was the color of the vehicle?

21         A.   White.

22         Q.   Was this a company vehicle, Mr. Garcia?

23         A.   Yes, sir.

24         Q.   And were you actually engaged in work for

25    your job on the day of this incident?
```

1          Q.   First line here states Garcia and his

2     brother, Corey Guerra, owned a civil engineering

3     business.   On Thursday September 9, 2021 they drove

4     west on East San Bernardino Avenue and came to a

5     stop at the intersection with Church Street.   As

6     they sat at the intersection, Garcia saw a gray

7     Toyota truck, suspect vehicle, traveling north on

8     Church Street.

9          Do you remember seeing that gray Toyota

10    truck as you were sitting at that intersection with

11    your brother, Mr. Guerra?

12         A.   I do.

13         Q.   All right.   And next -- this is

14    summarizing your statement again:   The Toyota drove

15    about 25 miles per hour and turned right onto

16    eastbound San Bernardino Avenue, failing to stop at

17    the stop sign.   Because of how fast the Toyota

18    drove, the driver of the truck, Justin Cody Harper,

19    lost control of the vehicle.   The Toyota drove over

20    the east curb line of Church Street and the south

21    curb line of East San Bernardino Avenue.

22         I'm going to pause for a moment.   Does

23    that sound accurate based on observations that you

24    made of this Toyota truck is it ran through the

25    stop sign and drove through the intersection at

1    approximately 25 miles per hour?

2        A.   Yes, sir, it does.

3        Q.   So you actually saw that vehicle hit the

4    curb line?

5        A.   Yes, sir.

6        Q.   All right.  What happened when that Toyota

7    truck hit that curb line?  Did it go up on two

8    wheels or anything like that?

9        A.   He definitely got a little loose -- the

10   truck got loose, and he seemed to lose control of

11   the truck as he as was making the turn.  He was

12   trying to make the turn when he came into contact

13   with the curb.  So it threw his rear end into my

14   vehicle --

15       Q.   Okay.

16       A.   -- into the rear end of my vehicle.

17       Q.   All right.  And the next statement in fact

18   references that.  So it says:  The Toyota truck

19   drove back onto East San Bernardino Avenue.  The

20   driver rear fender of the vehicle impacted the

21   driver side rear fender of Garcia's truck.  Do you

22   see that?

23       A.   I do.

24       Q.   Now, describe for me -- when you say

25   impacted, what does that mean?  Was it a hard bump?

1    It caused damage to your truck or what?

2        A.   It caused damage to the truck, but we're

3    in a half ton truck that is loaded down quite a

4    bit.  So it hit us, but it didn't cause us to hit

5    anything else.  It just impacted us, and that's

6    about it.

7        Q.   Okay.  So I'm trying to understand and

8    visualize this.  So bear with me a little bit.

9    This Toyota truck is turning right onto the street

10   that you are stopped at, hit a curb, and kind of

11   based on your observations it caused the Toyota

12   truck to kind of swing wide and impact the back of

13   your truck with the rear bumper of the Toyota.  Is

14   that correct?

15       A.   That is 100 percent correct.

16       Q.   And what happened after the Toyota truck

17   impacted with the rear portion of your truck?

18       A.   He continued the same direction he was

19   going which was continuing to the east on the

20   street.  I don't remember the name of the street.

21   He continued east on that street.  And I proceeded

22   to turn my vehicle -- make a U-turn in the

23   intersection and try to follow him.

24       Q.   Okay.  Now, the next statement in your

25   statement says:  Garcia described Harper as a

```
 1   short, white, adult male who is about 30 years old
 2   with short hair, possibly a mustache.  Garcia saw
 3   Harper's bare shoulders so he initially thought
 4   Harper did not have a shirt on.
 5           Is that your recollection as you sit here
 6   today as far as what you observed on the date of
 7   the incident?
 8        A.  Yes, sir.
 9        Q.  When the truck drove past you, did you get
10   a good look at the driver's face?
11        A.  I did.
12        Q.  Okay.  Going onto the next paragraph on
13   Bates RPD-1191 it states:  After Garcia's truck was
14   hit, he looked in the rearview mirror and saw the
15   Toyota did not stop but fled.  Garcia turned his
16   truck around and chased the Toyota.  As they
17   prepared to turn left and make a U-turn, Garcia saw
18   a black-and-white Redlands Police Department sport
19   utility vehicle, SUV, with Redlands Police
20   Department emblems driving north on Church Street.
21           Do you recall making that observation?
22   Immediately after your accident and your turning
23   around to follow the Toyota truck, do you remember
24   seeing a Redlands police vehicle?
25        A.  Yes, sir.
```

```
 1          Do you see that?

 2      A.  I do.

 3      Q.  All right.  Anything about any of the

 4  statement that I read to you that you believe to be

 5  inaccurate in any way?

 6      A.  I don't remember him having actually blue

 7  jean pants.  Just dark-colored pants is what I

 8  thought I told the officer.

 9      Q.  Okay.  But white tank top, dark blue pants

10  of some sort?

11      A.  Yes, sir.

12      Q.  Next in the first full paragraph on

13  RPD1192.  It states:  When Garcia's truck got

14  closer to Harper, Harper waved at Garcia and Corey.

15  Garcia stopped the truck and rolled down his

16  window.  Harper called out, "Give me a ride!"

17  Garcia replied, "Pound sand!"

18          You see that language?

19      A.  I do.

20      Q.  All right.  Does that refresh your

21  recollection as far as the nature of the

22  conversation you had with Mr. Harper?

23      A.  It does.

24      Q.  All right.  Now earlier in your deposition

25  I showed you that Ring camera video, Bates 885.
```

                                                                27

 1   out to San Bernardino Road, which was the direction

 2   that he was running when he -- after he entered the

 3   backyard.  So I was just going onto San Bernardino

 4   Road.  That was the next street that he would have

 5   to come out on if he was going to continue to go

 6   through backyards.

 7        Q.  And it was your intention to visually

 8   locate him and follow him?

 9        A.  Yes.

10        Q.  Next paragraph in your statement on

11   RPD1192 says:  Garcia watched as Harper ran across

12   the front yard into the front door of the residence

13   at 1605 Nathan Court.

14            Do you see that language?

15        A.  I do.

16        Q.  All right.  So you see Mr. Harper runs

17   across the yard and up to the front door of the

18   residence.  Did you see him attempt to enter the

19   residence at all?

20        A.  I just saw him go to the front door area.

21   I didn't observe him trying to enter the residence.

22   No, I did not.

23        Q.  Okay.  And when you saw him going to the

24   front door area of the residence, approximately how

25   far away were you, sir?

1      A.   I was approximately 60 feet away.

2      Q.   And I assume during this whole time

3   Mr. Corey Guerra was in the vehicle with you.   Is

4   that true?

5      A.   Yes, sir.

6      Q.   It states in your statement:   Garcia

7   looked around and could not see the officer chasing

8   Harper; so Garcia stopped his truck in the street

9   and continued to keep visual observation of Harper.

10   After going to the front door of the residence on

11   Nathan Court, Harper walked to the front driver

12   side door of black Honda that was parked in the

13   driveway.   Harper opened the door and got into the

14   car.

15        Do you see that?

16      A.   I do.

17      Q.   As you made these observations, were you

18   still in the same location approximately 60 feet

19   away?

20      A.   Yes, sir.   I was in San Bernardino Road in

21   the street in my truck observing him.

22      Q.   Okay.   As Garcia continued to watch, he

23   saw a male, later identified as Martin Salazar,

24   walk out of the garage at the location and yell out

25   to Harper.   Salazar told Harper, "Get out of that

```
 1    car!  That's my aunt's car!"
 2            So you heard this statement by the person
 3    who was later identified as Mr. Salazar?
 4        A.  Yes, sir, I did.
 5        Q.  And were you still in the same location
 6    sitting in the truck approximately 60 feet away at
 7    the time you heard this?
 8        A.  I was creeping forward on San Bernardino
 9    Road trying to get closer to the activity.  So I
10    might have been a little closer at that time.  I
11    was rolling -- continuing to roll west on San
12    Bernardino.
13        Q.  Okay.  Did you have your windows to your
14    truck down at this point in time?
15        A.  Yes, sir.
16        Q.  Was that for both the driver and the
17    passenger side windows of your vehicle?
18        A.  Yes, sir.
19        Q.  And were you able to clearly hear
20    Mr. Salazar talking to Mr. Harper, making these
21    statements?
22        A.  I could, yes, sir.
23        Q.  Where was Mr. Harper?  It says he got into
24    the vehicle, the black Honda that was parked in the
25    driveway.  Was he in the driver's side seat of that
```

```
1    says:  As soon as Salazar grabbed the door handle,

2    Harper put the car in reverse and began backing the

3    car down the driveway.

4           Do you see that?

5        A.  I do.

6        Q.  Would it be fair to say that the Honda was

7    parked nose-in into the driveway?

8        A.  It was.

9        Q.  So it's backing out of the driveway in

10   reverse as Mr. Salazar is still grabbed onto that

11   door handle.  Is that correct?

12       A.  That is correct.

13       Q.  It appeared to Garcia as though Salazar

14   was being drug down the driveway by Harper in the

15   stolen Honda.

16           Can you estimate for me approximately how

17   fast that Honda was backing down that driveway?

18       A.  Maybe five to ten miles an hour.

19       Q.  And as that reverse action of the Honda is

20   occurring, is Mr. Salazar -- he has his hand on

21   that driver's side door handle the whole time?

22       A.  He does.

23       Q.  Okay.  When you saw that it appeared a

24   that Salazar was being drug down the driveway by

25   Harper in the stolen Honda, was Mr. Salazar on his
```

```
 1    feet the whole time, or was he off of his feet
 2    literally being drug down the driveway?  Describe
 3    that for me in further detail if you can.
 4         A.  He was holding onto the door handle trying
 5    to keep up with the vehicle as it was going in
 6    reverse.  And his feet were kind of skipping across
 7    the ground.
 8         Q.  Okay.  It then states next:  Garcia jumped
 9    out of his truck and ran to help Salazar.  As he
10    ran up to Harper in the stolen Honda, he could tell
11    the emergency brake on the car was still on because
12    the front wheels were spinning and pushing the car
13    backward, but the back wheels were locked and not
14    rolling, which kept the car from accelerating as
15    fast as it could have.
16         Do you see that language?
17         A.  I do.
18         Q.  Now, when you say the front wheels of the
19    Honda were spinning, are we literally talking about
20    breaking rubber, hearing --
21         A.  Smoking, spinning, breaking rubber, yes
22    sir.
23         Q.  So you heard tires shrieking and so forth
24    as a vehicle will do sometimes --
25         A.  Absolutely, yes, sir.
```

1    Q.  When you ran up to -- strike that.

2         When you got out of your truck, how did

3    you get over to the Honda?  Did you run?  Walk?

4    A.  I ran.

5    Q.  When you got out of your truck,

6    approximately how many feet from the Honda were you

7    when you started running towards it?

8    A.  40 to 50 feet maybe.

9    Q.  And when you first got over to the Honda

10   at a distance where you can literally reach out and

11   physically touch it, where was the Honda located?

12   Was it in the driveway still?  Was it in the

13   street?

14   A.  It was exiting the driveway.  I believe

15   half of the vehicle was in the street, and the

16   other half was in the drive apron over the walk

17   area, the sidewalk.

18   Q.  Okay.  Now, I'm going down to the next

19   page in your statement.  This is RPD1193.  Top of

20   page it states:  Salazar still held onto the door

21   and continued to be drug down the driveway and into

22   the street.  As Salazar held onto the door, Harper

23   hit the male in an attempt to try to get him to let

24   go.

25         Do you see that?

```
 1   were you able to see where Mr. Salazar was at that
 2   point in time?
 3        A.  Mr. Salazar was still on the driver's
 4   side.  I don't know if he was hanging onto the
 5   door, but he was right at the door.
 6        Q.  Okay.  Next paragraph down on RPD1193 it
 7   states:  Suddenly Harper accidentally hit the
 8   button to unlock all the car doors.  Garcia pulled
 9   the front passenger door open, leaned into the car,
10   and punched Harper three times in the side of his
11   head.
12             Do you see that?
13        A.  I do.
14        Q.  And is that your recollection?  For
15   example, did you hear like the car door unlock as
16   you sometimes do when someone hits the button to
17   open it?
18        A.  I did.  I just happened to be pulling on
19   the handle while he hit that button, and it opened
20   right up.
21        Q.  And it says:  After punching Harper,
22   Garcia grabbed hold of Harper and told him to shut
23   the car off.  Harper elbowed Garcia to try to get
24   Garcia to let go, but Garcia held on.  Garcia told
25   me he hit Harper because Harper was being violent
```

```
 1    with him and Salazar and because he did not know if
 2    Harper had any weapons on him.
 3              I want to break that down little bit.  It
 4    says you pulled the car door open, and you struck
 5    Harper three times to the side of his head.  Do you
 6    see that language?
 7         A.  I do.
 8         Q.  Does that comport with your recollection
 9    of the events on the day of the incident?
10         A.  Yes.
11         Q.  Where were you striking Mr. Harper?  You
12    said the side of the head.  This is some gesturing
13    on the camera right now.
14         A.  On the right side of his face.
15         Q.  Did -- as you were striking him
16    approximately those three times, did you say
17    anything to him?
18         A.  I was telling him to stop.
19         Q.  Did he say anything in response to your
20    striking him or your commands to him to stop?
21         A.  I don't remember.
22         Q.  It notes that Harper tried to elbow you to
23    get you to let go, but you held on.  Do you see
24    that language?
25         A.  Yes, sir.
```

1        Q.   So break down the sequence of events to me

2    as best as you can, Mr. Garcia.   It appears you

3    pulled the door open, struck Mr. Harper

4    approximately three times, were yelling at him to

5    stop.   And then apparently you grabbed onto

6    Mr. Harper someplace on his body.   Is that correct?

7        A.   Correct.   I jumped into the vehicle and

8    first tried to throw the car into park.   He put the

9    car back into drive.   That's when I punched him.   I

10   kept punching him because we were fighting to get

11   the car from park to drive.

12       Q.   I see.

13       A.   And in that time he was trying to elbow me

14   to get me away from him.

15       Q.   When you say -- I'm sorry.   If I can

16   interrupt you for one second.

17            When you say you jumped into the car, did

18   you physically get into the passenger side seat of

19   the vehicle?

20       A.   Yes, sir.

21       Q.   Okay.   So your butt was literally in the

22   passenger seat as you are engaged with this

23   struggle with Mr. Harper over control of the

24   vehicle?

25       A.   My knees are on the passenger seat, and my

```
 1   feet are hanging out the door.  And I'm engaged
 2   with him looking straight at him with my knees on
 3   the seat.
 4       Q.  And so you strike him.  You are grabbing.
 5   The shift on the vehicle, is it one of the shifts
 6   like in the center console area that you move
 7   forward and back to go from park into drive, et
 8   cetera?
 9       A.  That's correct.
10       Q.  Okay.  So you are struggling with him over
11   that shifter.  You are trying to put it in park.
12   It appears to you that he's trying to put it in
13   drive to be able to drive away.  Is that correct?
14       A.  That is correct.
15       Q.  Okay.  And it then says Garcia held onto
16   Harper and waited for the police officer while
17   Corey stood nearby and called 911.
18          Do you see that?
19       A.  I do.
20       Q.  Was there any conversation between you and
21   your stepbrother, Corey Guerra, like Corey, call
22   the cops, or anything like that, or did he just
23   kind of take that action independently?
24       A.  I believe he took that action
25   independently.
```

1      A.  I would say -- I was not in the immediate

2  path of the vehicle.  I was off to the side.  I was

3  about 8 to 10 feet away from the vehicle.

4      Q.  Okay.  I'm going to now show you another

5  video.  I'm going to stop sharing my screen.  Give

6  me a second to get this up here.

7          You see a frozen screen of a video right

8  now?

9      A.  I do.

10          MR. TOUCHSTONE:  This is Bates 886.  We'll

11  attach this as Exhibit 3 to your deposition,

12  Mr. Garcia.

13          (Defendants' Exhibit 3 was marked for

14          identification.)

15  BY MR. TOUCHSTONE:

16      Q.  I will represent to you this is a video

17  that was created by a bystander of the incident.

18  Can you -- I wish could I make it bigger, but I

19  don't know how to do that.  Can you see where my

20  cursor is hovering around here?

21      A.  I can.

22      Q.  I'm pointing at a black vehicle.  That is

23  the black Honda that we were talking about here?

24      A.  Yes, sir.

25      Q.  We have been discussing for about the last

```
 1   half hour?
 2        A.  Yes, sir.
 3        Q.  Okay.  And there is an individual looks
 4   like wearing a brown shirt and I guess gray pants
 5   or long shorts.  Do you see that?
 6        A.  You know, honestly, sir, it's too small
 7   for me to see that.
 8        Q.  Okay.  We also have another individual
 9   over here where my cursor is hovering wearing a
10   white shirt and dark-colored shorts.  Do you see
11   that?
12        A.  I see that.
13        Q.  Do you know who that person was in the
14   white shirt and dark shorts?
15        A.  I can't tell who that is, no.
16        Q.  And we have another individual standing
17   over here wearing a black shirt.  Do you know who
18   that person is?
19        A.  In fact I'm going to try to put my finger
20   on this and see if I can zoom this up a little bit.
21   I can.
22            I don't know who either one of those
23   gentleman are.  I can't tell.
24        Q.  All right.  I'm going to play the video.
25   We are now paused at two seconds into it of Bates
```

886.  I'm going play it through a little bit.

Do you see it looks like there is a police officer in the open doorframe of that Honda?

A.  Yes, sir, I see him.

Q.  Is that consistent with Officer Koahou's statement -- or Officer Koahou's position as he was yelling commands at Mr. Harper?

A.  Yes, it is.

Q.  All right.  I'm going to back that up.  It happens pretty quickly here.  Did you hear that clicking and then the yell afterwards?

A.  I did not, sir.  If you want to try to rewind it one more time, I'll listen more carefully.

Q.  I'll try that, and I'll try to turn the volume up.

A.  Okay.

Q.  I'm starting to play the video at six seconds in.  Did you hear a click and then a yell out?

A.  I did not, sir.  I did not hear anything.

Q.  And now we may be suffering some technical issues here.  So I apologize.  I'm going to go ahead and play from this point forward.  I'm paused right now at 10 seconds into the video.

```
 1              I'm now paused at 15 seconds.  It appears
 2    that there was some verbal commands, something to
 3    the effect of don't do it, don't do it.  Did you
 4    hear anything of nature?
 5         A.  I did not hear that.
 6         Q.  Okay.  Setting aside the audio issues that
 7    we're having, I'm going to rewind again, and I'm
 8    going to play it through without commentary.  I'm
 9    starting at eight seconds.
10              Okay.  That's the depiction of the
11    interaction with Officer Koahou and the vehicle,
12    black Honda, with Mr. Harper in it immediately
13    before the shooting incident.  Were you able to
14    hear the two gunshots, Mr. Garcia?
15         A.  I could not hear the gunshots coming over
16    the audio.
17         Q.  Does that video appear to accurately
18    depict what you actually observed as far as the
19    incidents itself at least as far as the location of
20    Officer Koahou, yourself, et cetera?
21              MR. TERRELL:  I would object.  It's
22    compound on that one.
23              MR. TOUCHSTONE:  Good objection, Counsel.
24    I'll break it down.
25         Q.  The video that we just observed, the
```

```
 1    Exhibit 3 to your deposition, Bates stamp 886, does
 2    it appear to you to accurately depict the incident
 3    that you physically observed on the day of
 4    September 9, 2021, as far as the officer-involved
 5    shooting?
 6         A.   Yes, sir.
 7         Q.   I'm now going to try to go back to your
 8    statement again.  Do you see the copy of the victim
 9    interview continued, Joseph Garcia?  Is that up on
10    your screen?
11         A.   Not yet.  It's buffering.
12              When he went to go get my sandwich, I made
13    a copy of -- I have the report in front of me now.
14         Q.   Okay.  Let me try again.  How about now?
15         A.   Still nothing, sir.
16         Q.   Let's do this.  I'm looking at the
17    statement, and I want you to go to the last page
18    Mr. Garcia.  And in the first full paragraph of
19    page four of your statement, which I'll represent
20    is RPD1194 -- I don't know if you have a Bates
21    stamped investigation.  But there should be a
22    paragraph that says when the Honda got to the end
23    of the cul-de-sac.  Do you see that?
24         A.   I have it in front of me, yes, sir.
25         Q.   Let's go from there.
```

1       REPORTER'S CERTIFICATE

2

3           I, GLINDA F. BANKS, CSR No. 11984,

4   Certified Shorthand Reporter in and for the State

5   of California, do hereby certify:

6           That the foregoing proceedings were taken

7   before me at the time and place therein set forth,

8   at which time the witness was put under oath by me;

9           That the testimony of the witness and all

10  objections made at the time of the examination were

11  recorded stenographically by me and were thereafter

12  transcribed;

13          That the foregoing is a true and correct

14  transcription of my shorthand notes so taken.

15          I further certify that I am not a relative

16  nor employee of any attorney or of any of the

17  parties, nor financially interested in the action.

18          I declare under penalty of perjury under

19  the laws of the State of California that the

20  foregoing is true and correct.

21          Dated this date of September 3, 2024.

22          *Glinda F. Banks*

23          GLINDA F. BANKS, CSR No. 11984

24

25