1

2

3

4                 UNITED STATES DISTRICT COURT

5                 CENTRAL DISTRICT OF CALIFORNIA

6

7    JUSTIN CODY HARPER,              )
                                      )              CERTIFIED COPY
8              Plaintiff(s),          )
                                      )
9       vs.                           ) Case No.
                                      ) 5:23-cv-00695-SSS-DTBx
10   CITY OF REDLANDS, REDLANDS       )
     POLICE DEPARTMENT, POLICE        )
11   OFFICER KOAHOU, and DOES         )
     1-10,                            )
12                                    )
               Defendant(s).          )
13   _____)

14

15                    REMOTE PROCEEDING

16

17   DEPOSITION OF:    COREY GUERRA
     TAKEN BY     :    JAMES R. TOUCHSTONE, ESQUIRE
18   Commencing   :    1:10 P.M.
     Location     :    Rancho Cucamonga, California  91739
19   Day, Date    :    Monday, August 19, 2024
     Reported by  :    JOLYNE K. ROBERTS, CSR NO. 10823
20   JOB No.      :    24-141097B

21

22

23

24

25

1    that day as far as what I'll call the incident, which is

2    what ultimately led to the arrest of Mr. Harper?

3              So, for example, it's my understanding that you

4    were in a vehicle, a work vehicle that was struck by

5    another vehicle that Mr. Harper was driving.

6              Is that correct?

7        A     That is correct.

8        Q     All right.  And this was a work truck for Dan

9    Guerra, your business; is that true?

10       A     Yes, sir.

11       Q     And was there anyone in the truck with you?

12       A     My stepbrother Joe Garcia.

13       Q     And who was driving your vehicle?

14       A     Joe Garcia.

15       Q     And do you recall where you were when you had

16   that traffic collision with a truck being driven by

17   Mr. Harper?

18       A     We were at a stop sign on San Bernardino Avenue.

19   I remember that because we have a job site on that

20   street.

21       Q     Okay.  And I'm going to, I think, refer you to,

22   at this point in time, your statement, just so we have

23   all those details.  If you could bring -- the first page

24   is a three-page statement and has in the bottom

25   right-hand corner RPD0973.  And let me know when you have

```
1    states -- and I'm not going to read this verbatim -- top

2    paragraph, that you provided an interview with a

3    detective on the evening of September 9th at the incident

4    location.

5            Do you recall providing an interview to a law

6    enforcement officer concerning the incident?

7        A    Yes, I do.

8        Q    Okay.  And then going down to the second

9    paragraph, this is the beginning of the summary of your

10   interview with that officer.  It says:

11               On Thursday, September 9, 2021, at

12               approximately 1340 hours, Guerra and

13               his brother, Joe Garcia, were stopped

14               in the westbound left turn lane at

15               East San Bernardino Avenue and Church

16               Street in their Chevrolet work truck.

17               While stopped a silver Toyota Tundra

18               traveled north on Church and attempted

19               to make a right turn on East San

20               Bernardino Avenue.  The driver of the

21               vehicle, later identified as Justin

22               Harper, lost control of the vehicle.

23               Harper's vehicle back left corner

24               panel struck the back left corner

25               panel of Guerra's vehicle.  Guerra
```

1          looked back and saw Harper drive east

2          on East San Bernardino Avenue and make

3          a right turn onto Joanna Street.

4          First question:  Is there anything -- based on

5     your recollection of what you told the detective during

6     that interview, is there anything in that paragraph that

7     appears to be inaccurate in any way?

8       A    The only thing is that we were going straight,

9     so we were in a left turn lane.  I think that's only a

10    two-lane road anyway.  That's all I saw that's

11    inaccurate.

12      Q    All right.  Now, this Toyota Tacoma truck that

13    was being driven by Mr. Harper says struck your vehicle

14    in the back left corner panel; is that correct?

15      A    That is correct.

16      Q    All right.  And did you, subsequent to this

17    incident, get a chance to look at the damage to your work

18    vehicle?

19      A    Can you say that again?

20      Q    Yeah.  After the arrest incident involving

21    Mr. Harper, were you able to look at your work truck and

22    see what kind of damage had been caused by that vehicle

23    collision?

24      A    Yes.

25      Q    And could you describe that damage for me,

1    please?

2        A    We have a toolbox, built-on toolbox on our work

3    truck, and one of the bottom boxes was completely

4    destroyed, and the door had fallen off.

5        Q    And anything else you recall about the damage to

6    your vehicle that was caused by that traffic collision?

7        A    A few scuffs, marks, paint damage.  Standard

8    stuff, bumper damage.  It ended up resulting in our truck

9    being salvaged.  They had to total our truck.

10       Q    I see.  And when that traffic collision

11   occurred, were you yourself injured in any way?

12       A    No, sir.

13       Q    To your knowledge, was Mr. Garcia injured

14   physically in any way?

15       A    Not that I'm aware of, no.

16       Q    Okay.  And what occurred after that traffic

17   collision with respect to yours and Mr. Garcia's actions?

18       A    We were pausing right after contact to see if

19   they were going to stop, the other driver, in which case

20   he did not.  He kept going.

21            And shortly thereafter an officer had made the

22   same turn and kind of looked up as to where did he go?

23   So we pointed the direction he went.

24            I had seen the driver make a right on a street,

25   and at that point we turned around and tried to go at

```
 1      A    Yes.  I do not know the street names offhand,
 2   but that's definitely the path of travel.
 3      Q    Next it states:
 4           Guerra turned north on Stoney Court
 5           and parked, looking for Harper.
 6           Now, does that sound accurate, first off?
 7      A    Correct, yes.
 8      Q    All right.  Now, while you were pursuing the
 9   vehicle that had struck you, were you and Mr. Garcia
10   having any conversation of any sort that you recall?
11      A    Only, Which way did he go?  That was about it.
12      Q    Okay.  Had either of you called 911, for
13   example, or the authorities to try to report what had
14   happened to you up until this point in time?
15      A    Not up to that point in time.  We're talking
16   about a very short amount of time, and first concern was
17   to try to get a license plate or some kind of
18   identification.
19      Q    Right.  The next paragraph says:
20           While Guerra was parked, Harper ran on
21           foot between the residences at 1560
22           Stoney Court and 923 Kimberly Avenue,
23           toward Guerra's vehicle.
24           Now, would it be fair to say that you did not
25   know the address when you described this to the detective
```

```
1   who was taking your statement?

2       A    Yeah, that's correct.

3       Q    All right.  But you did see Mr. Harper, the

4   driver of that truck which had struck you, running on

5   foot around some residences in that neighborhood in the

6   city of Redlands?

7       A    Yes, sir.

8       Q    All right.  Next sentence says:

9            Harper approached Guerra and asked if

10           Guerra could give him a ride.  Guerra

11           refused Harper the ride, and Harper

12           ran west and jumped into the backyard

13           of 913 Kimberly Avenue.

14           Again, would it be fair to say that you did not

15  recall the address of 913 Kimberly Avenue, per se?

16      A    Yes.

17      Q    You just kind of pointed out where these events

18  occurred?

19      A    That's correct.

20      Q    Tell me about the conversation that you had as

21  Mr. Harper approached the vehicle that you and Mr. Garcia

22  with sitting in.  What did you say to him and him to you,

23  to the best of your recollection?

24      A    I recall pulling up as he was running out of a

25  side yard, and he ran up to my window.  I was on the
```

16

1    passenger side, and my window was down, and he asked us

2    for a ride.  I replied in a manner and said, absolutely

3    not, or a bad word, and no.  And at that moment his eyes

4    showed me that he may or may not have realized that he

5    had hit us, at that point.  I don't know that he didn't

6    know; I'm just telling you the look on his face, and he

7    started running.

8        Q     Would it be accurate to say that when Mr. Harper

9    came up to your passenger side window to ask you for a

10   ride, that you recognized him as the driver of the Toyota

11   truck which had struck your vehicle?

12       A     100 percent.

13       Q     And what did you do after Mr. Harper ran off?

14       A     Continued to keep an eye on him and just see

15   where he was going.  He did disappear into another

16   backyard through a fence, I believe.  And at that point

17   there were -- I don't recall there being any other

18   officers around.  Once we saw the officer at the

19   intersection, we did not see the officer again until

20   later in this incident.  So we just tried to keep an eye.

21       Q     All right.  And I'm going to refer you to the

22   next paragraph on your statement.  It says:

23            Guerra saw Redlands Police Officer

24            Nick Koahou, driving his patrol

25            vehicle west on Kimberly Avenue.

1      A     That's correct, sir.  It was a different Street

2  than San Bernardino.

3      Q     Okay.  And when you say you saw Harper

4  attempting to steal a black Honda four-door vehicle

5  parked in the driveway, can you describe what actual

6  physical actions you saw occur?

7      A     He ran through the -- in front of the house by

8  the front door and quickly went to this black vehicle and

9  pulled on the door handle and jumped in the driver's

10  seat.

11      Q     Did you see Mr. Harper confronted by anyone when

12  he was taking these actions?

13      A     There was nobody outside at that moment.

14      Q     Next page of your statement, which in the bottom

15  right right-hand corner has RPD0974.  Let me know when

16  you have that.

17      A     I do have that.

18      Q     All right.  It states:

19              Guerra saw a Hispanic male, later

20              identified as Martin Salazar, trying

21              to open the driver's side door of the

22              black Honda.

23              I'm going to pause there for a second.  I take

24  it you did not personally know Mr. Salazar; is that

25  correct?

1     A     That is correct.

2     Q     You just saw a Hispanic male trying to open the

3  driver's side door where Mr. Harper had gotten into the

4  Honda; is that true?

5     A     Yes, sir, and he was yelling at the time.

6     Q     Do you recall what he was yelling?

7     A     I want to say something to the effect of, What

8  are you doing?  Get out of my -- I think he said aunt's

9  car or my something car.  Hard to hear him; I was a

10  little far away.

11     Q     That was my next question.  When you observed

12  these actions, approximately how far away were you?

13     A     Given that, I would say maybe 30 feet.  We

14  were -- we were near the bulb of the cul-de-sac and the

15  house is the last house on that street.  So not too far,

16  but I'd say about 30 feet.

17     Q     All right.  And when you say we, are you

18  referring to yourself and Mr. Garcia?

19     A     Yes, sir.

20     Q     So describe your actions for me.  Did you get

21  out of your vehicle and begin running over towards where

22  you saw Mr. Harper go?

23     A     Yes, we both exited the vehicle fairly quickly

24  when we saw that he was trying to operate the vehicle and

25  that the young man had come out of the garage trying to

```
 1      A    I believe him to still have been on the driver's
 2   side of the car.
 3      Q    All right.  Towards the actual driver's seat or
 4   towards the rear of the driver's side of the Honda?
 5      A    At one point he had tried to open the back door,
 6   and it might have been at that time.
 7      Q    Okay.  And when you saw the vehicle kind of back
 8   into the cul-de-sac blocking the driveway of that home,
 9   where were you located physically?
10      A    At that time I believe I had dialed 911 and was
11   speaking with the operator at the end of the cul-de-sac.
12   So the car had ended up pointed directly towards me where
13   I was standing.
14      Q    All right.  And would it be fair to say that --
15   well, strike that.
16           To the best of your ability, without having a
17   diagram in front of you, can you kind of describe to me
18   your approximate location on that cul-de-sac?  For
19   example, were you kind of in the middle of where the
20   cul-de-sac ends or to the east or west side of it, if you
21   know?
22      A    Just east of the radius point is where I would
23   be.
24      Q    All right.  Going down to the next paragraph in
25   your statement, it says:
```

25

```
 1              Guerra was on the phone with Redlands
 2              Police Dispatch and gave them updates
 3              during the incident.  While on the
 4              phone with dispatch, Guerra saw Garcia
 5              strike Harper with his fist in the
 6              right side of his neck and head
 7              approximately five to six times.
 8         Now, Garcia is, I believe, your stepbrother; is
 9    that correct?
10    A    That's correct.
11    Q    So while you were on the phone with the police
12    department, Mr. Garcia had moved closer to the Honda?
13    A    He had entered the passenger side of the vehicle
14    by then.
15    Q    The front passenger's seat area?
16    A    Yeah, that is correct.
17    Q    All right.  And did you see how he was oriented
18    in that front passenger seat of the Honda?  For example,
19    did he have his buttocks down in the seat like someone
20    would typically ride in the car, or was he on his knees
21    facing inward, or something else?
22    A    At one point he was facing the driver trying to
23    intervene at that time, but that's all I remember as far
24    as which way he was pointed.
25    Q    Okay.  And you -- when Mr. Garcia was striking
```

26

```
 1    Mr. Harper with his fist on the right side of his neck

 2    and head approximately five or six times, did you see

 3    what hand he was using to deliver those blows?

 4        A    His right hand, from what I remember.

 5        Q    Did you hear Mr. Garcia make any statements to

 6    Mr. Harper during the time he was striking Mr. Harper

 7    with his fist?

 8        A    The best I could tell you is I heard muffled

 9    yelling.

10        Q    Did you hear any words out of Mr. Harper's mouth

11    as this was occurring?

12        A    I did not.  The driver's door was still shut, so

13    I didn't really hear much from him.

14        Q    And if you can orient yourself at the time you

15    were making these observations with respect to the Honda,

16    where would you be standing?  On the driver's side?  On

17    the passenger side?  Front of the vehicle?  Rear of the

18    vehicle?

19        A    From what I recall, closer to the driver's side.

20        Q    Driver's side front of the vehicle or in the

21    middle?

22        A    Towards the front.

23        Q    Okay.  Going down to the next paragraph in your

24    statement, says:

25                Salazar opened the driver's side door
```

1              of the Honda and struggled with

2              Harper.

3              Do you recall seeing this physical struggle

4    between Mr. Salazar, the young man who initially tried to

5    stop the vehicle from being taken from the driveway, and

6    the driver of the vehicle, Mr. Harper?

7         A    I do.  I recall that.

8         Q    Can you describe that struggle for me, please,

9    to the best of your ability?

10        A    As soon as Mr. Salazar got the door open, he

11   reached in aggressively trying to dissuade the gentleman

12   that had taken the car -- I believe you said Mr. Harper.

13        Q    Yes.

14        A    Trying to break up his arm movements.  He's a

15   younger boy, smaller boy -- and I say that probably

16   because he's half my age.  But he had his hands trying to

17   get him from reaching the steering wheel, and at the same

18   time Joseph was still trying to intervene and gain

19   control of the vehicle.

20        Q    When you say Joseph, you're referring to Joseph

21   Garcia?

22        A    That's correct.

23        Q    Did you see any other individual involved with

24   the Honda vehicle at this time?

25        A    Not at that moment, no.

```
 1      Q     Let me ask you this:  Did you have any doubt in
 2   your mind that the individual who was wearing this type
 3   of clothing was a law enforcement officer?
 4      A     No doubt.
 5      Q     All right.  At this point in time I'm going to
 6   play a portion of an audio recording from Officer Koahou
 7   for you.
 8            We're going to attach this as Exhibit 2 to your
 9   deposition.
10            (Defendants' Exhibit 2 was marked for
11            identification and is attached hereto.)
12            MR. TOUCHSTONE:  And Jim, again, this is Bates
13   882, and I'm beginning the recording at 4:20.
14            Bear with me one moment, Mr. Guerra.
15      A     Yes, sir.
16                        [Audio playing]
17            MR. TOUCHSTONE:  All right.  I'll stop the tape
18   at 4 minutes and 30 seconds.
19      Q     BY MR. TOUCHSTONE:  Were you able to hear those
20   statements?
21      A     I'm sorry, you're speaking to me, right?
22      Q     Yes.  Were you able to hear the statements that
23   I just played?
24      A     I heard a bit of it.  Some of it was muffled.  I
25   heard 215 and out of the way.  Yes, I heard most of it.
```

```
 1       Q    I'm going to go back and play it again,
 2   particularly the last part.  I just want to ask you a
 3   couple of questions about it.
 4       A    Okay.
 5       Q    I winding it to 4:20.  I'm going to play it
 6   again through about 4:30.  I'll turn the volume up.
 7   Maybe that will help.
 8                         [Audio playing]
 9       Q    BY MR. TOUCHSTONE:  Were you able to hear that
10   that time, Mr. Guerra?
11       A    A little better than last time, yes.
12       Q    All right.  Now, Officer Koahou -- and I know
13   the record will speak for itself -- but he said something
14   to the effect of 215 the car.
15            Did you have any idea what that meant?
16       A    No, sir.
17       Q    All right.  And then there were some statements
18   to the effect of, Move out of the way; move out of the
19   way.  I'm going to shoot him.
20            Did you hear that on the recording?
21       A    I did hear that, yes.
22       Q    Do you recall hearing that on the actual day of
23   the incident when you were out there physically?
24       A    No, sir, I do not.
25       Q    When you saw Officer Koahou kind of running up
```

1    to the vehicle, can you describe for me your location as

2    far as distance from the Honda Accord and whatever the

3    closest point on the vehicle was to you?

4        A    I believe at that point once I had waved him

5    over, he ran directly by me within -- within inches.  And

6    I must have been 25 feet from the car.  I was still in

7    the cul-de-sac, so I bet that's probably a 35-foot radius

8    cul-de-sac.  So I bet I was 25 to 30 feet from the

9    vehicle.

10       Q    Okay.  And if you were to reach your hand out,

11   what would be the closest part of the Honda that you'd be

12   able to touch?

13       A    The driver's side headlight for sure.

14       Q    Okay.  And when you saw Officer Koahou -- I take

15   it he was running towards the Honda?

16       A    Absolutely.

17       Q    As he was running towards the Honda, did you see

18   him have any weapons in his hands?

19       A    He had a Taser.

20       Q    Okay.  And you're clear it was a Taser and not a

21   firearm?

22       A    Yes, it was a bright color, yellow, I believe.

23            MR. TOUCHSTONE:  All right.  I'm going to play

24   an additional portion of the recording, this is 4 minutes

25   and 30 seconds, and I'll pause it in a certain period of

1    time.

2                        [Audio playing]

3            MR. TOUCHSTONE:  All right.  I stopped the

4    recording at 4 minutes and 40 seconds.

5        Q    BY MR. TOUCHSTONE:  Did you hear Officer Koahou

6    say, Move out of the way; I'm going to shoot him.  Move

7    out of the way; I'm going to shoot him?

8        A    I believe I heard it.

9        Q    Do you recall hearing words to that effect on

10   the day of the incident directly from the officer?

11       A    No, I do not.  I do not recall.  He must have

12   been at the car at that point.

13       Q    Okay.

14       A    I was still on the phone with 911, and I was 25,

15   30 feet away.

16       Q    And as Officer Koahou got closer to the Honda,

17   did you ever see him -- before you heard the gunshots,

18   did you ever see -- strike that.

19            Where did Officer Koahou go when he got directly

20   up to the Honda?

21       A    I think he was on the driver's side.

22       Q    And was -- at that point in time was the

23   driver's side door open?  Closed?  If you know.

24       A    It was in between the two.  They were still sort

25   of battling, Salazar and the driver at the time.  And it

```
 1   went back and forth.  So it depends on which moment.
 2       Q    Understood.  And as Officer Koahou is
 3   approaching closer and closer to the Honda and yelling
 4   words to the effect of get out of the way; get out of the
 5   way, did that cause Mr. Salazar to back away from the
 6   vehicle?
 7       A    I believe he did, yes.
 8       Q    And did Officer Koahou have physical contact
 9   with the Honda --
10       A    Yes.
11       Q    -- such as opening the door or anything to that
12   effect?
13       A    Yes, he did.
14       Q    What do you recall seeing happen?
15       A    I believe that he reached for the door or window
16   and definitely put his hands on it and was able to at
17   that point have access to the vehicle.  I don't recall
18   whether he opened the door or if the door was already
19   open, if you will.  But he had access at that point and
20   was face-to-face with the driver.
21       Q    All right.  Can you estimate for me the
22   approximate distance after Officer Koahou pulled that
23   door open, how close did he get to Mr. Harper, if you
24   know?
25       A    A few feet.
```

34

1    Q    And based on your recollection, did Officer

2  Koahou still have that yellow Taser in his hand at the

3  time?

4    A    Yes, sir.

5    Q    Did you see him have a firearm in the other

6  hand, or was he just armed with a Taser at that time?

7    A    Just the Taser.  His front hand was up in the

8  air, and his Taser was in his right hand.

9         MR. TOUCHSTONE:  Okay.  I'm now going to play a

10  portion of the recording again beginning at 4 minutes and

11  40 seconds.  And again, this is Bates 882, Exhibit 2 to

12  your deposition.

13                    [Audio playing]

14    Q    BY MR. TOUCHSTONE:  All right.  I'm pausing the

15  audio again at 4 minutes and 52 seconds.

16         Did you hear multiple commands by Officer

17  Koahou, Get out; facedown; words to that effect?

18    A    Yes, I did.

19    Q    Do you recall hearing commands of that sort on

20  the day of the incident being directed towards

21  Mr. Harper?

22    A    I do recall some yelling, and I did hear, Get

23  out and, Get down.

24    Q    Now, at some point in time did you see or hear

25  or otherwise comprehend that Officer Koahou had deployed

1    his Taser against Mr. Harper?

2        A    I did hear it, yes.

3        Q    And describe what made you believe that Officer

4    Koahou had deployed his Taser against Mr. Harper.

5        A    I heard the sound of the Taser after I believe

6    he said, I'm going to tase you.  I heard the sound of the

7    Taser, and then directly afterwards, he had dropped the

8    Taser onto the ground.

9        Q    Did you ever hear any words from Mr. Harper that

10   would be consistent with him agreeing to obey any of

11   Officer Koahou's commands like, for example, I'm giving

12   up.  Okay, okay, let me get out of the car?  Anything

13   like that?

14       A    I don't remember hearing him say anything, to be

15   honest with you.

16       Q    And after the Taser was deployed, what occurred

17   next, based on your recollection?

18       A    After -- almost directly after that I -- I don't

19   know how to time it out, but I heard gunshots.  And I was

20   still on the phone with 911 because I was still trying to

21   figure out what street we were on, and I didn't know if

22   the officer had called it in.  So I remember telling them

23   that I had heard the gunshots.

24       Q    And how many gunshots did you hear?

25       A    I believe I heard two.

36

```
 1      Q    And did you see where Officer Koahou was at the
 2   time that he fired the two gunshots in relationship to
 3   the black Honda?
 4      A    Yes, on the driver's side of the vehicle at the
 5   driver door.
 6      Q    And when you say at the driver door, can you get
 7   a little bit more specific for me, if you could?  For
 8   example, how far away was he?  Was the door open?  Shut?
 9   Do you recall?
10      A    I don't remember if the door was open or shut,
11   to be honest with you.  And he was only a few feet away.
12           MR. TOUCHSTONE:  All right.  And if you'll just
13   bear with me for a moment.
14           THE WITNESS:  Sure.
15           MR. TOUCHSTONE:  I have a bystander cell phone
16   video taken of what I believe the incident is that we're
17   talking about here that I'm going to show you.  I'll tell
18   you in advance it's somewhat small taken from a cell
19   phone from across the street.  But I'm going to try to
20   show it to you and see if you are able to recognize
21   anything as far as what's going on.
22           THE WITNESS:  Okay.
23                        [Video playing]
24           MR. TOUCHSTONE:  All right.  Can you see a
25   frozen video screen on your screen right now?
```

| | |
|---|---|
| 1 | THE WITNESS:  I do see that, yes. |
| 2 | MR. TOUCHSTONE:  We're at 00 of Bates RPD886. |
| 3 | And we'll attach this as Exhibit 3 to your deposition, |
| 4 | Mr. Guerra. |
| 5 | (Defendants' Exhibit 3 was marked for |
| 6 | identification and is attached hereto.) |
| 7 | Q    BY MR. TOUCHSTONE:  So again, we're frozen |
| 8 | screen right now, clearly. |
| 9 | Do you see my cursor hovering here? |
| 10 | A    I do. |
| 11 | Q    There appears to be an individual in a brown |
| 12 | shirt standing towards the front passenger side tire of a |
| 13 | black Honda in a cul-de-sac.  Do you know who that person |
| 14 | in the brown shirt is? |
| 15 | A    It is quite small.  That could be -- that could |
| 16 | be Mr. Garcia, but if -- I really -- it's so small, I |
| 17 | can't see it. |
| 18 | Q    Fair enough.  All right.  I'm going to play it |
| 19 | forward here, and I'll probably pause it, freeze frame it |
| 20 | and do a little bit of that with it.  So bear with me a |
| 21 | little bit. |
| 22 | A    Okay. |
| 23 | [Video playing] |
| 24 | Q    BY MR. TOUCHSTONE:  Okay.  Do you see the |
| 25 | individual in the brown shirt?  And we're now paused at |

1    3 seconds in the video.  See the individual in the brown

2    shirt how he walked from the passenger side of the

3    vehicle across the front bumper of the Honda?

4        A    Yes, I do.

5        Q    Do you have any recollection of seeing somebody

6    standing in front of the front bumper of the Honda?

7        A    Not directly, no.

8             MR. TOUCHSTONE:  I'm going to continue playing

9    from 3 seconds forward now.

10                        [Video playing]

11       Q    BY MR. TOUCHSTONE:  Were you able to hear the

12   audio of a clicking noise?

13       A    Can you do that one more time?  I didn't hear.

14   There was a buffering going on.

15            MR. TOUCHSTONE:  Oh, okay.  Let me try it again.

16   I'm going back to 5 seconds and play Exhibit 3 from 5

17   seconds forward.

18                        [Video playing]

19       Q    BY MR. TOUCHSTONE:  Now pausing at 10 seconds.

20   Did you hear a click?

21       A    I did hear a click, yes.

22       Q    Is that consistent with the noise of the Taser

23   that you heard on the day of the incident?

24       A    Very similar, yes.

25            MR. TOUCHSTONE:  All right.  Going to continue

1  playing from 10 seconds.

2                          [Video playing]

3      Q    BY MR. TOUCHSTONE:  All right.  Did you -- first

4  off, what did you observe in the video there?  Were you

5  able to make sense of it?  I know the screen is kind of

6  small.

7      A    Yes, I remember that happening.  I was -- that's

8  when the car took off and launched over the curb right

9  about that time.

10     Q    And so the video was consistent with what you

11  observed as far as the actions of the Honda on the day of

12  the incident?

13     A    Yes, sir.

14          MR. TOUCHSTONE:  I'm rewinding it to 14

15  seconds -- strike that.

16          I'm rewinding it to 13 seconds and play it

17  through one more time.

18                          [Video playing]

19     Q    BY MR. TOUCHSTONE:  Did you hear the pop pop

20  kind of noise?

21     A    Yes, sir.

22     Q    All right.  Was that consistent with the

23  rapidity with which those two shots were fired by Officer

24  Koahou at Mr. Harper, based on your recollection of the

25  incident?

```
 1        A     I believe so, yes.
 2        Q     So it's fair to say that you heard two shots
 3   that occurred very quickly in time on the day of the
 4   incident from the police officer, true?
 5        A     True.
 6        Q     And at the time that those shots were being
 7   fired at that vehicle, the Honda was moving forward?
 8        A     I don't remember it moving forward at the time,
 9   but it was very, very fast.
10        Q     Okay.  At some point in time do you recall
11   seeing the Honda accelerate forward and ultimately go
12   over the curbline there at Nathan Court?
13        A     Yes, I recall that very well.
14        Q     Now, I want to take you back to your statement,
15   and I'm now looking at page 2 of 3, the second paragraph
16   from the bottom.  Starts with, Guerra heard Koahou order
17   Harper to stop.
18        A     I have it.
19        Q     Guerra heard Koahou order Harper to
20              stop, or he would be Tased, and
21              immediately heard multiple "clacking
22              sounds" -- and that's in quotes.
23              The Honda's rear wheels were still
24              locked, and the front wheels were
25              continuing to spin.  Guerra believed
```

1
**CERTIFICATE OF**

2
**CERTIFIED SHORTHAND REPORTER**

3

4
    The undersigned Certified Shorthand Reporter of the State of California does hereby certify:

5
    That the foregoing proceeding was taken before me at the time and place therein set forth, at which time the witness was duly sworn by me;

6
    That the testimony of the witness and all objections made at the time of the examination were

7
recorded stenographically by me and were thereafter transcribed, said transcript being a true and correct

8
copy of my shorthand notes thereof;

9
    That the dismantling of the original transcript will void the reporter's certificate.

10
    In witness thereof, I have subscribed my name

11
this date:  August 27, 2024

12

13

14
_____

15
JOLYNE K. ROBERTS,
CSR NO. 10823

16

17

18

19

20

21

22
    (The foregoing certification of this transcript does not apply to any reproduction of the same by any means,

23
unless under the direct control and/or supervision of the certifying

24
reporter.)

25