**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

```
 1                  UNITED STATES DISTRICT COURT

 2                  CENTRAL DISTRICT OF CALIFORNIA

 3

 4   JUSTIN CODY HARPER,                )
                                        )
 5              Plaintiff,              )
                                        )
 6              vs.                     )  Case No.
                                        )  5:23-CV-00695-SSS-DTB
 7   CITY OF REDLANDS, REDLANDS POLICE  )
     DEPARTMENT, POLICE OFFICER KOAHOU, )
 8   and DOES 1 through 10, inclusive,  )
                                        )
 9              Defendants.             )
     _____ )

10

11

12

13

14            REMOTE VIDEOCONFERENCE DEPOSITION OF

15               OFFICER NICHOLAS KOAHOU

16              THURSDAY, OCTOBER 10, 2024

17

18

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  108815
```

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

Page 11

| | | |
|---|---|---|
| 1 | A. | I believe it was maybe two weeks after. |
| 2 | Q. | Do you recall the date of the shooting? |
| 3 | A. | September 9, 2021. |
| 4 | Q. | How many shots did fire? |
| 5 | A. | Two shots. |
| 6 | Q. | What type of weapon did you fire the shots from? |
| 7 | A. | Glock-22, 40-caliber semiautomatic pistol. |
| 8 | Q. | So you would have had to press the trigger |
| 9 | | essentially two times? |
| 10 | A. | Yes. |
| 11 | Q. | And were you shooting at a person? |
| 12 | A. | Yes. |
| 13 | Q. | And were you trying to shoot center mass? |
| 14 | A. | I wasn't aiming at that point. |
| 15 | | It was more of a blank shoot. |
| 16 | Q. | Did you have a general understanding of what part of |
| 17 | | the body you were pointing and shooting at? |
| 18 | A. | Yes. |
| 19 | Q. | What was your understanding at that point? |
| 20 | A. | Left side of the body. |
| 21 | Q. | You were trained obviously that shooting at someone |
| 22 | | could cause serious injury or death? |
| 23 | A. | Yes. |
| 24 | Q. | Were you in uniform at the time? |
| 25 | A. | Yes. |

JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.
Officer Nicholas Koahou on 10/10/2024

Page 14

```
1    him?

2         A.    Eastbound on Nomi [phoentic] Avenue.

3         Q.    Did you follow the vehicle for some time?

4         A.    I did.

5         Q.    At some point did you see someone get out of the

6    vehicle and run?

7         A.    Yes.

8         Q.    And was that Mr. Harper?

9         A.    Yes.

10        Q.    And where did the vehicle -- where was the vehicle

11   that he was in, on what street when he got out and ran?

12        A.    It was stopped partially on the sidewalk in the

13   driveway I believe portion of the street on Joanne

14   [phoentic].

15        Q.    And did you see where Mr. Harper ran to?

16        A.    I did.

17        Q.    Where did he run to?

18        A.    He ran to a backyard of an address on Joanne.

19        Q.    And were you following him on foot?

20        A.    I was not.

21        Q.    What did you observe him do next?

22        A.    I saw him run from backyards I believe on Stoney

23   Court [phonetic], and then made his way towards the fence

24   line to a house on Stoney and Timber.

25        Q.    And then what did you see him do?
```

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

1    A.    Yes.

2    Q.    And who did you observe?

3    A.    I observed two Hispanic male adults that were inside

4    the vehicle appeared to be wrestling or fighting

5    Mr. Harper.

6    Q.    Did you say anything to them at this point?

7    A.    Yes.

8    Q.    What did you say?

9    A.    I was yelling for them to move and that I was going

10   to shoot.

11   Q.    You were going to shoot who?

12   A.    Mr. Harper.

13   Q.    Did you have your gun out at this point?

14   A.    My gun was in my hand, yes.

15   Q.    And was Mr. Harper sitting in the driver's seat at

16   this point?

17   A.    Yes.

18   Q.    And were the other Hispanic individuals partially in

19   the car?

20   A.    Yes.  They were -- yeah, they were in the cabinet.

21   Q.    And it appeared like they were struggling with

22   Mr. Harper?

23   A.    Correct.

24   Q.    And you had your gun out, and you told them words to

25   the effect to move, you were going to shoot Mr. Harper?

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

1      A.   Yes.

2      Q.   **Did they move?**

3      A.   They did, yes.

4      Q.   **Where did they move to?**

5      A.   The male that was on the driver side moved back

6    towards the front of the car, and the male that was in the

7    passenger came around the front of the vehicle.

8      Q.   **Was the vehicle on or off at that point, if you**

9    **know?**

10     A.   It was on.

11     Q.   **Did you tell the individuals to get off of the**

12   **street and out of the path of the vehicle?**

13     A.   I don't recall.

14     Q.   **Is that something that based on your training if you**

15   **were aware, you think you might have done, to tell them to**

16   **get out of the path of the vehicle if they were in front of**

17   **it with the engine on?**

18     A.   I may have.  I was focused on Mr. Harper at that

19   point.

20     Q.   **Were you concerned that Mr. Harper may try to take**

21   **off in the car?**

22     A.   Yes.

23     Q.   **So obviously, if he took off in the car, you**

24   **wouldn't want those other individuals to be in harm's way; is**

25   **it a fair?**

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

1      A.    That's fair.

2      Q.    Did you say anything to Mr. Harper at that point?

3      A.    I was ordering to get out of the vehicle and get on

4    the ground.

5      Q.    Is there an audio of the encounter that you're aware

6    of?

7      A.    Yes.

8      Q.    Any body-worn camera footage that you're aware of?

9      A.    We were not issued body-worn cameras at 2021.

10     Q.    Do you have them now?

11     A.    We do.

12     Q.    When did you get them, approximately?

13     A.    Maybe end of '22, beginning of '23.

14     Q.    Did you have some audio recording device

15   activated?

16     A.    I did.

17     Q.    And where was that on your person?

18     A.    On my tactical vest.

19     Q.    In additional to your firearm, you had a Taser?

20     A.    Yes.

21     Q.    Do you know what type of Taser it was?

22     A.    It was X26.

23     Q.    Did you also have pepper spray?

24     A.    Yes.

25     Q.    And did you have a police baton?

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
Officer Nicholas Koahou on 10/10/2024

Page 20

```
 1      A.   I did.

 2      Q.   Was that an expandable baton?

 3      A.   Yes.

 4      Q.   When you first approached the vehicle, was the door

 5   open?

 6      A.   Yes, the door was open.

 7      Q.   And we're talking about the front driver's door?

 8      A.   Yes.

 9      Q.   Do you recall if the vehicle was a two-door or a

10   four-door?

11      A.   It was a four-door.

12      Q.   And I think you've already told me this, but was it

13   black?

14      A.   It was black, yes.

15      Q.   Could you make out anything being said from the

16   Hispanic males that were there?

17      A.   No, I couldn't.

18      Q.   Other -- strike that.

19           Could you make out anything Mr. Harper was saying?

20      A.   No.

21      Q.   Now, at some point you decide to tase him?

22      A.   Correct.

23      Q.   And was the engine of the car still on when you

24   tased him?

25      A.   Yes.
```

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

Page 23

1    A.   I don't recall if we had training for it.

2    Q.   Did you have any discussions about it in debriefing

3   or tactically speaking whether it was a good idea or not to

4   tase someone who is trying to operate a motor vehicle?

5    A.   It's probably discussed.

6         I can't remember a specific conversation.

7    Q.   Okay.  Do you know if the Redlands policies on

8   tasing cover whether people who are operating a motor vehicle

9   should be tased?

10    A.   I don't know.

11    Q.   How much time do you think passed from you getting

12   to the open door area of that black Honda initially, and then

13   you tasing Mr. Harper?

14    A.   I would say approximately ten seconds.

15    Q.   And then you told me that you initially saw his

16   hands go up towards his chest during the tasing cycle?

17    A.   Yes.

18    Q.   Is it generally a five-second cycle?

19    A.   Yes.

20    Q.   And is the way that X26 is designed that, if you

21   press the trigger again after a five-second cycle, you get

22   another five-second cycle?

23    A.   Correct.

24    Q.   And then what did you see Mr. Harper do after you

25   saw his hands come up?

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

Page 24

1    A.   Once the hands came up, I saw his right hand starts

2  reaching out for -- to the gear shift.

3    Q.   **And the car was still on?**

4    A.   Yes.

5    Q.   **And the door was still open?**

6    A.   Correct.

7    Q.   **And at that point did you think he might try to pull**

8  **forward to leave the area?**

9    A.   Yes.

10   Q.   **At that point did you look to see where those people**

11 **were?**

12   A.   No because I was focused on his hands.

13   Q.   **Did you make any commands for those people to make**

14 **sure they got out of the way at that point?**

15   A.   I don't recall, if any.

16   Q.   **And what did you do at that point when you saw**

17 **Mr. Harper's hands go towards the gear shift?**

18   A.   I gave him commands to stop.

19        I think I said, "Don't do it," and I moved in to the

20 car to try to push it into park.

21   Q.   **Where was the gear shift on the car?**

22   A.   Center console.

23   Q.   **And could you tell what gear it was in when you**

24 **tried to move it into park?**

25   A.   I couldn't.

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

Page 25

1    Q.   You believe it was in a gear other than park?

2    A.   The vehicle wasn't moving during this whole thing.

3         I don't know what gear it was in.

4    Q.   Did you ever make contact with the gear shift?

5    A.   Yes.

6    Q.   And did the vehicle move at some point after you

7  make contact with the gear shift?

8    A.   When I say contact gear shift, it was to pull

9  Mr. Harper's hands away, but yes it did start to move.

10    Q.   How long after you had contact with the gear shift

11  did the vehicle start to move?

12    A.   Almost immediately.

13    Q.   And did it start to move forward?

14    A.   Yes.

15    Q.   And how long after the vehicle started to move

16  forward did you fire your first shot?

17    A.   Less than a half second.  It was very quick.

18    Q.   Did you attempt when you sinced the vehicle was

19  starting to move forward, did you attempt to pull yourself

20  away from the vehicle?

21    A.   I did.

22    Q.   And what did you do to do that?

23    A.   I started to pull back, and my arm became trapped

24  Mr. Harper's chest.

25    Q.   Were your feet outside of the car at this time?

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

Page 30

1     Q.   Do you know what I mean by idle speed?

2          In other words, if you put a car in gear, you know,

3     it might move at five miles-an-hour or so without hitting the

4     gas?

5     A.   It was accelerating forward.

6     Q.   Did any part of the car strike your body as it was

7     moving forward?

8     A.   Yes.

9     Q.   What part?

10    A.   The driver's door.

11    Q.   And how did the driver's door hit you?

12         Can you explain that, because I know it was to your

13    left; correct?

14    A.   Correct.

15    Q.   Can you explain how the door hit you.

16    A.   As I was starting to move forward and pulling away

17    from the vehicle, the acceleration of the car from standing

18    to accelerating forward caused the momentum of the door to

19    slam into my left side.

20    Q.   So the door started to close?

21    A.   Yeah.  It slammed on me.

22    Q.   Did the door actually close, or did it strike your

23    body so that it did not?

24         And when I mean close, close all the way.

25    A.   It struck the left side of me, and as I saw the car

JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.
Officer Nicholas Koahou on 10/10/2024

Page 31

```
1   fleeing, the door was shut.

2       Q.   Did you fire your shots before or after the door

3   impacted you?

4       A.   Before.

5       Q.   Did you look to see where these other individuals

6   were as the car was moving forward?

7       A.   Once the car was moving forward, I couldn't see them

8   out of my peripheral vision.

9       Q.   But after you fired your two shots and after the

10  door impacted you as you described, did you then look to see

11  where they were?

12      A.   Yes.

13      Q.   And where were they?

14      A.   I was standing right next on them.

15      Q.   Standing -- I didn't hear the last part --

16      A.   I was standing -- I was standing right next to them.

17      Q.   Right next to them.

18           And I think you've already told me that you didn't

19  see the car strike any of them; is that correct?

20      A.   Correct.

21      Q.   Did you see any injuries on any of them that you

22  recall?

23      A.   I didn't see any injuries on them, no.

24      Q.   And then does the car goes where after you fired

25  your two shots?
```

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

1    A.    The car accelerated in to the cul-de-sac, struck a

2  raised concrete curb, and lodged itself on San Bernardino

3  Avenue.

4    Q.    And your impression at this time is that most likely

5  Mr. Harper had been struck with either one of both of your

6  bullets?

7    A.    Yes.

8    Q.    And then did you then approach the vehicle at some

9  point?

10    A.    Yes.

11    Q.    And was Mr. Harper still in the driver seat?

12    A.    He had gotten out of the vehicle and was sitting on

13  the ground.

14    Q.    And did you observe any injuries on him?

15    A.    I saw that one of his fingers was I thought missing,

16  bloody, and when I rolled him over and put him in handcuffs,

17  I saw blood on his left --

18    Q.    His left foot?

19    A.    Left leg.

20    Q.    Left leg.  So his left leg, and then one of his

21  fingers appeared to maybe have been shot or missing?

22    A.    Correct.

23    Q.    Did you have any conversations with Mr. Harper at

24  that point?

25    A.    I just told him to roll over and put his hands

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

Page 33

1    behind his back.

2      Q.    And did he?

3      A.    Yes.

4      Q.    And you handcuffed him at that point?

5      A.    Yes.

6      Q.    Any other further conversation with Mr. Harper at

7    that point?

8      A.    No.

9      Q.    Did you talk to any of those individuals, the

10   Hispanic individuals, after the shooting?

11     A.    No.

12     Q.    Did you dispatch the shots were fired at some

13   point?

14     A.    Yes.

15     Q.    And request medical?

16     A.    I did not request medical at that point.

17     Q.    Is there a reason why?

18     A.    I was running back to my car.

19     Q.    Did you stay at the scene until supervisors

20   arrived?

21     A.    Yes.

22     Q.    Did you give a public safety statement at some

23   point?

24     A.    Yes.

25     Q.    And who did you give that statement to?

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

Page 34

```
 1       A.    Sergeant B [phonetic].

 2       Q.    And was that just like a general statement of how

 3   many shots you fired and in which direction?

 4       A.    Yes.

 5       Q.    So we're going to try to put up -- I'll mark it as

 6   Exhibit 1 what I think is the policy from Redlands Police

 7   Department for shooting at or from moving vehicles.

 8             I think it's 300.4.1.

 9             (Exhibit 1 was marked for identification.)

10             MR. GALIPO:  We're going to try to see if we can put

11   it up so week all see it.

12             I think Jim may have a copy.

13             MR. TOUCHSTONE:  I do.

14             MR. GALIPO:  Thank you.  We'll look at this and take

15   our first break if that's okay.

16             MR. TOUCHSTONE:  Sounds good, Dale.

17             MR. GALIPO:  Okay.

18   BY MR. GALIPO:

19       Q.    Can you see this either on your screen or the

20   document you have in front of you or both?

21       A.    Yes.

22       Q.    Okay.  Is this the policy you were referring to

23   earlier, shooting at or from moving vehicles, 300.4.1?

24       A.    Yes.

25       Q.    And I just want to go through it a little bit.
```

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
Officer Nicholas Koahou on 10/10/2024

Page 36

 1   code section?

 2       A.   Yes.

 3       Q.   I think you've already told me you didn't see a gun

 4   or anything in the car; is that true?

 5       A.   Correct.

 6       Q.   And do you believe you took steps to get out of the

 7   path of the vehicle?

 8       A.   Yes.

 9       Q.   And what steps did you take to get out of the

10   path?

11       A.   When I was approaching the vehicle from San

12   Bernardino Avenue I never stood in front of it.  I made my

13   way to the driver side to prevent myself from standing in

14   front of the vehicle.

15       Q.   Okay.  And then you did reach into the car at some

16   point; correct?

17       A.   Correct.

18       Q.   But you tried to also pull yourself out of the

19   vehicle as well before you fired?

20       A.   Yes.

21       Q.   Do you believe any part of your body was in the car

22   at the time you fired?

23       A.   No.  Because I was getting pulled forward.

24       Q.   It sounds like you fired both of your shots before

25   the door struck you; is that correct?

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
Officer Nicholas Koahou on 10/10/2024

1    A.   Correct.

2    **Q.   Okay.**

3         MR. GALIPO:  We can take that Exhibit 1 down.

4         Okay.  We've been going for almost an hour.

5         Is this a good time, Jim and Jinna, to take like a

6    ten-minute break?

7         MR. TOUCHSTONE:  Sounds good.

8         (Recess taken.)

9    BY MR. GALIPO:

10   **Q.   Are you ready to continue?**

11   A.   Yes, sir.

12   **Q.   Okay.  When you were approaching the black Honda,**

13   **did you ever see the reverse lights on?**

14   A.   No.

15   **Q.   Did you ever see the car reversing at all?**

16   A.   Yes.

17   **Q.   When did you see that?**

18   A.   When I was south in my police car on San Bernardino

19   Avenue.

20   **Q.   So you saw the reverse lights or the car reversing**

21   **while you were still in your car?**

22   A.   No, sir.

23   **Q.   Can you explain that part to me, please.**

24   A.   I was south of the vehicle.  So the nose of the

25   vehicle would have been pointed towards me towards San

Page 43

```
1      A.   Yes.

2      Q.   Did you think based at the time based on your

3  training that you could shoot Mr. Harper merely for driving

4  away?

5      A.   Merely driving away, no.  He was an imminent threat

6  at that point.

7      Q.   And why based on your training could you not shoot

8  him merely for driving away if he wasn't an imminent threat

9  of death or serious bodily injury?

10     A.   It would go against PC 35.  You're not going to

11 shoot somebody for -- that's not a threat to the public,

12 myself, or bystanders.

13     Q.   And to use deadly force, your understanding is there

14 has to be an imminent or immediate threat?

15     A.   Yes.

16     Q.   And to use deadly force you understanding is the

17 threat has to be of death or serious bodily injury?

18     A.   Correct.

19     Q.   Did you think tactically when you were trying to

20 reach into the car, you could potentially be putting yourself

21 at risk?

22     A.   I was assessing the situation tactically from the

23 beginning, the totality of the circumstances.

24          I needed to stop the threat, yes.

25     Q.   So I get that part.  But maybe you've answered it.
```

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

Page 47

1    A.    No.  The door -- I'm sorry, the door is shut.

2          The vehicle accelerated away from me.

3    Q.    **Can you give me an idea as to how far the car moved**

4    **forward until it came to a stop again after the shooting?**

5    A.    It hit the curb and lodged in to the San Bernardino

6    Avenue and continued to the west a couple hundred feet.

7    Q.    **Were you ever moving alongside the car as it was**

8    **moving forward?**

9          **In other words, walking or running with the car?**

10   A.    Yes.  Because my arm was trapped by Mr. Harper's

11   arm.

12   Q.    **How many steps do you think you took with the car?**

13   A.    I would say maybe a car length worth.

14   Q.    **Are you saying that your arm was inside the car when**

15   **you fired your shots?**

16   A.    No.  As I was pulling away from Mr. Harper where I

17   had the arm trapped, that's when I was pulling my firearm

18   out.  I was still moving forward with the vehicle and

19   starting to lose my balance.

20   Q.    **So you pulled your arm free before you fired?**

21   A.    Correct.

22   Q.    **You didn't smell any alcohol or drugs on Mr. Harper,**

23   **did you?**

24   A.    I don't recall smelling any.

25   Q.    **Do you recall who the next officer on-scene was?**

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

Page 54

```
 1                         CERTIFICATE

 2                             OF

 3            CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5            I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6    Stenographic Shorthand Reporter of the State of California,

 7    do hereby certify:

 8            That the foregoing proceedings were taken before me

 9    at the time and place herein set forth;

10            That any witnesses in the foregoing proceedings,

11    prior to testifying, were placed under oath;

12            That a verbatim record of the proceedings was made

13    by me, using machine shorthand, which was thereafter

14    transcribed under my direction;

15            Further, that the foregoing is an accurate

16    transcription thereof.

17            I further certify that I am neither financially

18    interested in the action, nor a relative or employee of any

19    attorney of any of the parties.

20

21            IN WITNESS WHEREOF, I have subscribed my name, this

22    date:  October 10, 2024.

23

24            _____
              Jinna Grace Kim, CSR No. 14151
25
```