1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                  ---oOo---          CERTIFIED COPY

4   JUSTIN CODY HARPER,          )     Case No.
                                 )     5:23-cv-00695-
5              Plaintiff,        )     SSS-DTBx
                                 )
6   vs.                          )
                                 )
7   CITY OF REDLANDS, REDLANDS   )
    POLICE DEPARTMENT, POLICE    )
8   OFFICER KOAHOU, and DOES     )
    1-10,                        )
9                                )
               Defendants.       )
10  _____)

11

12

13

14

15

16          DEPOSITION OF MARTIN SALAZAR

17             Remote Deposition

18          Tuesday, August 13, 2024

19

20

21

22

23

24  Reported by:
    Glinda F. Banks
25  CSR No. 11984
    JOB No. 24-140090B

```
 1    recording was placed into evidence.  The following
 2    is a summary of Salazar's statement.
 3            So that last part there, this is not going
 4    to be a verbatim transcript of everything that was
 5    discussed between you and Detective Romero.  Simply
 6    a summary.
 7        A.  Okay.
 8        Q.  As noted earlier, if you find anything you
 9    feel is inaccurately summarized, please let me
10    know.  All right, sir?
11        A.  Yes.
12        Q.  So it states that on Thursday, September
13    9, 2021, at approximately 1300 hours, Salazar was
14    in the driveway of his residence on Nathan Court
15    washing and detailing his aunt's Honda Accord.
16            Is that a -- does that appear accurate to
17    you?
18        A.  Yes.
19        Q.  Now, what type of Honda Accord are we
20    talking about?  Was this a sedan or coupe?
21        A.  This was a sedan.
22        Q.  So four doors; correct?
23        A.  Four doors, correct.
24        Q.  And how was the vehicle parked in your
25    driveway?  Was it parked nose-in, like facing the
```

1   garage?

2       A.   Facing the garage, correct.

3       Q.   Next sentence in your statement says:

4   Salazar placed the key into the vehicle's ignition

5   and started car to allow the air conditioner to

6   cool the inside of the vehicle.  While outside in

7   his front yard, Salazar saw a blue pickup truck

8   drive eastbound on San Bernardino Avenue.

9            Do you see that?

10      A.   Yes.

11      Q.   Does that sound accurate based on your

12  recollection of the events that you perceived on

13  September 9 and also what you told the detective

14  during the interview?

15      A.   Yes.

16      Q.   Let me you ask you this.  How long have

17  you lived at the Nathan Court residence?

18      A.   Since -- I would say since freshman year.

19  That was back in 2016.  So we're going on almost

20  eight years.

21      Q.   Okay.  Are you somewhat a familiar with

22  the streets and the neighborhood surrounding your

23  residence?

24      A.   Yes.

25      Q.   The next statement in your summary of what

```
 1    his aunt's parked vehicle.
 2            Now when you first made eye contact with
 3    this person who was later identified a Justin
 4    Harper, did you or he exchange any words, Mr.
 5    Salazar?
 6        A.  No.
 7        Q.  And how far away was Mr. Harper from you
 8    when you first saw him unimpeded without anything
 9    between you?
10        A.  He was probably like 10 feet away from me.
11        Q.  So it then states in your statement:
12    Salazar ran toward the vehicle, but Harper opened
13    the front driver side door and swung the door
14    toward Salazar.
15            When Mr. Harper was moving toward your
16    aunt's vehicle, can you describe how he was doing
17    it?  Was he running, walking fast, or what?
18        A.  He was running.
19        Q.  Okay.  And when he started running toward
20    your aunt's Honda Accord, approximately how far was
21    he from the vehicle?
22        A.  He was like 10 feet as well.
23        Q.  Okay.
24        A.  From my doorstep.
25        Q.  All right.  And it then states:  Harper
```

```
 1    told Salazar, "Get the hell out of here."
 2              Is that statement that Mr. Harper made to
 3    you, or did you make that statement to Mr. Harper?
 4         A.   I made the statement to Mr. Harper.
 5         Q.   Okay.  I was a little confused by that.
 6    So in your statement here they got that backwards.
 7    You are the one who said to Mr. Harper, "Get the
 8    hell out of here."  True?
 9         A.   Yes.
10         Q.   Okay.  Did Mr. Harper respond to you when
11    you told him to get the hell out of there?
12         A.   No.
13         Q.   What did you see him do right after you
14    made that statement?
15         A.   He jumped straight into the vehicle.
16         Q.   When say straight into the vehicle, you
17    are referring to the driver's seat of the Honda
18    Accord?
19         A.   The Driver's seat of the Honda Accord.
20         Q.   Next in your statement it says:  The door
21    struck Salazar and caused him to step back and lose
22    his balance.
23              Can you describe how -- if that's
24    accurate, and if so, how that occurred?  I'm a
25    little unclear.
```

```
 1        A.   So when he ran towards the vehicle, he got
 2   into the vehicle, then my word was exchanged.   And
 3   he didn't lock the door at first.   So the door --
 4   so when he got into the car and closed the door,
 5   the door was still unlocked at that period of time.
 6   And I got ahold of the door handle, and the door
 7   was open slightly.   And then he used a little bit
 8   of force to shake me off from the door.   And that's
 9   when I lost my balance.   And then he closes the
10   door and locks the door.
11        Q.   Okay.   When you say he used a little bit
12   of force to knock you off balance, you are saying
13   that he pushed the driver's side door open and into
14   you or what?
15        A.   Slightly, yes.   Not with full force, but
16   slightly.
17        Q.   Okay.   And did that cause you to fall to
18   the ground?
19        A.   My finger slipped from the door handle.
20        Q.   Okay.   And after your finger slipped from
21   the door handle, did you fall to the ground, or
22   were you just kind of off balance momentarily?
23        A.   I was just off balance momentarily.
24        Q.   And the next statement we have:   Harper
25   entered the vehicle and locked the door from the
```

1    but it was moving like two miles -- like inches.

2        Q.  Okay.  And as the vehicle started backing

3    up in reverse out of the driveway, what were you

4    doing?  Were you still pulling on the door handle

5    or anything of that sort?

6        A.  Pulling on the door handle and yelling for

7    help.  My neighbor was luckily outside.

8        Q.  And when you saw your neighbor, who are

9    you referring to?

10        A.  It's my neighbor across the street.  His

11    name is Greg.

12        Q.  Greg Gallo?

13        A.  Gallo, yes.

14        Q.  When you were yelling for help, did

15    Mr. Gallo respond to you in any way?

16        A.  Yes.

17        Q.  What did he say or do?

18        A.  He told me to get away from the vehicle.

19        Q.  Anything else that Mr. Gallo said to you?

20        A.  No.

21        Q.  Your next statement on RPD1196 says:

22    Harper accelerated but could hardly move the

23    vehicle.  Next sentence:  At some point Harper

24    drove the vehicle forward and reversed it out of

25    the driveway.

1          Now can you explain that to me?  Did at

2   some point in time while your aunt's vehicle was in

3   the driveway, was it backing up?  Did it start

4   moving forward and then backwards again?

5          A.  No.  So when he was reversing, he was

6   still moving like very, very slowly where he got

7   onto -- where he actually was able to come out of

8   my driveway where now he's actually on the street.

9   And the vehicle was now getting closer to my

10  neighbor's house, Greg Gallo.  And then that's

11  when -- from where his house is, that's when he

12  started going forward.

13         Q.  Okay.  Next sentence says:  The rear

14  wheels remained locked, but the front tires

15  screeched on the driveway pavement which allowed

16  the vehicle to reverse slowly into the middle of

17  Nathan Court.

18         Do you remember observing that?

19         A.  Yes.

20         Q.  Now during this time that the car is

21  backing out and going now into Nathan Court, were

22  you still holding onto the driver's side door

23  handle in an attempt to get into the vehicle?

24         A.  Yes.

25         Q.  And at any point in time did you lose your

1    feet and get pulled or dragged by the Honda Accord?

2        A.   Yes.

3        Q.   So at some point in time when that vehicle

4    was reversing out of your driveway onto Nathan

5    Court, you kind of fell down to your knees or lost

6    your balance again?  Or explain that to me.

7        A.   There was points in time where I did let

8    go of the door handle just following the car on

9    driver's side.

10       Q.   Okay.

11       A.   But then when he stopped -- kept on

12   stopping and going, that's when I grabbed back onto

13   the handle.

14       Q.   And were you actually holding onto the

15   driver's side door handle as it was in reverse such

16   that you were getting pulled with the vehicle out

17   of the driveway?

18       A.   Yes.

19       Q.   Now, when the vehicle got into the middle

20   of Nathan Court after it had backed out of your

21   driveway, from the time that it first started going

22   in reverse on Nathan Court until the time it got

23   out into the middle of Nathan Court, did you hear

24   Mr. Harper say anything to you?

25       A.   No.

```
 1        Q.  Okay.  I think I understand.  So to the
 2   best of your ability, can you estimate how many
 3   feet away he was from your aunt's vehicle when he
 4   yelled to you to let go of the car, or words to
 5   that effect?
 6        A.  He was like 25 feet.  He wasn't that close
 7   to it at all.
 8        Q.  And going back to your statement.  It says
 9   the vehicle came to a stop in the middle of Nathan
10   Court and faced south toward San Bernardino Avenue.
11            Does that sound accurate to you?
12        A.  Yes.
13        Q.  Going on to the next page, which for the
14   record is RPD1197, it says:  Salazar continued to
15   yell at Harper to exit the vehicle, but Harper
16   refused and continued to try to release the
17   emergency brake.
18            Now, when it says Harper refused, was he
19   making verbal statements to you saying no, I'm not
20   going do that?  Or is that he just wasn't getting
21   out of the car?
22        A.  He was just ignoring me and wasn't getting
23   out of the car.
24        Q.  Okay.  Next it says:  An unknown white
25   male adult, approximately 50 to 60 years old,
```

```
 1   wearing a brown T-shirt, entered the front
 2   passenger seat and began striking Harper six to
 3   seven times on the side of his head with his fist.
 4           Did you observe this happen?
 5       A.  Yes.
 6       Q.  And where were you located such that you
 7   were able to observe these actions by the unknown
 8   white adult male?
 9       A.  I stepped away from the vehicle.  So now I
10   was about 15 to 10 feet away from the vehicle.
11       Q.  How were you oriented 15 or 20 feet away?
12   Were you, for example, to the driver's side of the
13   vehicle?  The rear of the vehicle?  The front of
14   the vehicle?  Or what?
15       A.  The driver's side.
16       Q.  Okay.
17       A.  I mean -- sorry.  It would be not the
18   driver -- the driver -- back driver side.
19       Q.  So driver's side of the vehicle but more
20   towards the rear of the vehicle --
21       A.  More towards the rear.
22       Q.  Like a backseat passenger on the driver's
23   side?
24       A.  Correct.
25       Q.  And as you saw this unknown male striking
```

```
 1   vehicle pressing buttons inside the vehicle to

 2   unlock the emergency brake.

 3        Q.  I see.  And you visually saw him pressing

 4   various buttons and controls --

 5        A.  Yes.

 6        Q.  -- inside the vehicle?

 7        A.  Yes.

 8        Q.  Okay.  Next statement says:  At the same

 9   time Salazar observed a police officer running

10   toward them.  The officer, Nick Koahou, identified

11   himself as Redlands Police and told Salazar to step

12   back.  Koahou told Salazar, "I got this, back up."

13          Is that your recollection of what you

14   heard as the Redlands police officer approached you

15   and your aunt's vehicle?

16        A.  Yes.

17        Q.  Where were you located when the officer

18   arrived on scene and told you to step back?

19        A.  I was in the rear, the rear driver's side.

20        Q.  Had you already opened the front driver's

21   side door of the car when the officer approached?

22        A.  I didn't open the door.  It was the other

23   white male adult that was 50 to 60 years old.

24        Q.  So let me ask you this.  When this other

25   unknown white male was striking Mr. Harper, where
```

1    was he at in relation to the vehicle?

2         A.   He was on the driver's side.

3         Q.   He was on the driver's side?

4         A.   Correct.

5         Q.   So he had pulled open the driver's side

6    door and was striking Mr. Harper?

7         A.   Yes.

8         Q.   Did you ever see that individual place

9    Mr. Harper in some type of a headlock?

10        A.   Yes.

11        Q.   Describe how that happened for me.

12        A.   He grabbed him and put him in like some

13   kind of lock where he was hitting him in the head,

14   which caused him to probably be dazed.  And then by

15   that time the officer came and told us to back up,

16   that he got this.

17        Q.   And where was the white male located when

18   he was holding Mr. Harper in a headlock and

19   striking him?  Was he, for example, standing on the

20   ground near the driver's side open door, or was he

21   on the other side of the vehicle?

22        A.   He was -- I apologize.  He was on the

23   other side, the passenger's side.

24        Q.   Okay.  So just so we're clear.  The

25   individual who was striking Mr. Harper and at some

```
 1   point in time put him in a headlock was contacting
 2   Mr. Harper through the driver's side of the
 3   vehicle?  Or strike that.  Strike that.
 4          The white adult male who was striking
 5   Mr. Harper and at some point in time put him in a
 6   headlock was contacting Mr. Harper through the
 7   passenger's side of your aunt's Honda.  Is that
 8   correct?
 9      A.  Yes.
10      Q.  Okay.  Do you know how or if the driver's
11   side of your aunt's Honda, driver's side door, was
12   opened?
13      A.  No.
14      Q.  You did not open it yourself?
15      A.  No.
16      Q.  Do you recall seeing the police officer
17   open the driver's side door of your aunt's Honda?
18      A.  Yes.
19      Q.  Okay.  So when you observed that, you were
20   still standing towards the driver's rear passenger
21   area of the car?
22      A.  Yes.
23      Q.  So if I understand this -- and you correct
24   me if I've got it wrong -- police officer runs up;
25   says words to the effect of Redlands Police, I got
```

```
 1   this, back up; then opens the driver's side door of

 2   your aunt's Honda.  Is that correct?

 3        A.  Correct.

 4             MR. TOUCHSTONE:  I'm going to play some

 5   audio for you here.  I want you to tell me if this

 6   refreshes your recollection at all.

 7             For the record, Counsel, this is Bates

 8   882, Koahou belt recording of incident, produced in

 9   Defendant's initial disclosures.

10             (Defendants' Exhibit 2 was marked for

11             identification.)

12   BY MR. TOUCHSTONE:

13        Q.  Hang on, Mr. Salazar.  I'll get it right

14   here in a minute.  All right.  I am playing it

15   starting at 3:21.  I think this is probably a

16   little bit earlier than your interactions with

17   Officer Koahou.  So I might skip it forward.  But

18   hang on.

19             First off, can you hear that?

20        A.  No.

21        Q.  You cannot.  Can you hear any audio there

22   either?

23        A.  No.  I can hear it now, yes.

24        Q.  I'm going turn it up as loud as it will

25   go.  We had some trouble with audio earlier.  Bear
```

```
 1   with me.
 2           You hear that, Mr. Salazar?
 3       A.  Yes, I hear it.
 4       Q.  Do you recall hearing the officer say
 5   words to the effect of "move out of the way.  I'm
 6   going to shoot him"?
 7       A.  Yes.
 8       Q.  That sounds familiar to you?
 9       A.  Yes.
10       Q.  I'm going to continue playing.  And I
11   paused at 4:41.
12           Okay.  Did you hear "facedown now,
13   facedown now" a couple of times?
14       A.  Yes.
15       Q.  Does that sound accurate based on what you
16   recall occurring during this incident between the
17   officer and Mr. Harper?
18       A.  Yes.
19       Q.  And are you familiar with a taser device,
20   Mr. Salazar?
21       A.  Yes.
22       Q.  Okay.  At any point in time during this
23   incident did you see the police officer pull out
24   his taser?
25       A.  Yes.
```

```
 1        Q.  Okay.  I'm going to go back up to your
 2   statement.  Can you see your statement right now?
 3        A.  No.
 4        Q.  Hang on one second.  I'll go back over to
 5   that.  How about now, can you see your statement?
 6        A.  Yes.
 7        Q.  Okay.  It says:  Koahou stood in the
 8   doorway between the front driver's side seat and
 9   the door of the vehicle.  Koahou ordered Harper to
10   stop moving around and put his hands up in the air.
11        Did you hear Officer Koahou say put your
12   hands in the air?
13        A.  Not that I remember.
14        Q.  Okay.  Harper ignored the commands, and
15   Koahou reached inside the driver's side area and
16   tried to pull Harper out of the vehicle.  Did you
17   observe that type of action happening?
18        A.  Yes.
19        Q.  Describe that for me in further detail if
20   you could.
21        A.  So the door is open.  So the officer opens
22   the door.  And he pretty much had -- I want to say
23   he had his taser at the moment and was telling him
24   to put his hands up and don't move.  And from there
25   that's when the next action happened.
```

1        Q.  Did you hear the taser go off or see it

2    fire at Mr. Harper?

3        A.  Yes.

4        Q.  Did you hear like a clicking noise?  Does

5    that sound familiar?

6        A.  Yes.

7        Q.  And after the taser was deployed at

8    Mr. Harper, did Mr. Harper do anything or say

9    anything in response?

10       A.  He was just in pain, yelling.

11       Q.  Do you recall what he was yelling?

12       A.  Just screaming.  Just not -- just no

13   words.

14       Q.  Okay.  It says Harper briefly let go of

15   the steering wheel and turned his body to the right

16   toward the center of the vehicle.

17            Do you remember seeing that action by

18   Mr. Harper?

19       A.  Yes.  He kind of tucked in and leaned his

20   body on the center console.

21       Q.  When you say tucked, you mean bend over

22   from his waist toward the center console area?

23       A.  So his stomach -- like he was curled up.

24       Q.  Okay.

25       A.  Curled up on the center console.

1      Q.   Okay.  Next sentence says:  Harper grabbed

2  the vehicle -- the vehicle's gear shift, tried to

3  place the gear into drive.

4          Do you remember seeing that happen?

5      A.   Yes.

6      Q.   Officer Koahou -- I'm adding officer.  It

7  says Koahou reached inside the vehicle and tried to

8  control Harper's hands.

9          Did you see actions to that effect occur?

10     A.   Yes.

11     Q.   Can you describe that in any further

12  detail for me?

13     A.   He was pretty much trying to grab his

14  hands to avoid trying to steer the vehicle into a

15  different direction where they would lose their

16  balance.

17     Q.   Okay.  Was -- now we heard part of the

18  interactions between Officer Koahou and Mr. Harper

19  there.  And I'll replay it for you here in a

20  moment.  Do you recall Officer Koahou saying

21  anything to Mr. Harper when he is physically

22  struggling with him trying to control Mr. Harper's

23  hands?

24     A.   No.

25     Q.   I am going to go back to that audio

```
1    recording and see if I can play it again for you.
2    Okay?
3         A.   Okay.
4         Q.   I'm pausing the audio at 4:20.  And again
5    this is Bates 882 attached as Exhibit 2 to your
6    deposition.  I'm going to play it from 4:20 onward.
7    Okay, Mr. Salazar?
8         A.   Okay.
9         Q.   Now, you heard that audio.  Did you hear
10   "facedown, facedown" and again "don't do it or I'm
11   going to shoot you"?  Do you recall on the date of
12   the incident hearing those words out of Officer
13   Koahou's mouth?
14        A.   Yes.
15        Q.   When Officer Koahou was saying "facedown,
16   facedown," was that when he was physically
17   struggling with Mr. Harper to control his hands, if
18   you know?
19        A.   Not that I remember.  But I would say yes.
20            MR. TERRELL:  I would object to that last
21   answer if he's guessing or making an estimate.
22            Can we clarify that?
23            MR. TOUCHSTONE:  Yeah.  Fair enough.
24        Q.   So Mr. Salazar, you recall in the
25   beginning of the deposition that nobody here wants
```

```
 1   you to guess.  So if you recall something or if you
 2   don't, that's fine.  So --
 3        A.  Okay.
 4        Q.  So when -- I'll repeat the question so
 5   we're clear and you can provide a clear answer one
 6   way or the other.
 7            When you heard "facedown, facedown" by
 8   Officer Koahou, do you know what he was doing in
 9   relationship to Mr. Harper at that time?
10        A.  What the officer was doing?
11        Q.  Yes, sir.
12        A.  He was trying to grab onto his hands from
13   the steering wheel.
14        Q.  I'm going to go back to your statement
15   now.  Can you see your statement over there?
16        A.  Yes.
17        Q.  Okay.  Going down to the next paragraph on
18   Bates RPD1197, it says:  While Koahou struggled to
19   gain control of Harper, the vehicle slowly began to
20   move forward.  Salazar stated as the vehicle moved
21   forward Koahou planted his feet on the ground next
22   to the front door, but his upper body was still
23   inside the vehicle.  Koahou advised Harper to stop
24   the car or he would be shot.
25            We just heard on the audiotape -- and you
```

1    correct me if you didn't hear this.  But what I

2    heard was "don't do it, don't do it, I'll shoot

3    you."  Do you recall that on the audiotape?

4        A.  Yes.

5        Q.  Is that kind of consistent with what you

6    are discussing here, Koahou advised Harper to stop

7    the car or he would be shot?

8        A.  Yes.

9        Q.  It says:  The vehicle continued moving

10   forward at approximately five miles per hour with

11   Koahou still inside the front driver's compartment.

12   Koahou jumped back and away from the vehicle and

13   pointed his firearm at the front driver's side

14   door.  Salazar saw Koahou fire one shot from his

15   firearm toward the front driver's side door of the

16   vehicle as the vehicle's door closed.  Salazar

17   estimated Koahou stood approximately six inches

18   from the front driver's side door when he fired at

19   the moving vehicle.

20           Do you see that language?

21       A.  Yes.

22       Q.  Does that appear accurate based on your

23   recollection of the events as you sit here today,

24   Mr. Salazar?

25       A.  I might have said six inches.  I meant six

1   feet.

2       Q.   Okay.   That appeared pretty close to me

3   which is why I wanted you to clarify that.

4            So Officer Koahou is about six feet away

5   from the front driver's side door of your aunt's

6   Honda Accord when he fired his weapon at the

7   vehicle; is that correct?

8       A.   Yes.

9       Q.   And if I can, I'm going to try to show you

10  a bystander video.   We had some trouble with this

11  earlier.   Let's see what we can do here.   Bear with

12  me.

13           For the record this is Bates 886.

14           (Defendants' Exhibit 3 was marked for

15           identification.)

16  BY MR. TOUCHSTONE:

17      Q.   Do you see a still shot of a video screen

18  in front of you, Mr. Salazar?

19      A.   I do see a video, yes.

20      Q.   Okay.   Can you see my cursor hovering

21  towards the top of the screen?

22      A.   Yes.

23      Q.   Okay.   I know it's some distance away

24  here.   But this vehicle, the black vehicle that I'm

25  covering my cursor over in the middle of the screen

1   at 0:03 seconds of Bates 886, does that appear to

2   be your aunt's black Honda?

3        A.   Yes.

4        Q.   And it appears that there is a couple of

5   people towards the front of the vehicle here.  Do

6   you know who either of those two persons are in

7   front of the vehicle?

8        A.   No.  Those are two subjects -- two

9   subjects that came from -- I honestly don't know

10  where they came from.  But I guess -- to my

11  understanding what was said to me was that they

12  were struck by the truck, that blue truck that

13  Harper was driving.  And they followed the vehicle,

14  and they were helping me out.

15       Q.   Okay.  Now I want to play from three

16  seconds forward for a few seconds.  And I'll view

17  it with you a couple times.  Okay?

18       A.   Okay.

19       Q.   I'm stopping the video at 16 seconds.  Did

20  you see that video?  Were you able to see it on

21  your end, Mr. Salazar?

22       A.   Yes.

23       Q.   Did that video appear to accurately depict

24  the events that occurred on September 9, 2021, with

25  respect to the officer-involved shooting?

1          A.   Yes.

2          Q.   Now, were you able to hear the audio of

3    that video as well?

4          A.   Yes.

5          Q.   Did you hear two gunshots?

6          A.   I didn't hear two gunshots in the video.

7          Q.   As you -- I'm going put your statement

8    back up.

9               It says:  Salazar estimated Koahou stood

10   approximately -- it says six inches, but we have

11   now established that that was six feet from the

12   driver's side door when he fired at the moving

13   vehicle.  And it says in your statement that you

14   observed one shot being fired.

15              Is that correct?

16         A.   Yes.

17         Q.   Okay.  Do you recall, as you sit here

18   today, was it one or two shots that you heard?

19         A.   That I recall I thought it was one shot.

20         Q.   Okay.  Fair enough.  Going back to your

21   statement here, the next sentence says:  The

22   vehicle sped away at a fast rate of speed, struck

23   the south curb of Nathan Court, drove over a

24   sidewalk and entered onto San Bernardino Avenue.

25              Do you see that?

```
 1        A.  Yes.
 2        Q.  So after the gunshots you saw the vehicle
 3   drive off, hop over a curb, and go onto San
 4   Bernardino Avenue.  Is that accurate?
 5        A.  Correct.
 6        Q.  And can you estimate for me the speed of
 7   the vehicle as it drove off after the gunshot you
 8   heard?
 9        A.  It was going like 30 miles per hour.  30
10   to 40.
11        Q.  The vehicle turned west, drove a short
12   distance, and came to a stop.  Salazar did not know
13   if Harper had been shot or injured by the round
14   fired by Koahou.
15            Can you see that?
16        A.  Yes.
17        Q.  Okay.  When you saw the vehicle come to a
18   stop, where were you located when you observed
19   that?
20        A.  When the vehicle came a stop on San
21   Bernardino Avenue?
22        Q.  Yes, sir.  Where were you standing?
23        A.  I actually ran inside the house.
24        Q.  So let's back up.  So you see the officer
25   struggling with Mr. Harper.  You see the taser be
```

1           MR. TOUCHSTONE:  Vague as to time.

2           THE WITNESS:  Repeat the question.

3    BY MR. TERRELL:

4       Q.  Based on that statement I'm asking you:

5    At some point in the contact between the officer

6    and Mr. Harper the vehicle started moving forward;

7    correct?

8       A.  Correct.

9       Q.  Okay.  And the first speed that you have

10   estimated here is approximately five miles an hour

11   when the officer was still inside the vehicle.  Is

12   that correct?

13      A.  Correct.

14      Q.  Okay.  And it's not on the note here.  But

15   I'd like to ask you if you can recall your

16   testimony with the detective when you went in to

17   speak with at the Redlands Police Department.  Do

18   you recall stating that the officer's hand was on

19   the driver's door when he started to move?  Do you

20   recall saying that, that his left hand was on the

21   door?

22      A.  Correct.

23      Q.  Okay.  Do you recall where his right hand

24   was?

25           MR. TOUCHSTONE:  Objection.  Vague as to

1                    REPORTER'S CERTIFICATE

2

3            I, GLINDA F. BANKS, CSR No. 11984,

4    Certified Shorthand Reporter in and for the State

5    of California, do hereby certify:

6            That the foregoing proceedings were taken

7    before me at the time and place therein set forth,

8    at which time the witness was put under oath by me;

9            That the testimony of the witness and all

10   objections made at the time of the examination were

11   recorded stenographically by me and were thereafter

12   transcribed;

13           That the foregoing is a true and correct

14   transcription of my shorthand notes so taken.

15           I further certify that I am not a relative

16   nor employee of any attorney or of any of the

17   parties, nor financially interested in the action.

18           I declare under penalty of perjury under

19   the laws of the State of California that the

20   foregoing is true and correct.

21           Dated this date of September 3, 2024.

22                    *Glinda F. Banks*

23           GLINDA F. BANKS, CSR No. 11984

24

25