```
 1
 2
 3
 4                  UNITED STATES DISTRICT COURT
 5                 CENTRAL DISTRICT OF CALIFORNIA
 6
 7   JUSTIN CODY HARPER,            )
                                    )           [CERTIFIED COPY]
 8              Plaintiff(s),       )
                                    )
 9      vs.                         ) Case No.
                                    ) 5:23-cv-00695-SSS-DTBx
10   CITY OF REDLANDS, REDLANDS     )
     POLICE DEPARTMENT, POLICE      )
11   OFFICER KOAHOU, and DOES       )
     1-10,                          )
12                                  )
                Defendant(s).       )
13   _____)
14
15                    REMOTE PROCEEDING
16
17   DEPOSITION OF:     GREGORY GALLO
     TAKEN BY      :    JAMES R. TOUCHSTONE, ESQUIRE
18   Commencing    :    10:00 A.M.
     Location      :    Rancho Cucamonga, California  91739
19   Day, Date     :    Monday, August 19, 2024
     Reported by   :    JOLYNE K. ROBERTS, CSR NO. 10823
20   JOB No.       :    24-141097A
21
22
23
24
25
```

1  didn't.  I would have been run over, actually.
2       Q    All right.  Going down to the next paragraph on
3  Bates RPD099, it says:
4            Gallo approached the vehicle and
5            opened the driver's side rear
6            passenger door of the Honda.  When
7            Gallo opened the door, he saw an
8            unknown heavyset male that opened the
9            front passenger door, entered the
10           vehicle, and grabbed Harper around his
11           head.  According to Gallo, Harper
12           looked, quote/unquote, loaded and
13           under the influence of speed.
14           I want to discuss that with you.  You stated
15  that you moved out of the driveway to get out of the way
16  of the reversing vehicle, true?
17      A    Correct.
18      Q    And after you moved out of the way and started
19  moving forward some distance, you ran up to the vehicle
20  and opened the driver's side rear door?
21      A    I first tried to open the driver's side door,
22  but it was locked.  And so this heavier set gentleman who
23  had come to the passenger side was trying to get in, and
24  I was trying to unlock any doors that I could so he could
25  get in.

1      And at about the same time I heard police cars
2 coming up.  They were on San Bernardino Avenue and
3 were -- we're on the end of a cul-de-sac, and it's a tall
4 curb, and I didn't know how soon they'd be able to
5 respond and help stop the situation right there.
6      But I was able to enter the backseat of the car,
7 and the other gentleman, whom I later learned had been
8 hit in his work truck by Mr. Harper, was still -- was
9 looking for him and found him in our court.
10     Q    Did you know this heavyset person?
11     A    No, never met him before in my life, but thank
12 goodness he was there, truthfully.
13     Q    Okay.  So when you enter into the rear driver's
14 side passenger seat, can you -- I mean, did you
15 physically get in the vehicle like you were sitting in it
16 and going for a ride?
17     A    No, I was probably half in the car.  I think I
18 had my right cheek on the seat and was trying to do
19 anything to stop the car from moving so we can stop all
20 the insanity that was going on.
21     Q    And when you got into the vehicle, you said you
22 noticed this heavyset gentleman had Harper around the
23 head.  Can you describe that for me?
24     A    Kind of like a headlock, really.  And he was a
25 pretty good-sized gentleman, and he -- he had him there.

22

```
 1   And I didn't think that Mr. Harper was going to get away
 2   or anything or could even see because I thought -- he had
 3   an arm that's twice the size of mine; big guy -- and
 4   thought that that might have -- might subdue him enough.
 5       Q    Was it the heavyset gentleman's left arm around
 6   Mr. Harper's head?
 7       A    I believe it was his -- I believe it was his
 8   right.
 9       Q    Okay.
10       A    I'm not positive because I'm trying to remember
11   if he had faced me when I was in the backseat --
12   partially in the backseat.  I mean, things were happening
13   quick, and it was a lot of excitement.  And I can't say
14   it was fun or anything like that, but we were -- I'm kind
15   of glad that he did because that helped slow the process
16   down that maybe we could put an end to all this somehow.
17            And then moving forward, I heard the -- I saw
18   the officer -- I glanced real quick.  He was parked on
19   San Bernardino; was running towards me.
20            Did you want me to go --
21       Q    Let me pause you here.  I want to talk to you
22   more about the interactions in the car.
23            When you got into the vehicle, were you saying
24   anything to Mr. Harper, giving him commands, for example?
25       A    I probably would have.  I can't remember exactly
```

1  what I said, but, I mean, you want the situation to slow
2  down and to stop, so I probably said, you know, Stop.
3  Stop.  What are you doing this for?
4      Q    Do you recall hearing the heavyset gentleman
5  saying anything to Mr. Harper?
6      A    I think he might be cussing at him a bit because
7  I learned later that he had -- you know, snatched the
8  work truck that he was in with his friend -- with his
9  coworker, I should say.
10     Q    And do you recall Mr. Harper saying anything
11 while this physical struggle was going on?
12     A    No, I don't.  I don't think he was saying
13 anything.
14     Q    Okay.  Now, you stated you heard police sirens
15 in the area over on San Bernardino Avenue --
16     A    Which was approximately 30 feet from where we
17 were from -- no, it was probably 60 feet from my -- the
18 corner property of my house or yard to the street to San
19 Bernardino Avenue.
20     Q    And I have some audio from Officer Koahou that
21 I'm going to play for you.  See if this refreshes your
22 recollection about any statements that he may have made.
23          MR. TOUCHSTONE:  And for the record, I'm going
24 to attach this as Exhibit 2.  This is Bates 882,
25 RPD 0882.  All right.

24

```
1              (Defendants' Exhibit 2 was marked for
2              identification and is attached hereto.)
3              MR. TOUCHSTONE:  And Counsel, I'll start this at
4    4 minutes and 20 seconds into the recording.  I'm going
5    to play this for you, and hopefully you'll be able to
6    hear it.
7              THE REPORTER:  Counsel, you don't need me to
8    write the audio, correct?
9              MR. TOUCHSTONE:  Correct, you do not need to.
10             THE REPORTER:  Thank you.
11                       [Audio Playing]
12        Q    BY MR. TOUCHSTONE:  I'm pausing the audio at
13   4:34.  Do you hear the officer saying he's trying to 215
14   the car, and then you hear him -- sounds like he's
15   shouting at somebody, Move out of the way; I'm going to
16   shoot him?
17             Do you remember hearing any of those statements?
18        A    Yes.
19        Q    Okay.
20        A    That's why I removed myself from halfway in the
21   car and backseat on the left and got out of the way, and
22   thought the officer had the situation under control.  And
23   I try to always oblige whatever any officer ever says.
24        Q    All right.  I'm going to refer you back to your
25   statement here for one moment and play some additional
```

THE SULLIVAN GROUP OF COURT REPORTERS

```
 1   portions of the audio.
 2        A    Sure.
 3        Q    Says:
 4             Gallo heard police sirens arrive at
 5             the scene and saw a uniformed police
 6             officer later identified as Redlands
 7             Police Officer Nick Koahou run towards
 8             the Honda.  Gallo told the man holding
 9             Harper around the head that police are
10             here; they got this now.
11             Do you recall making that statement to the
12   heavyset man?
13        A    Yes.  Because previously, seconds before the
14   officer hollered that at me, We've got this, or whatever
15   his terms were, and I relayed that to this gentleman so
16   that we can both get out of the police's way.  And since
17   there were multiple sirens on San Bernardino, I figured
18   we'll have more police come into the situation.
19             And with an officer, you know, I think first
20   pulling his Taser, I wasn't going to interfere.  I'm
21   doing exactly what he's saying.
22        Q    Okay.  Now, when you hear this officer yelling
23   at you, did you look at the officer and see him running
24   towards you?
25        A    Yes.
```

26

```
 1       Q    Okay.  And when you saw him running towards you,
 2  did he have any weapons in his hands?
 3       A    Not until we got probably 10, 15 feet from me, I
 4  believe.
 5       Q    Okay.
 6       A    And I'm pretty sure that was a Taser.
 7       Q    All right.  I'm going to continue playing from
 8  4:34 onward.
 9                        [Audio Playing]
10            MR. TOUCHSTONE:  All right.  I'm pausing the
11  audio at 4:45.
12       Q    BY MR. TOUCHSTONE:  Did you hear statements of,
13  Get out or I'm going to shoot you?
14       A    Yes, I did.
15       Q    All right.  And at the time that the officer was
16  making those statements -- first off, did you hear him
17  say that on the day of the incident?
18       A    Yes.
19       Q    Where were you standing when you heard him make
20  those statements?
21       A    I was outside the car and back this way
22  [indicating].  Not that far, probably five, six feet
23  because as he was coming up, he was getting closer to the
24  car and telling me, you know, We've got this, or I've got
25  this.
```

27

1    I moved out.  I didn't want to abandon the
2  situation totally.  I wasn't going to run back in my
3  house or anything.
4       Q    Now, when you say you were back this way,
5  towards the Honda --
6       A    Towards the left rear of it, yes.
7       Q    And when he was saying get out of the car.
8  Facedown or I'm going to shoot you, did you hear the
9  officer on the day of the incident make those statements?
10      A    Yes.
11      Q    And at the time that he was making those
12 statements, did he still have his Taser in his hand?
13      A    Well, he didn't pull that out when he was far
14 away.  I think he was much closer to the car probably to
15 ascertain what was going on.
16           He must have been told that someone was trying
17 to steal a car, and when he got -- I would imagine 10, 15
18 feet away from the car coming towards the car, told us as
19 he's coming that far or maybe back a few more steps, I --
20 I've got this, I realized it was the officer.  I moved
21 out; he moved into place.  And -- and --
22      Q    And when you saw him draw a weapon, you're
23 pretty sure it was a Taser?
24      A    I believe so; I thought so.
25           MR. TOUCHSTONE:  Okay.  Now going back to the

```
 1   audio, I'm going to play 4:45 forward.
 2                    [Audio Playing]
 3       Q     BY MR. TOUCHSTONE:  All right.  Did you hear
 4   that noise, the clicking noise and the yelling by
 5   somebody?
 6       A     On the audio, yes.
 7       Q     Okay.  And do you recall seeing the officer tase
 8   Mr. Harper on the day of the incident?
 9       A     I was -- like I say, I'm -- the car is backed
10   up, and I believe he was -- the gentleman then was trying
11   to move forward with the officer partway in the car.
12   And, yes, I did.  I saw him, and my recollection is that
13   it might have hit him somewhere in the chest in this area
14   because he was here.
15       Q     He meaning the officer?
16       A     The officer was to Mr. Harper's left side, and
17   he was trying to stop the situation from progressing, and
18   he -- pardon me.  Yes, and then I heard the, I thought,
19   the Taser go off, and I thought it hit him somewhere in
20   this area, in the upper left body area.
21       Q     Him being Mr. Harper?
22       A     Yes, hitting Mr. Harper in that area, as far as
23   I can tell.
24       Q     And I want to nail down a couple of specifics.
25             When you hear the Taser fire, you state the
```

1     A     Sure.

2     Q     I'm going to show you a video taken by somebody
3  on their cell phone from across the way of the incident.
4  And this is Bates 88 -- RPD Bates 886.  And I'm going
5  to -- it's a little hard to see, but I want to play this
6  through to a certain point; then I'll pause the video and
7  see if it refreshes your recollection.

8           MR. TERRELL:  Jim, what exhibit is this?  What
9  number?

10          MR. TOUCHSTONE:  This will be Exhibit 3 to the
11  deposition, I'm sorry.

12          MR. TERRELL:  Thank you.

13          (Defendants' Exhibit 3 was marked for
14          identification and is attached hereto.)

15                    [Video playing]

16          MR. TOUCHSTONE:  I'm going to play that again
17  one more time, 15 seconds of the video.  I'll rewind it
18  to zero and play it again so you can see it a couple of
19  times.  I'm pausing it at 4 seconds in.

20                    [Video playing]

21    Q     BY MR. TOUCHSTONE:  Can you see my cursor
22  hovering over an individual in a brown shirt?

23    A     Yes.

24    Q     Do you know who that is, sir?

25    A     I was hoping that can be blown up, but I'm sure

```
 1   it can.
 2        Q    Unfortunately, I can't.
 3        A    I believe that's me to his -- that person, where
 4   the cursor is at, me on the left -- on our right side,
 5   his left, I believe.
 6        Q    Who's in the white shirt?
 7        A    I believe that's me.  Can I get a little closer
 8   for one second?
 9        Q    Yes.
10        A    Yeah, I believe that is.
11        Q    And do you see that individual wearing a black
12   shirt that appears you and the white shirt are facing
13   towards?
14        A    Yes, I do see him.
15        Q    And who is that, if you know?
16        A    Well, he's taller than I am by probably five
17   inches.  Hmm.  I don't know.  I'm sorry.
18        Q    No, that's fine.  And do you see the police
19   officer -- and again we're paused at 4 seconds of
20   Bates 886.
21             Do you see the police officer standing in the
22   open doorway of the Honda?
23        A    Yes.
24        Q    And is that consistent with your recollection?
25        A    Yes.
```

38

1  Q   I'm going to play it again.  I'll start at zero
2  and let it play all the way through again.
3                    [Video playing]
4  Q   BY MR. TOUCHSTONE:  Does that video accurately
5  depict your recollection of the events of the incident?
6  A   Yes, it does.
7  Q   And when you observed that video, did that
8  refresh your recollection as to whether the driver's side
9  door of the Honda was open as it began pulling away?
10 A   I believe it was open.
11 Q   I'm going to direct your attention back to your
12 statement now, Mr. Gallo, on the second page, RPD 0980 at
13 the very top.  Says:
14          Harper continued to drive south on
15          Nathan Court over the sidewalk and
16          onto San Bernardino Avenue.  Harper
17          drove approximately 80 to 100 feet
18          west on San Bernardino Avenue, and the
19          vehicle stopped and Harper was taken
20          into custody by law enforcement.
21 Q   Does that sound accurate based on your
22 individual observation?
23 A   Yes, it does.
24 Q   And you stated that the Honda drove over the
25 curb and onto San Bernardino Avenue.  Is that accurate?

THE SULLIVAN GROUP OF COURT REPORTERS

```
 1                    CERTIFICATE OF

 2              CERTIFIED SHORTHAND REPORTER


 3
            The undersigned Certified Shorthand Reporter of
 4   the State of California does hereby certify:
            That the foregoing proceeding was taken before
 5   me at the time and place therein set forth, at which time
     the witness was duly sworn by me;
 6          That the testimony of the witness and all
     objections made at the time of the examination were
 7   recorded stenographically by me and were thereafter
     transcribed, said transcript being a true and correct
 8   copy of my shorthand notes thereof;
            That the dismantling of the original transcript
 9   will void the reporter's certificate.

10          In witness thereof, I have subscribed my name

11   this date:  August 27, 2024

12

                    [signature: Jolyne K. Roberts]
13

14   _____

            JOLYNE K. ROBERTS,
15          CSR NO. 10823

16

17

18

19

20

21

            (The foregoing certification of
22          this transcript does not apply to any
            reproduction of the same by any means,
23          unless under the direct control and/or
            supervision of the certifying
24          reporter.)

25
```