Dale K. Galipo, (CA Bar No. 144074)
dalekgalipo@yahoo.com
LAW OFFICES OF DALE K. GALIPO
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367
Tel: (818) 347-3333 / Fax: (818) 347-4118

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUSTIN CODY HARPER,<br><br>Plaintiff,<br>v.<br>CITY OF REDLANDS; NICHOLAS KOAHOU,<br><br>Defendants. | Case No. 5:23-cv-00695-SSS-SP<br><br>**DECLARATION OF POLICE PRACTICES EXPERT SCOTT DEFOE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date: February 28, 2025<br>Time: 2:00 p.m.<br>Courtroom: 2 |

-1-                    Case No. 5:23-cv-00695-SSS-SP
DECLARATION OF SCOTT DEFOE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# DECLARATION OF SCOTT A. DEFOE

I, Scott DeFoe, declare as follows:

1.    I am a police practices expert specializing in the procedures of police practices and proper police tactics, including proper procedures for the detention and arrest of individuals and the type and degree of force, if any, appropriate under different circumstances.

2.    I am a competent adult and personally familiar with the facts contained herein and would and could competently testify thereto if called upon to do so.

3.    My opinions are based in part on my training, professional experience and education. I am a twenty-year veteran of the Los Angeles Police Department. I held supervisory positions for the last 14 years of my career.  During my tenure with the LAPD, I received over 100 commendations, including the Medal of Valor, Purple Heart, and Police Star.

4.    My qualifications to review this case are set forth in detail in "Exhibit 1" attached hereto.

5.    Before reaching my opinions in this case, I reviewed the investigation materials from the City of Redlands Police Department, including the police reports, City of Redlands Policy Manual, scene photographs, deposition transcripts, cell phone video footage, audio-recorded interviews, and other specific case materials listed in "Exhibit 2" attached hereto.

6.    <u>Deadly Force Applications</u>

    a) The use of deadly force is the most serious decision a peace officer has to make.  Deadly force applied by a peace officer is force that creates a substantial risk of causing death or serious bodily injury.  (*Peace Officer Standards and Training ("POST") 2020 Update, Learning Domain ("LD") 20: Chapter 4—Deadly Force, page 3*).

b) A peace officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary to defend against an imminent threat of death or serious bodily injury to the officer or to another person. (*Cal. Penal Code Section 835a(c)(1)(A); POST LD 20: Chapter 4—Deadly Force, page 4*).

c) A threat of death or serious injury is imminent when, based upon the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. (*Cal. Penal Code Section 835a(e)(2)*).

d) Deadly force can only be used on the basis of an "objectively reasonable" belief that the suspect poses an immediate threat of death or serious bodily injury. Subjective fear alone does not justify the use of deadly force. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that from appearances, must be instantly confronted and addressed. (*Cal. Penal Code Section 835a(e)(2)*).

e) Basic police training teaches that that a suspect's failure to comply with officer commands alone is an insufficient basis for the use of deadly force.

f) Police officers are trained that the decision to use deadly force must be guided by the reverence for human life.

g) Pursuant to basic police training and standards, an officer must

justify every shot he or she fires.

      h) Basic police training teaches that an overreaction in using deadly force is excessive force.

    7.   <u>Standards Surrounding Shooting at Moving Vehicles</u>

Redlands Police Department Policy Manual, Policy 300.4.1, Use of Force, states as follows:

> Shots fired at or from a moving vehicle are rarely effective and may involve additional considerations and risks. When feasible, officers should take reasonable steps to move out of the path of an approaching vehicle instead of discharging their firearm at the vehicle or any of its occupants. An officer should only discharge a firearm at a moving vehicle or its occupants when the officer reasonably believes there are no other reasonable means available to avert the imminent threat of the vehicle, or if deadly force other than the vehicle is directed at the officer or others, Government Code 7286(b). Officers should not shoot at any part of the vehicle in an attempt to disable the vehicle.

Officers are expected to follow their own department policies.

In addition to the Redlands Police Department Policy Manual, basic police officer training teaches that shooting at a moving vehicle has shown to be a poor tactic in most scenarios. If a driver is wounded or killed when operating a motor vehicle, it prevents their ability to effectively operate a motor vehicle. Additionally, an assaultive motor vehicle does not presumptively justify the use of deadly force.

    8.   Under the facts of this case and pursuant to police standards and training, it would have been inappropriate for Officer Koahou to shoot at Mr. Harper for fleeing or attempting to flee. Police officers are trained that a police officer cannot justify shooting a vehicle or its driver simply because that vehicle was fleeing or trying to leave the area.

Police officers are trained that they can only shoot a fleeing felon where all of the following factors are present: (1) the person threatens the officer with a weapon or the officer has information that the person has committed a felony involving the

1   infliction of serious bodily harm or death, (2) the officer has probable cause to

2   believe that that the person will cause death or serious bodily injury to another

3   person unless immediately apprehended, (3) the officer has probable cause to

4   believe that the use of deadly force is reasonably necessary, and (4) the officer gives

5   some warning that deadly force may be used, where feasible.  (*POST LD 20,*

6   *Chapter 4, Use of Deadly Force, pages 5, 6, 11; Cal. Penal Code 835a; Redlands*

7   *Police Department Policy Manual 300.4, Deadly Force Applications*).

8         These four factors were not met in this case.  Mr. Harper did not inflict or

9   threaten to inflict death or serious bodily injury against anyone at any point relative

10   to this incident; Mr. Harper did not have a firearm, and Officer Koahou had no

11   information that Mr. Harper was armed; Mr. Harper posed no immediate threat of

12   death or serious bodily injury necessitating deadly force.

13        9.     Officer Koahou violated basic police officer training and standards with

14   respect to the use of deadly force, when he shot Mr. Harper while Mr. Harper

15   occupied the driver seat of a vehicle.  A reasonable officer acting consistent with

16   standard police practices would not have used lethal force in this situation.  Mr.

17   Harper did not pose an immediate threat of death or serious bodily injury to Officer

18   Koahou or to any other person at the time of the shots. At the time of the shooting, it

19   was not the case that any person was about to be run over by the vehicle with no

20   opportunity to get out of the way.

21           a)  According to Officer Koahou, he was trained that if he shot and

22                  incapacitated the driver it could potentially endanger the public.

23                  (*Deposition Transcript of Nicholas Koahou, page 28*).

24           b)  Officer Koahou advised the civilians to move away from the Honda,

25                  and they complied. At the time that Officer Koahou Tased Mr. Harper,

26                  nobody was standing in front of the Honda—the civilians had already

27                  moved to the side of the Honda. (*Deposition Transcript of Martin*

28

DECLARATION OF SCOTT DEFOE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1    *Salazar, page 49*).

2    c) As Mr. Harper began to pull the car forward, Officer Koahou pulled

3    himself back and away from the car. (*Deposition Transcript of*

4    *Nicholas Koahou, page 26*).

5    d) Officer Koahou, did not see anyone standing in front of Mr. Harper's

6    car when he shot—the civilians had already moved to the side of the

7    Honda. (*Deposition Transcript of Nicholas Koahou, page 27*).

8    e) Officer Koahou never fell to the ground and did not have any physical

9    injuries. (*Deposition Transcript of Nicholas Koahou, page 27*).

10    f) When Officer Koahou fired, he did not see a gun or knife on Mr.

11    Harper or inside Mr. Harper's vehicle. (*Deposition Transcript of*

12    *Nicholas Koahou, page 28*).

13    g) Officer Koahou fired his rounds before the vehicle's door hit him.

14    (*Deposition Transcript of Nicholas Koahou, page 31*).

15    h) Officer Koahou took steps to get out the path of Mr. Harper's vehicle.

16    (*Deposition Transcript of Nicholas Koahou, page 36*).

17    i) According to Witness Gregory Gallo, he, Mr. Salazar and the other

18    civilian on scene were not physically harmed as a result of this incident,

19    (*Deposition Transcript of Gregory Gallo, page 45*).

20    10.    Officer Koahou Engaged in Pre-Shooting Negligent Tactics

21    a) There was a gross lack of situational awareness and fundamental

22    tactical errors on the part of Officer Koahou during this incident.

23    b) A reasonable officer in Officer Koahou's position would have

24    immediately moved to a position of cover and formulated an effective

25    and safe tactical plan.  A reasonable officer under these facts would

26    have waited for additional Redlands Police Department officers and a

27    San Bernardino County Sheriff's Department Police Helicopter unit to

28

DECLARATION OF SCOTT DEFOE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

assist with containment and tactical deployment to take Mr. Harper into custody. (*POST LD 23, Chapter 2: Basic Tactical Considerations Approach, (pages 2-8); Redlands Police Department, Policy Manual, Policy 420, Obtaining Air Support*).

c) A reasonable officer in Officer Koahou's position would have established a perimeter in anticipation that Mr. Harper could flee the area. Establishing a perimeter contains and isolates the crime scene, prevents the suspect from escaping the area, prevents unauthorized entry into the area, and can aid in apprehending the suspect.

d) Redlands Police Department Policy Manual, Policy 429, Foot Pursuit Policy, advises against pursuing a suspect on foot as a solo officer. Pursuant to Officer Koahou's own policy, surveillance and containment are generally the safest tactics for apprehending fleeing persons. According to Officer Koahou, if Mr. Harper drove away, he could have got on his police radio and advised other police units. (*Deposition Transcript of Nicholas Koahou, Page 45*).

e) Officer Koahou failed to de-escalate and defuse the situation involving Mr. Harper. De-Escalation is a concept that involves an officer's use of time, distance and relative positioning to decrease the need for using force.  Rather than de-escalating the situation, Officer Koahou unnecessarily escalated the situation and made a poor tactical decision when he reached into the Honda to extract Mr. Harper. (*Redlands Police Department, Policy Manual, Policy 300.3.6, Use of Force Alternative Tactics—De-Escalation; POST LD 21*). According to Officer Koahou, when he reached inside of the Honda, he could be putting himself at risk. (*Deposition Transcript of Nicholas Koahou, Page 43*).

f) Redlands Police Department, Policy Manual, Policy 304.4, Verbal and Visual Warnings, instructs that "[a] verbal warning of the intended use of the Taser device should precede its application, unless it would otherwise endanger the safety of officers or when it is not practicable due to the circumstances." The purpose of the warning in part is to provide the individual with a reasonable opportunity to voluntarily comply. Officer Koahou failed to issue a verbal warning to Mr. Harper that he was going to deploy his Taser, and he also failed to provide Mr. Harper a reasonable opportunity to comply.

g) Redlands Police Department, Policy Manual, Policy 304.5.2, Special Deployment Considerations, teaches officers not to Tase a person who is operating a vehicle. If neuro muscular incapacitation were achieved, it may have prevented Mr. Harper from safely operating the Honda, which can cause an unnecessary collision that could result in injury or death.

h) Officer Koahou Tased Mr. Harper in the chest. Redlands Police Department, Policy Manual, Policy 304.5.3, Targeting Considerations, trains officers to avoid the chest area when deploying a Taser.

11. <u>The Shooting was Excessive and Unreasonable</u>

From the standpoint of police practices, including basic police training, POST standards, and the City of Redlands's own policies, Officer Koahou's use of deadly force was improper, inappropriate, excessive and unreasonable, including (but not limited to) for the following reasons:

a) <u>No Immediate Defense of Life Situation</u>. Police officers are trained that they can only use deadly force in an Immediate Defense of Life Situation, in other words, when there is an immediate or imminent threat of death or serious bodily injury.

1    A fear of future harm is not enough.  There was no immediate
2    defense of life situation when Officer Koahou fired his shots.  No
3    person was about to be run over by Mr. Harper's vehicle at the
4    time of the shots.

5    b)    <u>Subjective fear is insufficient</u>.  Basic police training requires that
6    any use of deadly force must be based on an "objective" rather
7    than "subjective" "reasonable necessity" of action to "imminent
8    danger."  In this case, the record does not support any objectively
9    reasonable explanation that Mr. Harper posed an immediate
10    threat of death or serious bodily injury at the time that any of the
11    shots were fired.  Mr. Harper was unarmed, and no person was
12    about to be struck by Mr. Harper's vehicle.

13    c)    <u>Violation of basic police training.</u>  Officer Koahou violated
14    police training and standards surrounding shooting at vehicles
15    and their driver when he shot Mr. Harper while Mr. Harper
16    occupied the driver seat of a vehicle.  There was no person about
17    to be struck by Mr. Harper's vehicle when Officer Koahou fired
18    his shots. Therefore, there was no reason for Officer Koahou to
19    shoot.

20    d)    <u>No crime involving the infliction of serious injury or death.</u>
21    Officer Koahou was not responding to a crime involving the
22    infliction of death or serious bodily injury.  Officer Koahou had
23    no information that Mr. Harper was armed and no information
24    that anyone had been injured.

25    e)    <u>Cannot shoot for fleeing</u>. Officer Koahou could not justify
26    shooting Mr. Harper under a Fleeing Felon theory, including
27    because Mr. Harper was unarmed, and he never inflicted death or

28

DECLARATION OF SCOTT DEFOE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1    serious bodily injury on anyone prior to the shooting.

2    f)    <u>Unarmed</u>.  Mr. Harper did not have a firearm or other weapon

3    during this incident, and his hands were visibly empty during the

4    shooting.

5    g)    <u>No verbal threats</u>.  Mr. Harper never verbally threatened to harm

6    anyone.

7    h)    <u>Reasonable alternative measures available</u>.  Officers are trained

8    that they can only use deadly force in a "last resort" situation.

9    Officer Koahou other reasonable measures available, including

10    giving Mr. Harper an opportunity to comply after being Tased,

11    moving out of the way, waiting for backup, giving further

12    commands, and setting up a perimeter for later apprehension.

13    i)    <u>No reverence for human life</u>.  Police officers are trained that they

14    must show a reverence for human life.  Officer Koahou showed

15    no reverence for human life when he fired at Mr. Harper.

16    j)    <u>Police officers are responsible for justifying every shot</u>.  Police

17    officers are trained that they must justify every shot they fire.

18    Officer Koahou is responsible for every shot that he fired in this

19    case, and both of his two shots were unjustified.

20

21

22

23

24

25

26

27

28

Case No. 5:23-cv-00695-SSS-SP
DECLARATION OF SCOTT DEFOE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1        I declare under penalty of perjury that the foregoing is true and correct, and

2    that this was executed this 17th day of January 2025 at Huntington Beach,

3    California.

4

5    _____

6            Scott A. DeFoe

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 1

**Materials Reviewed:**

1. Complaint for Damages, Demand for Jury Trial, <u>Case No. 5:23-cv-695.</u>

2. Stipulated Protective Order, <u>Case No. 5:23-cv-695</u>.

3. Declaration of Robert McFarlane, <u>12/20/2024</u>.

4. Redlands Police Department, <u>Incident No. 210030548</u>, (<u>RPD 00001-48</u>).

5. Photographs, (<u>RPD 00049-130</u>).

6. Redlands Police Department, Policy Manual, <u>7/21/2021</u>, (<u>RPD 00131-835</u>).

7. California Commission on POST, Koahou, Nicholas, <u>POST ID No. C13-M61</u>, (<u>RPD 00836-838</u>).

8. Audio-Recording, (<u>Cordoba Recording</u>), <u>RPD 0840-44772516</u>, (<u>2:51</u>).

9. Audio-Recording, (<u>Cordoba Recording</u>), <u>RPD 0841-44772517</u>, (<u>1:49</u>).

10. Audio-Recording, (<u>Cordoba Recording</u>), <u>RPD 0842-44772518</u>, (<u>16:17</u>).

11. Audio-Recording, (<u>Cordoba Recording</u>), <u>RPD 0843-44772519</u>, (<u>6:28</u>).

12. Audio-Recording, (<u>Cordoba Recording</u>), <u>RPD 0844-44772520</u>, (<u>10:11</u>).

13. Audio-Recording, (<u>Cordoba Recording</u>), <u>RPD 0845-44772521</u>, (<u>3:28</u>).

14. Audio-Recording, (<u>Cordoba Recording</u>), <u>RPD 0846-44772522</u>, (<u>6:43</u>).

15. Audio-Recording, (<u>Doley Recording</u>), <u>RPD 0847-45238182</u>, (<u>3:34</u>).

16. Audio-Recording, (<u>Frisch Recording</u>), <u>RPD 0848-42354190</u>, (<u>31:43</u>).

17. Audio-Recording, (<u>Frisch Recording</u>), <u>RPD 0849-42354191</u>, (<u>10:05</u>).

18. Audio-Recording, (Gutierrez Recording), RPD 0850-48762070, (7:21).

19. Audio-Recording, (Gutierrez Recording), RPD 0851-48762071, (1:39).

20. Audio-Recording, (Gutierrez Recording), RPD 0852-48762072, (1:45).

21. Audio-Recording, (Gutierrez Recording), RPD 0853-48762077, (23:24).

22. Audio-Recording, (Gutierrez Recording), RPD 0854-48762078, (4:47).

23. Audio-Recording, (Gutierrez Recording), RPD 0855-48762079, (47:19).

24. Audio-Recording, (Gutierrez Recording), RPD 0856-48762080, (49:42).

25. Audio-Recording, (Gutierrez Recording), RPD 0857-48762081, (1:50).

26. Audio-Recording, (Lomelin Recording), RPD 0858-50072305, (1:02).

27. Audio-Recording, (Lomelin Recording), RPD 0859-50072306, (19:48).

28. Audio-Recording, (Mead Recording), RPD 0860-39692943, (51:00).

29. Audio-Recording, (Mead Recording), RPD 0861-39692944, (54:42).

30. Audio-Recording, (Mead Recording), RPD 0862-39692945, (6:18).

31. Audio-Recording, (Mead Recording), RPD 0863-39692946, (9:45).

32. Audio-Recording, (Mead Recording), RPD 0864-39692947, (17:10).

33. Audio-Recording, (Mead Recording), RPD 0865-39692948, (6:32).

34. Audio-Recording, (Mead Recording), RPD 0866-39692949, (0:52).

35. Audio-Recording, (Truong Recording), RPD 0867-47596770, (38:08).

36. Audio-Recording, (Truong Recording), RPD 0868-47596772, (11:05).

37. Audio-Recording, (<u>Vasquez Recording</u>), <u>RPD 0869-49032657</u>, (<u>4:17</u>).

38. Audio-Recording, (<u>Vasquez Recording</u>), <u>RPD 0870-49032658</u>, (<u>10:25</u>).

39. Audio-Recording, (<u>Vasquez Recording</u>), <u>RPD 0871-49032659</u>, (<u>17:52</u>).

40. Audio-Recording, (<u>Vasquez Recording</u>), <u>RPD 0872-49032661</u>, (<u>3:55</u>).

41. Audio-Recording, (<u>Vasquez Recording</u>), <u>RPD 0873-49032662</u>, (<u>8:38</u>).

42. Audio-Recording, (<u>Vasquez Recording</u>), RPD 0874-Export_2021-09-09, (<u>11:28</u>).

43. Audio-Recording, <u>RPD 0875</u>-Hospital Recording 5, (<u>0:52</u>).

44. Audio-Recording, <u>RPD 0876</u>-Hospital Recording, (<u>54:42</u>).

45. Audio-Recording, <u>RPD 0877</u>-Hospital Recording 2, (<u>6:18</u>).

46. Audio-Recording, <u>RPD 0878</u>-Hospital Recording 3, (<u>9:45</u>).

47. San Bernardino County Sheriff's Department, Special Investigations Division, PC 245(<u>a</u>)(<u>1</u>), <u>Assault with a Deadly Weapon</u>, <u>H#2021-111</u>, <u>DR No. 602100177</u>, 9/9/2021, (<u>RPD 0887-890</u>).

48. Case Summary & Miscellaneous Reports, San Bernardino County Sheriff's Department, <u>DR #602100177, H#2021-111</u>, (<u>RPD 0891-1300</u>).

49. Audio-Recording, <u>RPD 0879</u>, Hospital Recording 4, (<u>Harper Discussion</u>), (<u>6:32</u>).

50. Audio-Recorded Interview with Harper, (<u>Scene</u>), (<u>RPD 0880</u>), (<u>51:00</u>).

51. Audio-Recorded Interview with Harper's Mother, (<u>RPD 0881</u>), (<u>17:00</u>).

52. Koahou Belt Recording, (<u>RPD 0882</u>), (<u>6:58</u>).

53. Koahou Public Safety Statement, (<u>RPD 0883</u>), (<u>0:40</u>).

54. "Ring Video Suspect's Running," (<u>RPD 0884</u>), (<u>1:09</u>).

55. Ring Video, Harper Running, (<u>RPD 0885</u>), (<u>0:29</u>).

56. Cell Phone Video of Shooting, (<u>RPD 0886</u>), (<u>1:18</u>).

57. Ring Video, (<u>RPD 1275</u>), (<u>0:31</u>).

58. Ring Video, (<u>RPD 1276</u>), (<u>0:31</u>).

59. Ring Video, (<u>RPD 1278</u>), (<u>0:14</u>).

60. City of Redlands Police Department Stipulation of Probable Cause and Release, Justin Harper, (<u>RPD 1979</u>), <u>Case No. 210030548</u>.

61. Photographs, (<u>RPD 002137-2803</u>).

62. Deposition Transcript and Exhibits of Nicholas Koahou taken on October 10, 2024.

63. Deposition Transcript of Justin Cody Harper taken on October 23, 2024.

64. Deposition Transcript and Exhibits of Gregory Gallo taken on August 19, 2024.

65. Deposition Transcript and Exhibits of Justin Garcia taken on August 13, 2024.

66. Deposition Transcript and Exhibits of Martin Salazar taken on August 13, 2024.

**<u>California POST Basic Learning Domains as Follows:</u>**
1. #1: "Leadership, Professionalism and Ethics."
2. #2: "Criminal Justice System."
3. #3: "Policing in the Community."
4. #19: "Vehicle Operations."
5. #20: "Use of Force."
6. #22: "Vehicle Pullovers."
7. #21: "Patrol Techniques."
8. #23: "Crimes in Progress."

9.  #33: "Arrest and Control."

10. #35: "Firearms/Chemical Agents."

11. #37: "People with Disabilities."

EXHIBIT 2

## My Qualifications for Reviewing this Case:

My opinions are based on my education, training and experience.  Upon my graduation in June 1988 from Northeastern University in Boston with a Bachelor's Degree in Criminal Justice, I was hired as Criminal Investigator/Special Agent GS-1811.  Upon completion of Criminal Investigator/Basic Agent School at the Federal Law Enforcement Training Center (FLETC), 6-Month academy, I was assigned to the Organized Crime Drug Task Force where I functioned as an agent and undercover operative. The investigations focused on targeting criminal organizations that were involved in large scale narcotic smuggling and money laundering operations.

I was assigned to the Office of the Special Agent In-Charge, in San Francisco from August 1988 until I joined the Los Angeles Police Department in November of 1989. While in the academy, I was selected by the staff to be my Recruit Class Leader.  Upon my graduation from the LAPD Academy, I was assigned to 77th Division.  In addition to being assigned to 77th Division, I was assigned to Northeast Division (Patrol), Northeast Division (Special Projects Unit-SPU), Northeast Division C.R.A.S.H (Gang Detail).  I was selected to be transferred to Operations Central Bureau C.R.A.S.H., where I worked a plain clothes detail targeting specific gangs throughout Operations Central Bureau.

I applied and was selected to be a Police Officer III at Wilshire Area Vice where I functioned as an undercover operative targeting prostitution, gambling, bookmaking and other Vice related offenses. While working Wilshire Vice, I was ambushed and received two gunshot wounds.  I received the Purple Heart in 2010.  Upon return from my injuries, I attended mandated Field Training Officer School and was assigned as a Field Training Officer at Wilshire Division.  I trained recruits upon their graduation from the Los Angeles Police Academy in tactics, use of force, report writing, vehicle stops, calls for service, court testimony, emergency procedures, pursuit policy, accident investigations, perimeters, Department policies and procedures, and effective communication skills. While assigned as a Field Training Officer, I was involved in an In-Policy Lethal Use of Force incident, while working with a Probationary Police Officer who had recently graduated from the Los Angeles Police Academy.

I was promoted to the rank of Detective and attended Basis Detective School.  Upon completion of Basic Detective School, I was assigned to Wilshire Area Narcotics, Field Enforcement Section, where I functioned in an undercover capacity.

I was promoted to the rank of Sergeant I and assigned to Hollenbeck Division. Prior to my assignment, I attended mandated Basic Supervisor School. In conjunction with Supervisor School, I was selected to attend the West Point Leadership Academy Supervisor Training. The training focused on team building, leadership, and decision making. While assigned to Hollenbeck Division, I conducted roll call training on a daily basis on numerous subject matters to include Use of Force Options (Non-Lethal and Lethal), Tactics, Calls for Service, Calls for Service involving the Mentally Ill, Vehicle Pursuit Policy, LAPD Policies and Procedures, Use of Force Policy, Updated Legal Bulletins, Training Directives, and other Standardized Roll Call Training. I directly supervised a Watch of Officers and provided supervisory oversight during calls for service, tactical situations, perimeter tactics, containment and control issues and use of force incidents. I conducted audits, personnel investigations, Standard Based Assessments (Ratings), Use of Force Investigations, Administrative Projects, and prepared commendations for officer's field performance. While assigned to Hollenbeck Division, I was selected as the Officer-In-Charge of Hollenbeck Division's Special Enforcement Group. I directly supervised (14) Police Officers and Detectives assigned to the Unit. Our unit worked in conjunction with Hollenbeck Detectives and specifically targeted career criminals in the Division. I provided ongoing mandated Department Training as well tactical, firearms, less than lethal and search warrant tactics training to the Officers and Detectives. As a Unit, we prepared and served numerous search warrants. I provided search warrant tactical briefing and de-briefing of each warrant at the conclusion of the of the service. I completed audits, administrative projects, Use of Force Investigations, personnel complaints, and other administrative duties as deemed necessary by the Area Commanding Officer.

During this time, I was selected to be loaned to Internal Affairs, Headquarters Section. I investigated personnel complaints that were too large in scope for a geographical Division. At the conclusion of my loan, I was selected to Management Services Division, Special Projects, Office of the Chief of Police. I completed numerous in-depth staff projects for review by the Chief of Police. In addition, I was assigned with conducting research and editing the 2000 LAPD Department Manual.

Also, during this time, I earned my Master's Degree in Public Administration from California State University, Long Beach.

I applied and was selected as a Sergeant II at 77th Division Vice. I directly supervised ten undercover officers and four uniformed officers. I provided all facets of training to

the officers assigned to Vice at that time to include: Use of Force Policy, Legal Updates, Department Directives, Training Bulletins, Standardized Roll Call Training, Tactics Training, Undercover Operations training, Surveillance training, and any other training deemed necessary by my Area Commanding Officer. I conducted audits, personnel investigations, administrative projects, Use of Force Investigations and special projects.

During this time, I was selected by the Chief of Police to be loaned to the Rampart Corruption Task Force. I conducted Use of Force audits on Specialized Units in Central and South Bureaus. I reported directly to the Office of the Chief of Police.

In 2000, I applied and was selected to Metropolitan Division K9 Platoon as a Sergeant II+1. I directly supervised (18) K9 Handlers. Metro K9 conducted K9 Operations for the entire Department covering all Patrol Divisions and Specialized Units. I provided all facets of training to the K9 Officers to include: K9 Operations, tactics, search warrant services, Mobile Field Force Options, Less than Lethal Force Options, Lethal Force Options, Department Directives, Training Bulletins, and other training dictated by the Officer-in-Charge and Commanding Officer. In addition, I taught K9 Operations at in-service training, Watch Commander School, Field Training Officer (FTO) School, and Basic Detective School. While at K9, I investigated and completed K9 contacts, personnel complaints, and Use of Force Investigations. In addition, I directed and was directly involved in Use of Force incidents. I received the LAPD Medal of Valor and LAPD Police Star for two lethal use of force incidents while assigned to K9.

In 2005, I was selected as a Sergeant II+1 in Special Weapons and Tactics (SWAT). I directly supervised sixty SWAT Officers. I conducted and facilitated all facets of SWAT training to include Weapons Training (.45 caliber, MP-5, M-4, Benelli Shotgun, Remington 870 Bean Bag Shotgun, .40mm, SAGE, MX-26 Taser) on a monthly basis. In addition, I facilitated and conducted training in the following training Cadres: Breacher (Explosive), Crisis Negotiation-Mental Health, MEU, SMART, Suicide Prevention, Counter-Terrorism Cadre, Climbing, Hostage Rescue, Sniper Training, Air Support Training (Fast rope, Aerial Platform Shooting). I directly supervised SWAT missions and High-Risk Search Warrant Services to include all facets (preparation, briefing, deployment, de-briefing). I was the Supervisor-in-Charge of the Crisis Negotiation Team. I provided on-going crisis negotiation training, mental health training, de-briefs, 40-hour POST Certified CNT School, and suicide prevention training. I worked in conjunctional with the mental health community to provide and facilitate training with LAPD SMART, LAPD Mental Evaluation Unit (MEU), Behavioral Science

Services Section (BSS), and the Didi Hirsch Suicide Prevention Training. In addition, I assisted the West Point Military Academy with the development of their crisis negotiation curriculum.

During this time, I was selected as the sole LAPD SWAT representative to respond to Mumbai India with Counterterrorism following the terrorist attack in November 2008. I taught use of force, tactics and SWAT deployment to 250 Mumbai Special Tactical Police Officers. Upon my return, I assisted with the development of multiple venue/multiple attacker tactics.

In June 2010, I retired from the Los Angeles Police Department with 20 years in service to pursue an opportunity in the private sector. I held supervisory positions for the last 14 years of my career. During my tenure with the LAPD, I received over 100 Commendations to include: The Medal of Valor, Purple Heart and the Police Star.

From June 2010 through April 2013, I was the Vice President of Security Operations at Caruso Affiliated in Los Angeles, CA. My responsibilities included: Identified and conducted Risk and Vulnerability Assessments for all Caruso Affiliated Developments, projected developments/investments, and residences. Utilized strategic-level analysis from the intelligence community, law enforcement and the private sector. Ensured a coordinated ability to identify and monitor potential or actual incidents among critical infrastructure domains and all personal and professional interests of Caruso Affiliated. Mitigated expected threats. Utilized preplanned, coordinated actions in response to infrastructure warnings or incidents. Responded to hostilities. Identified and eliminated the cause, or source, of an infrastructure event by the utilization of emergency response measures to include on-site security personnel, local law enforcement, medical and fire rescue and relevant investigative agencies. Conducted all facets of security training for the company and employees. Formulated Business Continuity and CEO Succession Plans for the company and all affiliated business interests. Conducted ongoing audits and internal investigations.

From June 2013 to June 2014, I was hired as a Deputy Sheriff at the Riverside Sheriff's Department where I conducted all facets of patrol service to include calls for service, self-initiated field activity, arrests, citations, and court testimony. In addition, during my tenure with the Riverside County Sheriff's Department, I was assigned to Robert Presley Detention Center (RPDC). Processed and monitored inmate population from initial intake, housing, court, transportation and release. Conducted searches of inmate population as well as the

facility on an ongoing basis. Utilized experience as a gang officer, Detective and Sergeant with LAPD to conduct interviews and interrogations of prisoners regarding a myriad of investigations. Provided information to gang detail. Functioned as a mentor to newly appointed Deputy Sheriffs as well as Supervisors. Attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. Attended on-going training to include Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents, and Proper Protocols and Procedures when responding to a medical incident or suicide.

From June 2014 to March 2016, I was the Director of Security at Universal Protection Service where I supervised 84 Security Professionals at the City National Plaza. Conducted and facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals.  Ensured all Security Professionals were compliant with BSIS security training and licensing.  Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft.  Conducted ongoing Risk and Vulnerability Assessments of the City National Plaza to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. Coordinated all security efforts to ensure safety at Special Events.  Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis.

From March 2016 to September 5, 2017, I was the Director of Security at L&R Group of Companies.  Identified and conducted Risk and Vulnerability Assessments for all L&R Group of Companies developments and projected developments throughout the United States. Conducted and/or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals.  Ensured all Security Professionals were compliant with BSIS security training and licensing.  Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft.  Conducted ongoing Risk and Vulnerability Assessments to include security

staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. Coordinated all security efforts to ensure safety at Special Events.  Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis as well as respective law enforcement agencies throughout the United States on security matters.