# EXHIBIT 1

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4   JUSTIN CODY HARPER,                  )
                                          )
 5              Plaintiff,                )
                                          )
 6              vs.                       ) Case No.
                                          ) 5:23-CV-00695-SSS-DTB
 7   CITY OF REDLANDS, REDLANDS POLICE    )
     DEPARTMENT, POLICE OFFICER KOAHOU,   )
 8   and DOES 1 through 10, inclusive,    )
                                          )
 9              Defendants.               )
     _____)

10

11

12

13

14           REMOTE VIDEOCONFERENCE DEPOSITION OF

15               OFFICER NICHOLAS KOAHOU

16               THURSDAY, OCTOBER 10, 2024

17

18

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  108815
```

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

Page 2

```
 1                  UNITED STATES DISTRICT COURT

 2                  CENTRAL DISTRICT OF CALIFORNIA

 3

 4   JUSTIN CODY HARPER,                )
                                        )
 5                  Plaintiff,          )
                                        )
 6            vs.                       ) Case No.
                                        ) 5:23-CV-00695-SSS-DTB
 7   CITY OF REDLANDS, REDLANDS POLICE  )
     DEPARTMENT, POLICE OFFICER KOAHOU, )
 8   and DOES 1 through 10, inclusive,  )
                                        )
 9                  Defendants.         )
     _____)
10

11

12

13

14            The remote videoconference deposition of OFFICER

15   NICHOLAS KOAHOU, taken on behalf of the Plaintiff, beginning at

16   2:07 p.m., and ending at 3:50 p.m. on Thursday, October 10, 2024,

17   before Jinna Grace Kim, Certified Stenographic Shorthand

18   Reporter No. 14151.

19

20

21

22

23

24

25
```

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
Officer Nicholas Koahou on 10/10/2024

Page 8

```
 1      Q.   And what agency did you go to?

 2      A.   City of Redlands Police Department.

 3      Q.   And can you just tell me why you made the transfer

 4 at that time?

 5      A.   It was personal.  I had a lot of friends in the

 6 city.  I thought I had better opportunities at Redlands.

 7      Q.   Were you there when the City of San Bernardino filed

 8 for bankruptcy?

 9      A.   Yes.

10      Q.   Trust me.  I felt like I was too.

11           I think I had eight or ten cases and four of them

12 had already settled; that's another story.

13           And then were you assigned to patrol again with

14 Redlands?

15      A.   Yes.

16      Q.   And is that your current assignment now?

17      A.   No.

18      Q.   What is your assignment now?

19      A.   I'm detective.

20      Q.   Was that a promotion?

21      A.   It's a lateral move, corporal to detective.

22      Q.   When you were with the City of San Bernardino had

23 you been involved in any officer-involved shootings when you

24 were the shooter?

25      A.   Yes, sir.
```

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
Officer Nicholas Koahou on 10/10/2024

Page 9

| | | |
|---|---|---|
| 1 | Q. | How many? |
| 2 | A. | Just one. |
| 3 | Q. | What year was that in? |
| 4 | A. | 2015. |
| 5 | Q. | Do you remember the name of the person you shot? |
| 6 | A. | It was Terrace [phonetic] RSC [phonetic]. |
| 7 | Q. | Were you -- was there a lawsuit as a result of that |
| 8 | | shooting? |
| 9 | A. | No. |
| 10 | Q. | And how about at Redlands, is this your only |
| 11 | | officer-involved shooting there? |
| 12 | A. | Yes. |
| 13 | Q. | Did the City of San Bernardino have a policy |
| 14 | | discouraging or disfavoring shooting at moving vehicles? |
| 15 | A. | I don't recall. |
| 16 | Q. | Do you know if Redlands has that type of policy? |
| 17 | A. | Yes. |
| 18 | Q. | When you went to Redlands did you have to go through |
| 19 | | a period of field training? |
| 20 | A. | Yes. |
| 21 | Q. | And during the field training was part of it to |
| 22 | | become familiar with their policies? |
| 23 | A. | Yes. |
| 24 | Q. | If you know, I don't know if you're familiar with |
| 25 | | this name, but do you know if Redlands uses a company called |

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
Officer Nicholas Koahou on 10/10/2024

Page 10

1    Lexipol for their policies?

2        A.    Yes.

3        Q.    Had you reviewed their policy related to shooting at

4    or from moving vehicles at any time before the shooting we're

5    here to talk about?

6        A.    Yes.

7        Q.    You are familiar with the policy?

8        A.    I am.

9        Q.    Have you reviewed it at all since the time of this

10   shooting?

11       A.    Yes.

12       Q.    Can you tell me what documents you've reviewed to

13   prepare for this deposition?

14       A.    I believe it's Lexipol policies 300.

15             I don't remember the subsection.

16       Q.    And in addition to that policy did you review other

17   documents like your statement or things like that related to

18   the case?

19       A.    Yes, I do.

20       Q.    Can you please tell me what else you've reviewed?

21       A.    The statement that was given to the Sheriff's

22   Department, belt recording, dispatch log, dispatch audio, and

23   video surveillance.

24       Q.    When did you give your statement in relation to the

25   date of the shooting?

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

Page 11

```
 1     A.   I believe it was maybe two weeks after.

 2     Q.   Do you recall the date of the shooting?

 3     A.   September 9, 2021.

 4     Q.   How many shots did fire?

 5     A.   Two shots.

 6     Q.   What type of weapon did you fire the shots from?

 7     A.   Glock-22, 40-caliber semiautomatic pistol.

 8     Q.   So you would have had to press the trigger

 9   essentially two times?

10     A.   Yes.

11     Q.   And were you shooting at a person?

12     A.   Yes.

13     Q.   And were you trying to shoot center mass?

14     A.   I wasn't aiming at that point.

15          It was more of a blank shoot.

16     Q.   Did you have a general understanding of what part of

17   the body you were pointing and shooting at?

18     A.   Yes.

19     Q.   What was your understanding at that point?

20     A.   Left side of the body.

21     Q.   You were trained obviously that shooting at someone

22   could cause serious injury or death?

23     A.   Yes.

24     Q.   Were you in uniform at the time?

25     A.   Yes.
```

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
Officer Nicholas Koahou on 10/10/2024

Page 12

1    Q.    How old are you now?

2    A.    40.

3    Q.    It may sound old when you turn 40, but at my age I

4    can tell you it's very young.

5    A.    Okay.  I'm feeling it.

6    Q.    What is your height and weight, currently?

7    A.    Six-feet, 240.

8    Q.    Was that about your weight at the time of the

9    incident in 2001?

10   A.    Sorry.  2021?

11   Q.    2021.  I'm sorry.

12   A.    That's about right.

13   Q.    Where was Mr. Harper when you first saw him?

14   A.    When I first saw Mr. Harper it was when he was

15   running from the vehicle that I was following.

16   Q.    Had you ever seen him before that day to your

17   knowledge?

18   A.    Never.

19   Q.    Did you know, for example, whether he had a criminal

20   history or not?

21   A.    I did not.

22   Q.    Did you have any information that he was armed with

23   a handgun?

24   A.    No.

25   Q.    Did you ever see a handgun on him at any time?

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

Page 13

1        A.    No.

2        Q.    Did you have any specific information that he was

3    under the influence of drugs or alcohol?

4        A.    No.

5              MR. TOUCHSTONE:  Well, Dale, I'm going to interpose

6    an objection.  Vague as to time.

7              Are you referring throughout the entire incident, or

8    when he first saw him?

9              MR. GALIPO:  When he first saw him.

10             MR. TOUCHSTONE:  Okay.  Go ahead.  I'm sorry.

11             THE WITNESS:  When I first saw him I did not.

12   BY MR. GALIPO:

13       Q.    Did you ever have any information specifically that

14   he was under the influence of drugs or alcohol?

15       A.    I suspected that he was once I deployed the Taser.

16       Q.    Did you shoot him because you thought he was under

17   the influence?

18       A.    No.

19       Q.    What was the general information you had at the time

20   regarding the call in the beginning?

21       A.    The general information was they saw a vehicle had

22   driven through a license plate later in the city.

23       Q.    And did you see this vehicle at some point?

24       A.    Yes, I did.

25       Q.    And what street was the vehicle on when you saw

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

Page 15

1    A.   Try to get over a wood panel fence which he failed

2    to do, and then I saw him pull several panels of that fence

3    down.

4    Q.   Do you have an estimate as to his age?

5    A.   He looked mid to late 20's.

6    Q.   Any estimate as to his height or weight?

7    A.   I believe about five-feet, eight inches maybe, and

8    weight it was average weight.

9    Q.   What did you see him do after you saw him pull some

10   of those portions down?

11   A.   He's -- through the hole and into a backyard on

12   Stoney Court.

13   Q.   Did he go out of your view at that time?

14   A.   Yes.

15   Q.   And how long was he out of your view until you saw

16   him again?

17   A.   Approximately five to ten seconds.

18        It wasn't very long.

19   Q.   And where was he when you saw him again?

20   A.   He emerged from the backyard of the address that he

21   ran to back out on Stoney Court.

22   Q.   Could you tell what race he was?

23   A.   He was a white male.

24   Q.   Did you ever see any weapons in his hands up to this

25   point?

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

Page 16

 1     A.   No.

 2     Q.   Did you have any information that he had physically

 3   injured anyone?

 4     A.   No, not at this point.

 5     Q.   What do you observe him do next?

 6     A.   He started to run out to San Bernardino Avenue which

 7   would have been a northeast direction.

 8     Q.   And were you following him at this point?

 9     A.   At this point I went back to my police car.

10     Q.   And then where did you see him go next?

11     A.   I didn't see him until I saw a black Honda on Nathan

12   Court [phonetic].

13     Q.   And how long altogether do you think he was out of

14   your view during that time frame?

15     A.   Approximately 45 seconds, maybe a minute.

16     Q.   And where was Mr. Harper when you saw him again?

17     A.   In the driver seat of a black vehicle on Nathan

18   Court.

19     Q.   And at some point did you approach that vehicle?

20     A.   Yes.

21     Q.   And did you approach it on the driver side,

22   initially?

23     A.   Yes.  From the south to the driver side, yes.

24     Q.   Did you see some other individuals other than

25   Mr. Harper around the car?

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
Officer Nicholas Koahou on 10/10/2024

Page 17

1    A.   Yes.

2    **Q.   And who did you observe?**

3    A.   I observed two Hispanic male adults that were inside

4    the vehicle appeared to be wrestling or fighting

5    Mr. Harper.

6    **Q.   Did you say anything to them at this point?**

7    A.   Yes.

8    **Q.   What did you say?**

9    A.   I was yelling for them to move and that I was going

10   to shoot.

11   **Q.   You were going to shoot who?**

12   A.   Mr. Harper.

13   **Q.   Did you have your gun out at this point?**

14   A.   My gun was in my hand, yes.

15   **Q.   And was Mr. Harper sitting in the driver's seat at**

16   **this point?**

17   A.   Yes.

18   **Q.   And were the other Hispanic individuals partially in**

19   **the car?**

20   A.   Yes.  They were -- yeah, they were in the cabinet.

21   **Q.   And it appeared like they were struggling with**

22   **Mr. Harper?**

23   A.   Correct.

24   **Q.   And you had your gun out, and you told them words to**

25   **the effect to move, you were going to shoot Mr. Harper?**

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
Officer Nicholas Koahou on 10/10/2024

Page 18

```
 1        A.   Yes.
 2        Q.   Did they move?
 3        A.   They did, yes.
 4        Q.   Where did they move to?
 5        A.   The male that was on the driver side moved back
 6   towards the front of the car, and the male that was in the
 7   passenger came around the front of the vehicle.
 8        Q.   Was the vehicle on or off at that point, if you
 9   know?
10        A.   It was on.
11        Q.   Did you tell the individuals to get off of the
12   street and out of the path of the vehicle?
13        A.   I don't recall.
14        Q.   Is that something that based on your training if you
15   were aware, you think you might have done, to tell them to
16   get out of the path of the vehicle if they were in front of
17   it with the engine on?
18        A.   I may have.  I was focused on Mr. Harper at that
19   point.
20        Q.   Were you concerned that Mr. Harper may try to take
21   off in the car?
22        A.   Yes.
23        Q.   So obviously, if he took off in the car, you
24   wouldn't want those other individuals to be in harm's way; is
25   it a fair?
```

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
Officer Nicholas Koahou on 10/10/2024

Page 19

```
 1    A.   That's fair.

 2    Q.   Did you say anything to Mr. Harper at that point?

 3    A.   I was ordering to get out of the vehicle and get on

 4  the ground.

 5    Q.   Is there an audio of the encounter that you're aware

 6  of?

 7    A.   Yes.

 8    Q.   Any body-worn camera footage that you're aware of?

 9    A.   We were not issued body-worn cameras at 2021.

10    Q.   Do you have them now?

11    A.   We do.

12    Q.   When did you get them, approximately?

13    A.   Maybe end of '22, beginning of '23.

14    Q.   Did you have some audio recording device

15  activated?

16    A.   I did.

17    Q.   And where was that on your person?

18    A.   On my tactical vest.

19    Q.   In additional to your firearm, you had a Taser?

20    A.   Yes.

21    Q.   Do you know what type of Taser it was?

22    A.   It was X26.

23    Q.   Did you also have pepper spray?

24    A.   Yes.

25    Q.   And did you have a police baton?
```

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

Page 21

```
 1      Q.   Did you know what gear the car was in at that

 2   time?

 3      A.   No.

 4      Q.   Was the car stationary or moving when you tased

 5   him?

 6      A.   Stationary.

 7      Q.   And the door was still opened?

 8      A.   Yes.

 9      Q.   And how far do you think you were from Mr. Harper

10   when you tased him?

11      A.   Approximately six to seven feet.

12      Q.   Where were you aiming on his person when you tased

13   him?

14      A.   Center of his chest.

15      Q.   Was he turned somewhat towards you at that time?

16      A.   Yes, he was.

17      Q.   If the front of the vehicle was 12 o'clock, was his

18   upper body more turned like 9 o'clock?

19      A.   That's fair, yes.

20      Q.   Could you tell if the probes struck him or not?

21      A.   Yes.

22      Q.   Did they appear to strike him?

23      A.   Yes.

24      Q.   And what did he have on his upper body?

25           Was it a shirt, or do you recall?
```

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

Page 22

```
 1     A.    I believe it was a white tank top.
 2     Q.    At least initially, did it look like the Taser was
 3  having some effect on him?
 4     A.    Yes.
 5     Q.    What did you see that led you to believe it was
 6  having some effect?
 7     A.    I saw his arm curl up in to this position, up to the
 8  chest.
 9     Q.    Did you ever see him trying to remove the probes?
10     A.    No.
11     Q.    Prior to tasing him did you warn him you were
12  going to tase him?
13     A.    No.
14     Q.    Did you look to see where these people were in
15  relation to the car before you tased him?
16     A.    I could catch them out of my peripheral vision to my
17  left.
18     Q.    And where did you see that they were when you looked
19  from your peripheral vision?
20     A.    It would have been behind me facing to the west.
21           They were behind me about at 8 o'clock position if
22  west is 12:00.  They were about just off to my left.
23     Q.    Did you have any training with respect to tactically
24  the advantages and disadvantages of tasing someone who is in
25  a motor vehicle that's on?
```

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
Officer Nicholas Koahou on 10/10/2024

Page 25

1     Q.    You believe it was in a gear other than park?

2     A.    The vehicle wasn't moving during this whole thing.

3           I don't know what gear it was in.

4     Q.    Did you ever make contact with the gear shift?

5     A.    Yes.

6     Q.    And did the vehicle move at some point after you

7     make contact with the gear shift?

8     A.    When I say contact gear shift, it was to pull

9     Mr. Harper's hands away, but yes it did start to move.

10    Q.    How long after you had contact with the gear shift

11    did the vehicle start to move?

12    A.    Almost immediately.

13    Q.    And did it start to move forward?

14    A.    Yes.

15    Q.    And how long after the vehicle started to move

16    forward did you fire your first shot?

17    A.    Less than a half second.  It was very quick.

18    Q.    Did you attempt when you sinced the vehicle was

19    starting to move forward, did you attempt to pull yourself

20    away from the vehicle?

21    A.    I did.

22    Q.    And what did you do to do that?

23    A.    I started to pull back, and my arm became trapped

24    Mr. Harper's chest.

25    Q.    Were your feet outside of the car at this time?

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

Page 26

1    A.    Yes.

2    Q.    And can you explain to me what you did to move

3    backwards?

4    Did you take a step back or just pull your weight

5    out of the car; can you explain that?

6    A.    I was starting to get pulled forward, and I remember

7    ripping myself back away from the car.

8    Q.    And when you did that was your gun still

9    holstered?

10    A.    It was.

11    Q.    Was the open door of the vehicle to your left?

12    A.    Yes.  It would have been on my left shoulder.

13    Q.    Did you give Mr. Harper a verbal warning that you

14    were going to shoot him at that point?

15    A.    Yes.

16    Q.    What did you say?

17    A.    I think I told him, "Don't do it, I'll shoot you,

18    I'll shoot you," and I think I said, "Stop, stop."

19    Q.    Have you recently listened to the recording?

20    A.    Yes.

21    Q.    Did you hear yourself saying words to that effect?

22    A.    Yes.

23    Q.    Do you know how far the car moved forward before you

24    fired your first shot, whether it was more or less than five

25    feet?

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

Page 27

1    A.   I believe it had gone about five feet, maybe,

2    probably half a car length to a car length.

3        Q.   Did you ever go to the ground at that point?

4    A.   No.  I never fell to the ground.

5        Q.   Did you have any visible injury on your body from

6    the car?

7    A.   No.

8        Q.   Did you ever look to see where those other

9    individuals were in relation to the car before you shot?

10   A.   No.  I knew they were behind me on the left.

11       Q.   Did you yourself ever see anyone standing directly

12   in front of the car immediately before you shot him?

13   A.   Directly in front of the vehicle, it's -- I knew

14   they were off to my left in the path of that vehicle, but

15   standing 12 o'clock dead center, no.

16       Q.   Did you ever see anyone get struck by the car?

17   A.   No.

18       Q.   Did you fire your two shots in rapid succession?

19   A.   Yes.

20       Q.   How far do you think your gun was from Mr. Harper's

21   body when you fired?

22   A.   I am not sure.  Six, seven feet, maybe, maybe a

23   little less.

24       Q.   Did you have the gun in one hand or two?

25   A.   One hand.

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
Officer Nicholas Koahou on 10/10/2024

Page 28

```
 1      Q.   Are you right-handed or left?

 2      A.   Right.

 3           MR. TOUCHSTONE:  Slow down for the court reporter.

 4   BY MR. GALIPO:

 5      Q.   Did you have the impression that your shots struck

 6   him from that close distance?

 7      A.   Given the distance, yeah, I believe so.

 8      Q.   As part of your training at Redlands, were you

 9   trained that shooting the driver of a vehicle could possibly

10   incapacitate the driver?

11      A.   Yes.

12      Q.   And were you trained that if the driver's

13   incapacitated, that could potentially endanger the public, to

14   have an incapacitated driver?

15      A.   That's possible, yes.

16      Q.   Did you at any time before you fired see a gun

17   either on Mr. Harper or in the car?

18      A.   No.

19      Q.   Did you see any knife or other weapon on Mr. Harper

20   or in the car?

21      A.   No.

22      Q.   Which way was Mr. Harper's upper body facing or

23   positioned when you fired your two shots?

24      A.   It would have been facing towards the steering

25   wheel, but his body was canted out of the open driver's
```

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

Page 29

1    door.

2        Q.    His body was canted somewhat to his left?

3        A.    Correct.

4        Q.    Were his hands on the steering wheel?

5        A.    I couldn't see.

6        Q.    Do you know where his hands were at the time you

7    fired?

8        A.    I never recalled seeing his hands past touching the

9    gear shift.

10        Q.    So your recollection is hands go to the gear shift,

11    you go to the gear shift to try to prevent the car from going

12    in gear, and shortly thereafter the car starts moving

13    forward, and within about half a second time you attempt to

14    remove yourself, and then you unholster and fire the two

15    shots.

16            Do I have the chronology correct?

17        A.    Sure.  That's about right.

18            It's my recollection.  It was very fast.

19        Q.    When you pulled out your firearm, do you know if the

20    car had started moving yet or not?

21        A.    The car was moving forward.

22        Q.    Okay.  And do you know at that point whether it was

23    moving at an idle speed or something else?

24            MR. TOUCHSTONE:  Vague as to idle.

25    BY MR. GALIPO:

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

Page 30

1    Q.    Do you know what I mean by idle speed?

2          In other words, if you put a car in gear, you know,

3    it might move at five miles-an-hour or so without hitting the

4    gas?

5    A.    It was accelerating forward.

6    Q.    Did any part of the car strike your body as it was

7    moving forward?

8    A.    Yes.

9    Q.    What part?

10   A.    The driver's door.

11   Q.    And how did the driver's door hit you?

12         Can you explain that, because I know it was to your

13   left; correct?

14   A.    Correct.

15   Q.    Can you explain how the door hit you.

16   A.    As I was starting to move forward and pulling away

17   from the vehicle, the acceleration of the car from standing

18   to accelerating forward caused the momentum of the door to

19   slam into my left side.

20   Q.    So the door started to close?

21   A.    Yeah.  It slammed on me.

22   Q.    Did the door actually close, or did it strike your

23   body so that it did not?

24         And when I mean close, close all the way.

25   A.    It struck the left side of me, and as I saw the car

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

Page 31

1    fleeing, the door was shut.

2        Q.    Did you fire your shots before or after the door

3    impacted you?

4        A.    Before.

5        Q.    Did you look to see where these other individuals

6    were as the car was moving forward?

7        A.    Once the car was moving forward, I couldn't see them

8    out of my peripheral vision.

9        Q.    But after you fired your two shots and after the

10   door impacted you as you described, did you then look to see

11   where they were?

12       A.    Yes.

13       Q.    And where were they?

14       A.    I was standing right next on them.

15       Q.    Standing -- I didn't hear the last part --

16       A.    I was standing -- I was standing right next to them.

17       Q.    Right next to them.

18             And I think you've already told me that you didn't

19   see the car strike any of them; is that correct?

20       A.    Correct.

21       Q.    Did you see any injuries on any of them that you

22   recall?

23       A.    I didn't see any injuries on them, no.

24       Q.    And then does the car goes where after you fired

25   your two shots?

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

Page 32

1    A.    The car accelerated in to the cul-de-sac, struck a

2    raised concrete curb, and lodged itself on San Bernardino

3    Avenue.

4    Q.    And your impression at this time is that most likely

5    Mr. Harper had been struck with either one of both of your

6    bullets?

7    A.    Yes.

8    Q.    And then did you then approach the vehicle at some

9    point?

10   A.    Yes.

11   Q.    And was Mr. Harper still in the driver seat?

12   A.    He had gotten out of the vehicle and was sitting on

13   the ground.

14   Q.    And did you observe any injuries on him?

15   A.    I saw that one of his fingers was I thought missing,

16   bloody, and when I rolled him over and put him in handcuffs,

17   I saw blood on his left --

18   Q.    His left foot?

19   A.    Left leg.

20   Q.    Left leg.  So his left leg, and then one of his

21   fingers appeared to maybe have been shot or missing?

22   A.    Correct.

23   Q.    Did you have any conversations with Mr. Harper at

24   that point?

25   A.    I just told him to roll over and put his hands

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
Officer Nicholas Koahou on 10/10/2024

Page 34

```
 1     A.    Sergeant B [phonetic].

 2     Q.    And was that just like a general statement of how

 3   many shots you fired and in which direction?

 4     A.    Yes.

 5     Q.    So we're going to try to put up -- I'll mark it as

 6   Exhibit 1 what I think is the policy from Redlands Police

 7   Department for shooting at or from moving vehicles.

 8           I think it's 300.4.1.

 9           (Exhibit 1 was marked for identification.)

10           MR. GALIPO:  We're going to try to see if we can put

11   it up so week all see it.

12           I think Jim may have a copy.

13           MR. TOUCHSTONE:  I do.

14           MR. GALIPO:  Thank you.  We'll look at this and take

15   our first break if that's okay.

16           MR. TOUCHSTONE:  Sounds good, Dale.

17           MR. GALIPO:  Okay.

18   BY MR. GALIPO:

19     Q.    Can you see this either on your screen or the

20   document you have in front of you or both?

21     A.    Yes.

22     Q.    Okay.  Is this the policy you were referring to

23   earlier, shooting at or from moving vehicles, 300.4.1?

24     A.    Yes.

25     Q.    And I just want to go through it a little bit.
```

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
Officer Nicholas Koahou on 10/10/2024

Page 35

1          The first sentence says, "Shots fired at or from a

2    moving vehicle are rarely effective and may involve

3    additional considerations and risks."

4          Do you see that sentence?

5      A.   Yes.

6      Q.   And was that part of the policy in effect for

7    Redlands at the time of the shooting incident?

8      A.   It may have been.

9      Q.   And was it also part of your training?

10     A.   Yes.

11     Q.   Then it says, "When feasible, officers should take

12   reasonable steps to move out of the path of an approaching

13   vehicle instead of discharging their firearm at the vehicle

14   or any of its occupants."

15          Do you see that sentence?

16     A.   Yes.

17     Q.   That was also part of the policy and part of your

18   training?

19     A.   Yes.

20     Q.   "An officer should only discharge a firearm at a

21   moving vehicle or its occupants when the officer reasonably

22   believes there are no other reasonable means available to

23   avert the imminent threat of the vehicle, or if deadly force

24   other than the vehicle is directed at the officer or others."

25          Do you see that, and then it references a government

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

Page 36

1    code section?

2         A.    Yes.

3         Q.    I think you've already told me you didn't see a gun

4    or anything in the car; is that true?

5         A.    Correct.

6         Q.    And do you believe you took steps to get out of the

7    path of the vehicle?

8         A.    Yes.

9         Q.    And what steps did you take to get out of the

10   path?

11        A.    When I was approaching the vehicle from San

12   Bernardino Avenue I never stood in front of it.  I made my

13   way to the driver side to prevent myself from standing in

14   front of the vehicle.

15        Q.    Okay.  And then you did reach into the car at some

16   point; correct?

17        A.    Correct.

18        Q.    But you tried to also pull yourself out of the

19   vehicle as well before you fired?

20        A.    Yes.

21        Q.    Do you believe any part of your body was in the car

22   at the time you fired?

23        A.    No.  Because I was getting pulled forward.

24        Q.    It sounds like you fired both of your shots before

25   the door struck you; is that correct?

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

Page 37

1    A.    Correct.

2    Q.    Okay.

3         MR. GALIPO:  We can take that Exhibit 1 down.

4         Okay.  We've been going for almost an hour.

5         Is this a good time, Jim and Jinna, to take like a

6    ten-minute break?

7         MR. TOUCHSTONE:  Sounds good.

8         (Recess taken.)

9    BY MR. GALIPO:

10   Q.    Are you ready to continue?

11   A.    Yes, sir.

12   Q.    Okay.  When you were approaching the black Honda,

13   did you ever see the reverse lights on?

14   A.    No.

15   Q.    Did you ever see the car reversing at all?

16   A.    Yes.

17   Q.    When did you see that?

18   A.    When I was south in my police car on San Bernardino

19   Avenue.

20   Q.    So you saw the reverse lights or the car reversing

21   while you were still in your car?

22   A.    No, sir.

23   Q.    Can you explain that part to me, please.

24   A.    I was south of the vehicle.  So the nose of the

25   vehicle would have been pointed towards me towards San

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
Officer Nicholas Koahou on 10/10/2024

Page 40

```
 1    A.   Correct.
 2    Q.   And it continued to be in stop all the way up until
 3  the time you reached in towards the gear shifter?
 4    A.   Correct.
 5    Q.   And then almost immediately after that, it merged or
 6  started to move forward?
 7    A.   Accelerated forward, yes.
 8    Q.   Do you know how long it had been stopped for?
 9         In other words, had it been stopped for like 30
10  seconds?
11         Do you have any estimate before it moved forward
12  again?
13    A.   My best estimate would be 15 to 20 seconds.
14    Q.   And when you reached in with your right hand, did
15  you grab Mr. Harper's arm or hand?
16    A.   I grabbed his hand.
17    Q.   And which hand of his did you grab?
18    A.   His right.
19    Q.   And was his right hand on the shifter at that
20  point?
21    A.   Yes.
22    Q.   And could you tell if the shifter moved after you
23  grabbed his hand?
24    A.   I just knew that the vehicle started to move
25  forward.
```

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

Page 41

1    Q.    Did you see the open door of the vehicle ever strike

2    the other people that were there?

3    A.    After it accelerated forward and hit me, I did not

4    see.

5    Q.    And you've heard of the concept of de-escalation?

6    A.    Yes.

7    Q.    And what does that mean to you, essentially?

8    A.    Preventing the use of deadly force, considering a

9    totality of the circumstances, preventing the use of deadly

10    force which I was attempting to do in this situation.

11    Q.    In other words, rather than escalate a situation to

12    deadly force, try to de-escalate it so you don't need to use

13    deadly force?

14    A.    Yes, sir.  Which I did.

15    Q.    And you've had training on the use of deadly force

16    probably starting back from the academy?

17    A.    Yes.

18    Q.    And were you trained that deadly force is the

19    highest level of force an officer can use?

20    A.    Yes.

21    Q.    And were you trained that deadly force is likely to

22    cause death or serious bodily injury?

23    A.    Yes.

24    Q.    And were you trained that deadly force should only

25    be used if there is an immediate or imminent threat of death

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

Page 42

1    or serious bodily injury?

2        A.    Yes.

3        Q.    When you went to the academy do you recall being

4    trained on deadly force there?

5        A.    I'm sure we did.  I don't remember the training,

6    though.

7        Q.    Do you generally recall that deadly force was

8    trained as a last resort, only to be used in the direst of

9    circumstances?

10       A.    Sure.

11       Q.    And do you recall being trained there that deadly

12   force should only be used when no other reasonable options

13   are available?

14       A.    Yes.

15       Q.    And do you recall being trained that a verbal

16   warning should be given before using deadly force when

17   feasible?

18       A.    Yes.

19       Q.    And do you recall being trained that you were

20   responsible to justify each shot?

21       A.    Correct.

22       Q.    Do you have training or have you had training that

23   in order to use deadly force, someone has to have the

24   opportunity, ability, and intent to immediately cause death

25   or serious bodily injury?

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

Page 43

```
1      A.    Yes.

2      Q.    Did you think based at the time based on your

3   training that you could shoot Mr. Harper merely for driving

4   away?

5      A.    Merely driving away, no.  He was an imminent threat

6   at that point.

7      Q.    And why based on your training could you not shoot

8   him merely for driving away if he wasn't an imminent threat

9   of death or serious bodily injury?

10     A.    It would go against PC 35.  You're not going to

11  shoot somebody for -- that's not a threat to the public,

12  myself, or bystanders.

13     Q.    And to use deadly force, your understanding is there

14  has to be an imminent or immediate threat?

15     A.    Yes.

16     Q.    And to use deadly force you understanding is the

17  threat has to be of death or serious bodily injury?

18     A.    Correct.

19     Q.    Did you think tactically when you were trying to

20  reach into the car, you could potentially be putting yourself

21  at risk?

22     A.    I was assessing the situation tactically from the

23  beginning, the totality of the circumstances.

24          I needed to stop the threat, yes.

25     Q.    So I get that part.  But maybe you've answered it.
```

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
Officer Nicholas Koahou on 10/10/2024

Page 44

1          Did you think you were potentially putting yourself

2    at risk by reaching into the car?

3          A.   Is there a risk of it, yes.

4          There could be risks of getting hurt, but that's my

5    job.

6          Q.   Were you trying to avoid getting into the car

7    completely when you were on the side of it?

8          A.   Yes.  And that's why I utilized the Taser.

9          Q.   And it sounds like when you used the Taser from six

10   or seven feet away, there was some separation between you and

11   Mr. Harper at that time?

12         A.   Yes.

13         Q.   And was that about the same distance you were when

14   you fired your shots?

15         A.   It could have been within -- it was probably

16   closer.

17         Q.   Maybe a foot closer?

18         A.   I would say a little bit closer, yes, sir.

19         Q.   I take it if the vehicle had driven away, let's just

20   say hypothetically it had driven away, and there was not an

21   immediate threat, you would then have called over your radio

22   to alert other units?

23         A.   That's fair, yes.

24         Q.   What broadcast had you made over the police radio

25   during the incident that you can recall?

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

Page 47

```
 1    A.    No.  The door -- I'm sorry, the door is shut.

 2          The vehicle accelerated away from me.

 3    Q.    Can you give me an idea as to how far the car moved

 4    forward until it came to a stop again after the shooting?

 5    A.    It hit the curb and lodged in to the San Bernardino

 6    Avenue and continued to the west a couple hundred feet.

 7    Q.    Were you ever moving alongside the car as it was

 8    moving forward?

 9          In other words, walking or running with the car?

10    A.    Yes.  Because my arm was trapped by Mr. Harper's

11    arm.

12    Q.    How many steps do you think you took with the car?

13    A.    I would say maybe a car length worth.

14    Q.    Are you saying that your arm was inside the car when

15    you fired your shots?

16    A.    No.  As I was pulling away from Mr. Harper where I

17    had the arm trapped, that's when I was pulling my firearm

18    out.  I was still moving forward with the vehicle and

19    starting to lose my balance.

20    Q.    So you pulled your arm free before you fired?

21    A.    Correct.

22    Q.    You didn't smell any alcohol or drugs on Mr. Harper,

23    did you?

24    A.    I don't recall smelling any.

25    Q.    Do you recall who the next officer on-scene was?
```

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

Page 49

```
 1     A.   No.

 2     Q.   Did you have any understanding where backup was when

 3   you approached the black Honda initially when it was --

 4     A.   I didn't.  I don't know where they were.

 5     Q.   Have you seen like a surveillance video of some of

 6   the incident from a distance?

 7     A.   The incident referring to -- I'm sorry.

 8     Q.   I'm sorry.  Let me be more specific.

 9          The shooting part of the incident?

10     A.   Yes.

11     Q.   Do you recall at the end of your interview them

12   going through the surveillance video with you?

13     A.   Yes.

14     Q.   Did you have any physical injuries related to this

15   incident?

16     A.   No.

17     Q.   Okay.

18          MR. GALIPO:  Jim, why don't we take our last break,

19   maybe ten-minutes.  I'm pretty sure I'll finish by 4:00.

20          Just going to talk to my colleagues and look at my

21   notes.

22          MR. TOUCHSTONE:  All right.  Sounds good.

23          MR. GALIPO:  Okay.  Thank you.

24          (Recess taken.)

25   BY MR. GALIPO:
```

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
Officer Nicholas Koahou on 10/10/2024

Page 50

1    Q.   As you were approaching the black Honda on foot, did

2    you see one of the Hispanic males having a headlock on the

3    driver?

4    A.   Yeah.  It looked like he was fighting with the

5    driver.

6    Q.   And did you see the Hispanic male having the driver

7    in a headlock?

8    A.   Yes.  It's what it appeared.

9    Q.   And when you were telling the people to get out of

10   the way and saying you're going to shot, I'm taking it you

11   wanted to make sure they didn't get shot?

12   A.   That was my intention, was to get them out of the

13   way in case Mr. Harper turned the vehicle in to my path of

14   travel, to get them away and not have to -- if I did have to

15   shoot which I didn't want to, I didn't want to hit them

16   inadvertently through the glass.

17   Q.   And were you concerned that even shooting through

18   the glass, bullets can ricochet and the glass could

19   inadvertently strike them?

20   A.   That's a concern, yes.

21   Q.   Which way was the front of the black Honda facing

22   direction wise when it was at the curb?

23   A.   It was facing south.

24   Q.   And when you were firing, were you firing south,

25   southwest?

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

Page 52

1    Q.    I take it with respect to your training, you got

2    considerations for the safety of yourself and other officers,

3    the safety of the community, but also the safety of the

4    suspect?

5    A.    Correct.  That's correct.

6    Q.    And usually, the goal is to try to de-escalate a

7    situation and use the minimal amount of force if you can?

8    A.    Yes.

9    Q.    Did you ever see the front wheels of the vehicle

10   turning to the right or left as it was pulling away?

11   A.    As I was pulling away, no, because I was being

12   dragged forward, and -- yeah, I was being dragged forward at

13   that point so I didn't have view of the tires.

14   Q.    Okay.

15          MR. GALIPO:  I think that's all I have, Jim.

16          I don't know if you have any follow-up questions

17   today.

18          MR. TOUCHSTONE:  No questions.

19          MR. GALIPO:  All right.

20          And Jinna, do you need any spellings?

21          I know there were a lot of street names.  We can

22   send you a report if that will help you with the names of the

23   streets.

24          COURT REPORTER:  That will be good.  Thank you.

25          (Deposition proceeding concluded at 3:50 p.m.)

**JUSTIN CODY HARPER vs CITY OF REDLANDS, ET AL.**
**Officer Nicholas Koahou on 10/10/2024**

```
 1                    CERTIFICATE

 2                        OF

 3          CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5          I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6   Stenographic Shorthand Reporter of the State of California,

 7   do hereby certify:

 8          That the foregoing proceedings were taken before me

 9   at the time and place herein set forth;

10          That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12          That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15          Further, that the foregoing is an accurate

16   transcription thereof.

17          I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21          IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  October 10, 2024.

23
                         _____
24
                         Jinna Grace Kim, CSR No. 14151
25
```