# EXHIBIT 2

```
 1              UNITED STATES DISTRICT COURT FOR THE
 2                 CENTRAL DISTRICT OF CALIFORNIA
 3                           --o0o--
 4
 5   JUSTIN CODY HARPER,              CASE NO.:
                                      5:23-cv-00695 SSS (DTBx)
 6            Plaintiff,
 7   vs.
 8   CITY OF RELANDS, REDLANDS
     POLICE DEPARTMENT, POLICE
 9   OFFICER KOAHOU, and DOES 1
     through 10, Inclusive,
10
              Defendants.
11   _____/
12
13
14
15
16       VIDEOTAPED DEPOSITION OF JUSTIN CODY HARPER
17                   VACAVILLE, CALIFORNIA
18                    OCTOBER 23, 2024
19
20
21
22
23
24   REPORTED BY:  CARI L. GONZAGA, CSR NO. 12401
25   FILE NO.:  6932631
```

Page 1

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT FOR THE |
| 2 | CENTRAL DISTRICT OF CALIFORNIA |
| 3 | --o0o-- |
| 4 | |
| 5 | JUSTIN CODY HARPER,         CASE NO.: |
|   |                             5:23-cv-00695 SSS (DTBx) |
| 6 |       Plaintiff, |
| 7 | vs. |
| 8 | CITY OF RELANDS, REDLANDS |
|   | POLICE DEPARTMENT, POLICE |
| 9 | OFFICER KOAHOU, and DOES 1 |
|   | through 10, Inclusive, |
| 10 | |
|    |       Defendants. |
| 11 | _____/ |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 |       Deposition of JUSTIN CODY HARPER, taken on |
| 21 | behalf of the Defendants, at California State Prison |
| 22 | Solano, 2100 Peabody Road, Vacaville, California 95687, |
| 23 | commencing at 10:41 a.m., Wednesday, October 23, 2024, |
| 24 | before Cari L. Gonzaga, CSR No. 12401. |
| 25 | |

```
 1        Q    Did you recognize the truck?
 2        A    No, not at all.  I recognized the guy in the
 3   driveway though when he was trying to grab me out,
 4   uh-huh.
 5        Q    Okay.  So you got the guy from the garage on
 6   the passenger side; the hit-and-run guy was on the
 7   driver's side; is that right?
 8        A    Yes.
 9        Q    And you knew they wanted you out of the car;
10   is that correct?
11        A    Yes.
12        Q    Did the hit-and-run guy ever make physical
13   contact with you?
14        A    Yes.
15        Q    And when did that happen?
16        A    When he was trying to yank me out of the car.
17        Q    Was that after you had accidentally unlocked
18   the doors?
19        A    Yes.
20        Q    Did he punch you?
21        A    I don't remember.  I just remember them
22   yanking on me.  I felt like I was getting choked and
23   tried to pull out from both sides, so I don't really
24   know.
25        Q    So the garage guy also opened the door?
```

Page 42

```
 1      A    Yes.
 2      Q    Did the garage guy get into the passenger's
 3  seat?
 4      A    I don't think so.  I think he was just trying
 5  to pull me out from that side.
 6      Q    So not counting the officer, there were two
 7  guys that were trying to get you out of the Honda; is
 8  that correct?
 9      A    Yes.  The officer showed up after.
10      Q    When the doors got unlocked, were you already
11  out of the driveway?
12      A    Yes.
13      Q    And were you already in drive?
14      A    When I was in the driveway or when I was in
15  the street?
16      Q    Yeah, when you got -- so you pulled out of the
17  driveway, and then the doors get unlocked after you were
18  out of the driveway, right?
19      A    No, I was in the street.  It wouldn't go
20  anywhere.
21      Q    Is that because you couldn't get it in gear?
22      A    I don't know, I was pushing buttons.  It
23  wouldn't go in gear.  It wouldn't go.  I think it was in
24  gear.  It just wasn't going, maybe a key fob or I
25  couldn't tell you.
```

Page 43

```
1        Q    So, at any point, were you able to make the
2   vehicle go forward after pulling out of the driveway?
3        A    No.
4        Q    So did the vehicle stay in reverse the entire
5   time?
6        A    I don't think it did.  I tried to put it in
7   drive, and it wouldn't go.
8             MS. TERRELL:  Counsel, just vague as to time.
9   I know you're chronologically doing it, as I understand
10  it, so you're talking about when those two individuals
11  are at the vehicle?
12            MS. ROCAWICH:  Well, I'm talking about at any
13  point now.  He's saying he never got the vehicle to move
14  forward.
15            THE WITNESS:  I said I put it in drive and it
16  wouldn't go.  I think when he was trying to pull me out
17  of the vehicle, he might have dropped the key fob.  I
18  don't know why it went.  It was a new car.  You never
19  know.
20  BY MS. ROCAWICH:
21       Q    So you got in the car in the driveway --
22       A    Yes.
23       Q    -- you pulled out of the driveway --
24       A    And I tried to put it into drive and it
25  wouldn't go forward.
```

Page 44

1  the car?
2       A    They're both yanking on me from both sides.
3  I'm getting choked.  I don't even know what's going on.
4       Q    Which of the two guys was choking you?
5       A    The second vehicle, the truck.
6       Q    Okay.  While the guy was in the passenger's
7  seat with you, was the Honda moving?
8       A    No.
9       Q    Do you know why that guy in the passenger's
10 seat let go of you?
11      A    The guy in the passenger's seat?  The guy in
12 the driver's seat that owned the truck had a hold of me.
13      Q    The guy in the passenger's seat didn't have a
14 hold of you?
15      A    He was trying to grab me at the same time, but
16 we were talking about the second guy in the truck
17 choking me.
18      Q    So the garage guy, at some point, let go of
19 you; is that correct?
20      A    Yes, and the cops showed up.
21      Q    And then the hit-and-run guy also let go of
22 you at some point; is that correct?
23      A    On the cop's command, yes.
24      Q    What did you hear the cop say?
25      A    Telling everybody to get out of their vehicle.

Page 47

1    never put me face down.
2        Q    No, I'm saying as the officer is coming up to
3    the Honda, he tells the guys to get out, they let go of
4    you.
5             Did the officer tell you to get face down
6    before shooting you?
7        A    Get face down.  I wasn't out of the car.
8    You'd say, Get out of the car.  You wouldn't say, Get
9    face down.
10       Q    Okay.  Did the officer ever tell you he was
11   going to shoot you if you didn't get out of the car?
12       A    I think so.
13       Q    Do you remember how many times?
14       A    Maybe once or twice -- twice.  He might have
15   ordered them and me.  I don't know.  I remember him
16   saying something like that, Get out, or he's going to
17   shoot.
18       Q    Prior to the shooting, you didn't get out of
19   the car though; is that correct?
20       A    No.
21       Q    And that's because you were scared that you
22   were going to get hurt if you got out of the car?
23       A    Yes.
24       Q    As the officer came up to the Honda, was the
25   driver door open or closed?

Page 50

```
 1        Q    At what point did you try to surrender?
 2        A    Once I thought they were going to shoot me, I
 3   didn't really know if they were or not.
 4        Q    Did you try and surrender before or after you
 5   were tased?
 6        A    Before.
 7        Q    And when you say you tried to surrender, what
 8   did you do?
 9        A    I told them I was ready to get out of the
10   vehicle.
11        Q    Did you let go of the steering wheel?
12        A    Yes.
13        Q    And where were your hands, at that point, when
14   you let go of the steering wheel and said you're ready
15   to give up and get out of the vehicle?
16        A    I put them up.
17        Q    So when you were tased, you were no longer
18   holding onto the steering wheel, and your hands were up;
19   is that accurate?
20        A    Yes.
21        Q    Do you know at the time you were tased,
22   whether the Honda was in park or drive?
23        A    When I pulled out in reverse, I put it in
24   drive but it wasn't going.
25        Q    Was the emergency brake on?
```

Page 53

```
 1       A    No, I don't think so.  It wasn't.
 2       Q    So was the car stopped when you were tased?
 3       A    Yes.
 4       Q    And where were those other two guys that had
 5  been fighting with you when you were tased?
 6       A    The cop ordered them to get out of the
 7  vehicle, and I'm pretty sure they were right by the
 8  sidewalk or on the sidewalk.  I wasn't looking at them,
 9  so...
10       Q    And, at some point, you hit the accelerator;
11  is that correct?
12       A    Yes.
13       Q    And is that while you were still being tased
14  or immediately after?
15       A    It was immediately after being tased.
16       Q    How long was the taser actually shocking you?
17       A    I don't know.
18       Q    Would you say less than five seconds?
19       A    Maybe like five, ten seconds, five seconds
20  because I took off as soon as they shot me with the
21  taser gun.
22       Q    Where did the dart, the taser dart hit you?
23       A    I don't know.
24       Q    Do you remember having them removed at the
25  hospital?
```

Page 54

```
 1        A    No.
 2        Q    Did you have any marks on any part of your
 3   body besides the obvious?
 4        A    Well, on this side of my body, my leg was
 5   broken, my fingers were shot, so I went through two
 6   surgeries.  It took a while.  I didn't wake up for a
 7   while.
 8        Q    Okay.  So besides the gunshot wounds, did you
 9   have any kind of other wounds to your body?
10        A    I don't know, Miss.  I was in and out --
11             MS. TERRELL:  No more questions.
12             Next question.
13   BY MS. ROCAWICH:
14        Q    So you said you were tased, and then you hit
15   the accelerator; is that correct?
16        A    Yes.
17        Q    And then you were shot after hitting the
18   accelerator; is that correct?
19        A    Yes.
20        Q    Did the car move forward when you hit the
21   accelerator?
22        A    Yes.
23        Q    And where was the cop when that happened?
24        A    On the side of the vehicle.
25        Q    Was he still touching you?
```

Page 55

```
 1      A    When he shot me?
 2      Q    Yes, did he have one hand on you, or did he
 3  have both hands on his gun?
 4      A    Both hands were on the gun, but I know he --
 5  well, actually, they had to have both hands on their
 6  gun, so yeah.
 7      Q    Would you agree that a car can be used to
 8  injure someone?
 9      A    Yes.
10      Q    And then if you get run over by a car, you
11  could be seriously injured?
12      A    Yes.
13      Q    Or maybe even killed?
14      A    Yes.
15      Q    So immediately before you were shot, the
16  officer was being, kind of, dragged along the car as you
17  started driving; is that correct?
18           MS. TERRELL:  Misstates the testimony about
19  being dragged.
20           Go ahead.
21           THE WITNESS:  About what?
22  BY MS. ROCAWICH:
23      Q    Was the officer being dragged?
24      A    No.
25      Q    And you said you never layed hands on the
```

Page 56

```
 1   officer; is that correct?
 2       A   No.
 3       Q   And as you were accelerating after the
 4   shots -- strike that.
 5           As you were accelerating but before the shots,
 6   did you see those two guys that had been fighting with
 7   you?
 8       A   No.
 9       Q   Did you see anybody directly in front of the
10   car?
11       A   No.
12       Q   As you were accelerating, did you see anyone
13   jump out of the way as you started moving forward?
14       A   No.
15       Q   After being shot, how far did you drive the
16   car?
17       A   I don't know, a good hundred yards, couple
18   hundred yards, probably.  Went down the road and crashed
19   and drove a little bit more.
20       Q   So you were on a cul-de-sac, we establish,
21   right?
22       A   Yes.
23       Q   Did you hop that curb and then get back on San
24   Bernardino?
25       A   It crashed into the curb, yeah.
```

Page 57

1     Q    So even after you weren't still shocked, you
2 were still pressing the accelerator; is that correct?
3     A    No, it was driving slowly down the road, and
4 then it stopped.
5     Q    So you got tased and then you got shot and
6 then you said the car was moving slowly towards San
7 Bernardino?
8     A    It went fast and hit the court and it crashed
9 and it started rolling.  It didn't accelerate anymore
10 after that.
11    Q    So when it was going fast, was that after you
12 were shot?
13    A    Yes.
14    Q    And you weren't being shocked anymore by the
15 taser; is that correct?
16        MS. TERRELL:  Do you understand the question?
17        THE WITNESS:  No.
18 BY MS. ROCAWICH:
19    Q    So you were shocked by the taser which you
20 said forced you to accelerate; is that true?
21    A    Yes.
22    Q    And then you continued to accelerate even
23 after you were no longer being tased; is that correct?
24    A    Yes.  Do you know how many houses are on that
25 bluff?

```
 1    BY MS. ROCAWICH:
 2         Q    Were you trying to get away from the officer?
 3         A    Yeah and no.
 4         Q    Okay.  Why yes and why no?
 5         A    Because when they tased me, there's only like
 6    a little bit of a block left, I don't even remember, and
 7    then it crashes, hit the curb, and the airbag goes off,
 8    boom, and then I'm just rolling down the street.
 9         Q    So the airbag went off when you hit the end of
10    the cul-de-sac; is that correct?
11         A    Yes.
12         Q    Do you have any idea how fast you were going
13    when you hit the curb?
14         A    No, I do not.
15         Q    And the car came to a stop on San Bernardino;
16    is that correct?
17         A    Yes.
18         Q    Did you get out of the car on your own, or did
19    an officer pull you out?
20         A    I think I got out on my own.
21         Q    Did you fight with the officers when you got
22    out of the car?
23         A    What do you mean like attacked them or?
24         Q    Did you touch any officer when you got out of
25    the car?
```

Page 60

```
 1                    REPORTER'S CERTIFICATE
 2
 3           I, CARI L. GONZAGA, CSR No. 12401, Certified
 4   Shorthand Reporter, certify:
 5           That the foregoing proceedings were taken
 6   before me at the time and place therein set forth, at
 7   which time the witness was put under oath by me;
 8           That the testimony of the witness, the
 9   questions propounded, and all objections and statements
10   made at the time of the examination were recorded
11   stenographically by me and were thereafter transcribed;
12           That the foregoing is a true and correct
13   transcript of my shorthand notes so taken.
14           I further certify that I am not a relative or
15   employee of any attorney of the parties, nor financially
16   interested in the action.
17           I declare under penalty of perjury under the
18   laws of California that the foregoing is true and
19   correct.
20
             Reading and signing was requested.
21
22           Dated this 27th day of November, 2024.
23
                    [signature: Cari Watkers-Drewry]
24           CARI L. GONZAGA, CSR NO. 12401
25
```

Page 80