UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JUSTIN CODY HARPER,              )
                                 )
         Plaintiff(s),           )
                                 )
   vs.                           ) Case No.
                                 ) 5:23-cv-00695-SSS-DTBx
CITY OF REDLANDS, REDLANDS       )
POLICE DEPARTMENT, POLICE        )
OFFICER KOAHOU, and DOES         )
1-10,                            )
                                 )
         Defendant(s).           )
_____)

**CERTIFIED COPY**

REMOTE PROCEEDING

DEPOSITION OF:   COREY GUERRA
TAKEN BY     :   JAMES R. TOUCHSTONE, ESQUIRE
Commencing   :   1:10 P.M.
Location     :   Rancho Cucamonga, California  91739
Day, Date    :   Monday, August 19, 2024
Reported by  :   JOLYNE K. ROBERTS, CSR NO. 10823
JOB No.      :   24-141097B



SG THE SULLIVAN GROUP OF COURT REPORTERS
SULLIVANCOURTREPORTERS.COM
PHONE 562.888.6488

```
 1   please?
 2       A     We have a toolbox, built-on toolbox on our work
 3   truck, and one of the bottom boxes was completely
 4   destroyed, and the door had fallen off.
 5       Q     And anything else you recall about the damage to
 6   your vehicle that was caused by that traffic collision?
 7       A     A few scuffs, marks, paint damage.  Standard
 8   stuff, bumper damage.  It ended up resulting in our truck
 9   being salvaged.  They had to total our truck.
10       Q     I see.  And when that traffic collision
11   occurred, were you yourself injured in any way?
12       A     No, sir.
13       Q     To your knowledge, was Mr. Garcia injured
14   physically in any way?
15       A     Not that I'm aware of, no.
16       Q     Okay.  And what occurred after that traffic
17   collision with respect to yours and Mr. Garcia's actions?
18       A     We were pausing right after contact to see if
19   they were going to stop, the other driver, in which case
20   he did not.  He kept going.
21             And shortly thereafter an officer had made the
22   same turn and kind of looked up as to where did he go?
23   So we pointed the direction he went.
24             I had seen the driver make a right on a street,
25   and at that point we turned around and tried to go at
```

```
 1  get it back.
 2      Q    Okay.  Next sentence in your statement or your
 3  summary of your interview states:
 4           Guerra saw the black wheels -- strike that.
 5           Your statement says:
 6           Guerra saw the back wheels of the
 7           Honda were locked, and the front
 8           wheels of the Honda were spinning,
 9           creating a loud screeching noise.
10           Do you recall seeing the Honda with the tires
11  screeching and turning, front tires?
12      A    I do.
13      Q    Your next statement says:
14           Guerra believed the Honda's emergency
15           brake was activated.
16           Is that a conclusion you drew based on your
17  observations of the front wheels of the Honda that were
18  turning and screeching loud and the back wheels being
19  locked?
20      A    Yes.
21      Q    And in your experience where people engage an
22  emergency brake on a vehicle, is it your understanding
23  it's usually the back wheels which are locked up or where
24  the emergency brake is applied?
25      A    Yes, on a front wheel drive car, definitely.
```

22

```
 1           Nathan Court.
 2           Again, I assume that you were not exactly
 3   familiar with the address descriptions of the homes there
 4   on Nathan Court, but it would be fair to say that you saw
 5   the black Honda reverse out of the driveway where it was
 6   initially parked into the cul-de-sac area in front of
 7   another home?
 8       A   That's correct, yes.
 9       Q   And can you estimate the speed for me of how
10   quickly the Honda was backing into the cul-de-sac area at
11   that time?
12       A   Not very quickly.  The back tires were still
13   locked up.  So it was under 5 miles an hour.
14       Q   All right.  Now, with those back tires being
15   locked up, did you observe the rear end of the Honda,
16   like, bouncing or anything like that?
17       A   Maybe a little bit.  I couldn't tell you for
18   sure.
19       Q   All right.  But it was backing up relatively
20   slowly as it was going in reverse out of that initial
21   driveway that you observed the Honda in; is that correct?
22       A   Yes, sir.
23       Q   All right.  And as it got out into the
24   cul-de-sac, were you able to observe where Mr. Salazar
25   was at that point in time?
```

24

```
 1   to the vehicle, can you describe for me your location as
 2   far as distance from the Honda Accord and whatever the
 3   closest point on the vehicle was to you?
 4       A    I believe at that point once I had waved him
 5   over, he ran directly by me within -- within inches.  And
 6   I must have been 25 feet from the car.  I was still in
 7   the cul-de-sac, so I bet that's probably a 35-foot radius
 8   cul-de-sac.  So I bet I was 25 to 30 feet from the
 9   vehicle.
10       Q    Okay.  And if you were to reach your hand out,
11   what would be the closest part of the Honda that you'd be
12   able to touch?
13       A    The driver's side headlight for sure.
14       Q    Okay.  And when you saw Officer Koahou -- I take
15   it he was running towards the Honda?
16       A    Absolutely.
17       Q    As he was running towards the Honda, did you see
18   him have any weapons in his hands?
19       A    He had a Taser.
20       Q    Okay.  And you're clear it was a Taser and not a
21   firearm?
22       A    Yes, it was a bright color, yellow, I believe.
23            MR. TOUCHSTONE:  All right.  I'm going to play
24   an additional portion of the recording, this is 4 minutes
25   and 30 seconds, and I'll pause it in a certain period of
```

32

```
 1   3 seconds in the video.  See the individual in the brown
 2   shirt how he walked from the passenger side of the
 3   vehicle across the front bumper of the Honda?
 4       A    Yes, I do.
 5       Q    Do you have any recollection of seeing somebody
 6   standing in front of the front bumper of the Honda?
 7       A    Not directly, no.
 8            MR. TOUCHSTONE:  I'm going to continue playing
 9   from 3 seconds forward now.
10                      [Video playing]
11       Q    BY MR. TOUCHSTONE:  Were you able to hear the
12   audio of a clicking noise?
13       A    Can you do that one more time?  I didn't hear.
14   There was a buffering going on.
15            MR. TOUCHSTONE:  Oh, okay.  Let me try it again.
16   I'm going back to 5 seconds and play Exhibit 3 from 5
17   seconds forward.
18                      [Video playing]
19       Q    BY MR. TOUCHSTONE:  Now pausing at 10 seconds.
20   Did you hear a click?
21       A    I did hear a click, yes.
22       Q    Is that consistent with the noise of the Taser
23   that you heard on the day of the incident?
24       A    Very similar, yes.
25            MR. TOUCHSTONE:  All right.  Going to continue
```

39

1    A    I believe so, yes.
2    Q    So it's fair to say that you heard two shots
3  that occurred very quickly in time on the day of the
4  incident from the police officer, true?
5    A    True.
6    Q    And at the time that those shots were being
7  fired at that vehicle, the Honda was moving forward?
8    A    I don't remember it moving forward at the time,
9  but it was very, very fast.
10   Q    Okay.  At some point in time do you recall
11 seeing the Honda accelerate forward and ultimately go
12 over the curbline there at Nathan Court?
13   A    Yes, I recall that very well.
14   Q    Now, I want to take you back to your statement,
15 and I'm now looking at page 2 of 3, the second paragraph
16 from the bottom.  Starts with, Guerra heard Koahou order
17 Harper to stop.
18   A    I have it.
19   Q    Guerra heard Koahou order Harper to
20        stop, or he would be Tased, and
21        immediately heard multiple "clacking
22        sounds" -- and that's in quotes.
23        The Honda's rear wheels were still
24        locked, and the front wheels were
25        continuing to spin.  Guerra believed

41

```
 1        A     In my opinion, that was a possibility.
 2        Q     All right.  I don't -- well, actually, couple
 3   more questions.
 4              Were you physically injured on the day of the
 5   incident in any way?
 6        A     No, sir.
 7        Q     To your knowledge, was Mr. Garcia physically
 8   injured on the day of the incident in any way?
 9        A     No, sir, not to my knowledge.
10        Q     And have you ever had any negative contacts with
11   Redlands Police Department?
12        A     No, sir.
13              MR. TOUCHSTONE:  I have no further questions at
14   this time, Mr. Guerra.  I would propose we take a brief
15   ten-minute break.  Mr. Terrell may have some questions
16   for you.  This will allow all of us to take a quick
17   breather.
18              MR. TERRELL:  Thank you.
19              MR. TOUCHSTONE:  So we'll come back on at 2:18.
20      [Break in proceedings from 2:08 P.M. to 2:22 P.M.]
21              MR. TOUCHSTONE:  Back on the record.
22              Mr. Guerra, before the break I had indicated I'm
23   done with my questions at this point in time.  I believe
24   Mr. Terrell may have some questions for you.
25              THE WITNESS:  Okay.
```

49

```
 1                    CERTIFICATE OF

 2              CERTIFIED SHORTHAND REPORTER


 3
             The undersigned Certified Shorthand Reporter of
 4   the State of California does hereby certify:
             That the foregoing proceeding was taken before
 5   me at the time and place therein set forth, at which time
     the witness was duly sworn by me;
 6           That the testimony of the witness and all
     objections made at the time of the examination were
 7   recorded stenographically by me and were thereafter
     transcribed, said transcript being a true and correct
 8   copy of my shorthand notes thereof;
             That the dismantling of the original transcript
 9   will void the reporter's certificate.

10           In witness thereof, I have subscribed my name

11   this date:  August 27, 2024

12

                        [signature: Jolyne K. Roberts]
13
                        _____
14
                        JOLYNE K. ROBERTS,
15                      CSR NO. 10823

16

17

18

19

20

21
             (The foregoing certification of
22           this transcript does not apply to any
             reproduction of the same by any means,
23           unless under the direct control and/or
             supervision of the certifying
24           reporter.)

25
```